IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ALOHA SPORTS INC., a Hawaii corporation, | ) | CIVIL NO. CV04-000204 DAE/KSC |
| | ) | |
| Plaintiff, | ) | MEMORANDUM IN SUPPORT OF |
| | ) | MOTION |
| vs. | ) | |
| | ) | |
| THE NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION, an unincorporated association, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

DEFENDANT NCAA'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

140322.1

# TABLE OF CONTENTS

PAGE(S)

BACKGROUND UNDISPUTED FACTS .............................................................. 1

STANDARD FOR SUMMARY JUDGMENT ....................................................... 4

ARGUMENT ............................................................................................................. 5

I.    ASI'S BREACH OF CONTRACT CLAIMS FAIL AS A MATTER
      OF LAW .......................................................................................................... 5

      A.    ASI's breach of contract claim for the Seattle Bowl is without
            merit .................................................................................................... 5

      B.    ASI's breach of contract claim for the Aloha Bowl is without
            merit .................................................................................................... 9

II.   ASI'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A
      MATTER OF LAW ....................................................................................... 11

      A.    ASI's intentional interference with contract claim is without
            merit .................................................................................................. 11

      B.    ASI's tortious interference with prospective business advantage
            claim is without merit ...................................................................... 14

III.  ASI'S ANTITRUST CLAIMS FAIL FOR FAILURE TO BEAR ITS
      BURDEN UNDER SECTION 1 OF THE SHERMAN ACT ..................... 16

      A.    The NCAA's postseason football reimbursement rules must be
            reviewed under the Rule of Reason .................................................. 16

      B.    ASI has not defined a relevant market. ............................................ 18

      C.    ASI cannot show an adverse effect on competition ......................... 23

      D.    The NCAA had ample procompetitive justifications for the
            postseason reimbursement rule ........................................................ 25

IV.   ASI'S CLAIMS UNDER HRS § 480 FAIL AS A MATTER OF
      LAW .............................................................................................................. 28

      A.    Hawaii Revised Statute § 480-4 is modeled after the federal
            antitrust laws and ASI's claims under HRS § 480-4 should be
            dismissed for ASI's failure to meet its burden of proof under the
            rule of reason .................................................................................... 28

**TABLE OF CONTENTS (Continued)**

PAGE(S)

B.  ASI lacks standing to bring claims under HRS § 480-2 and has further failed to show any injury to its business or property to bring a claim under HRS § 480-2.......................................................... 29

    i.  Deceptive practices claims under HRS § 480-2 ..................... 30

    ii. Unfair competition claims under HRS § 480-2 ...................... 30

V.  CONCLUSION........................................................................................ 34

# TABLE OF AUTHORITIES

## CASES

Adidas America, Inc. v. NCAA,
    64 F. Supp. 2d 1097 (D. Kan. 1999)...................................................... 19, 21

Ai v. Frank Huff Agency, Ltd.,
    61 Haw. 607 (1980) ............................................................................... 33

Am. Ad Mgmt. v. Gen. Tel. Co.,
    190 F.3d 1051 (9th Cir. 1999) .............................................................. 23

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)............................................................................... 23

Bhan v. NME Hosp., Inc.,
    929 F.2d 1404 (9th Cir. 1991) ...................................................... 5, 16, 18

Brown Shoe Co. v. United States,
    370 U.S. 294 (1962)............................................................................... 19

California Dental Ass'n v. FTC,
    526 U.S. 756 (1999)............................................................................... 17

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)................................................................................. 5

Chicago Prof'l Sports Ltd. Pshp. v. NBA,
    95 F.3d 593 (7th Cir. 1996) .................................................................. 24

Chicago Prof'l Sports Ltd. Pshp. v. NBA,
    961 F.2d 667 (7th Cir. 1992) ................................................................ 24

Cieri v. Leticia Query Realty, Inc.,
    80 Haw. 54 (1995) ...................................................................... 29, 30, 33

Clark v. Cassidy,
    64 Haw. 74 (1981) ................................................................................. 32

Dalesandro v. Longs Drug Stores California, Inc.,
    383 F. Supp. 2d 1244 (D. Haw. 2005) ............................................................ 4

Dash v. Wayne,
    700 F. Supp. 1056 (D. Haw. 1988) ...................................................... 31, 32

Dedication and Everlasting Love to Animals v. The Humane Society of the
United States, Inc.,
    50 F.3d 710 (9th Cir. 1995) ......................................................... 25

Gough v. Rossmoor Corp.,
    585 F.2d 381 (9th Cir. 1978), cert. denied, 440 U.S. 936 (1979) ........... 18, 19

Graphic Products Distrib. v. Itek Corp.,
    717 F.2d 1560 (11th Cir. 1983) ...................................................... 19

Hawaii v. Gannett Pac. Corp.,
    99 F. Supp. 2d 1241 (D. Haw. 1999) ............................................... 29

Independent Ent'mt Group, Inc. v. NBA,
    853 F. Supp. 333 (C.D. Cal. 1994) ................................................. 27

Island  Tobacco Co. v. R.J. Reynolds Tobacco Co.,
    63 Haw. 289 (1981) ............................................................... 28, 29

Jenkins v. Commonwealth Land Title Insurance Co.,
    95 F.3d 791 (9th Cir. 1996) ........................................................ 33

Les Shockley Racing, Inc. v. Nat'l Hod Rod Ass'n,
    884 F.2d 504 (9th Cir. 1989) ....................................................... 24

Matsushita Electric Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ............................................................. 4, 23

McGlinchy v. Shell Chemical Co.,
    845 F.2d 811 (9th Cir. 1988) ....................................................... 18

Meridian Mortgage Inc., v. First Hawaiian Bank,
    109 Hawaii 35 (2005) ....................................................... 11, 13, 14

NCAA v. Bd. of Regents of the Univ. of Okla.,
        468 U.S. 85 (1984)................................................................. 16, 17

Nat'l Hockey League Players' Ass'n v. Plymouth Whalers,
        325 F.3d 712 (6th Cir. 2003) ............................................... 18, 27

Ochs v. Haw. Med. Serv. Ass'n,
        2005 Haw. App. LEXIS 376 (Haw. Ct. App. 2005).............................. 31, 32

Office of Hawaiian Affairs v. State,
        2005 Haw. LEXIS 475 (Haw. Sept. 9, 2005) .................................. 5

Omega Environmental, Inc. v. Gilbarco, Inc.,
        127 F.3d 1157 (9th Cir. 1997) ...................................... 15

Paulson, Inc. v. Bromar, Inc.,
        775 F. Supp. 1329 (D. Haw. 1991)............................................. 29

Queen City Pizza, Inc. v. Domino's Pizza, Inc.,
        124 F.3d 430 (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998)................ 19

Ralph C. Wilson Industries, Inc. v. Chronicle Broadcasting Co.,
        794 F.2d 1359 (9th Cir. 1986) ...................................... 23

Rebel Oil Co., Inc. v. Atlantic Richfield Co.,
        51 F.3d 1421 (9th Cir.), cert. denied, 516 U.S. 987 (1995)........................ 24

Richards v. Neilson Freight Lines, 810 F.2d 898 (9th Cir. 1987) .......................... 23

Robert's Hawaii School Bus, Inc., v. Laupahoehoe Transportation Co.,
        91 Haw. 224 (1999) ...................................... 28, 30, 33

SCFC ILC, Inc. v. Visa USA, Inc.,
        36 F.3d 958 (10th Cir. 1994) ...................................... 24

Spectrum Sports v. McQuillan,
        506 U.S. 447 (1993)............................................. 18

TV Communications Network, Inc. v. Turner Network Television, Inc.,
        964 F.2d 1022 (10th Cir. 1992) ...................................... 19

<u>T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.</u>,
        809 F.2d 626 (9th Cir. 1987) .......................................................... 28, 29, 31

<u>Tanaka v. Univ. of Southern California</u>,
        252 F.3d 1059 (9th Cir. 2001) ........................................................ 17, 18, 23

<u>Texaco, Inc. v. Dagher</u>,
        2006 U.S. LEXIS 2023 (February 28, 2006).......................................... 16, 17

<u>Toscano v. PGA Tour, Inc.</u>,
        201 F. Supp. 2d 1106 (E.D. Cal. 2002) ...................................................... 27

<u>Western Sunview Properties, LLC v. Federman</u>,
        338 F. Supp. 2d 1106 (D. Haw. 2004)........................................................... 5

<u>Weinberg v. Mauch</u>, 78 Hawaii 40, 50 (1995) ...................................................... 13

<u>Worldwide Basketball & Sports Tours, Inc. v. NCAA</u>,
        388 F.3d 955 (6th Cir. 2004) .......................................................... 19, 21, 27

## STATUTES

15 U.S.C. § 1 ....................................................................................... 16, 28

Fed. R. Civ. P. 56 ............................................................................................ 4

Haw. Rev. Stat. § 1-2 ...................................................................................... 31

Haw. Rev. Stat. § 1-3 ...................................................................................... 31

Haw. Rev. Stat. § 480-1 ................................................................................... 30

Haw. Rev. Stat. § 480-2 ................................................................... 29, 30, 31, 32, 33

Haw. Rev. Stat. § 480-3 ................................................................................... 29

Haw. Rev. Stat. § 480-4 ................................................................................... 28

Haw. Rev. Stat. § 480-13 .................................................................................. 33

The material facts are not in dispute. Plaintiff, Aloha Sports Inc. ("ASI") concedes: (1) the National Collegiate Athletic Association ("NCAA") has the authority to regulate intercollegiate postseason football games ("Bowl Games"), and (2) ASI violated those NCAA regulations in the conduct of its Bowl Games. The only question this Court need decide, then, is whether the NCAA's decision to deny certification of the proposed 2003 Seattle Bowl was consistent with its lawful rules? The Court can construe and apply those rules to the undisputed facts as a matter of law. All of ASI's theories fail on this central issue.

## BACKGROUND UNDISPUTED FACTS

**The NCAA.** The NCAA is a voluntary, nonprofit, standard-setting association comprised of over 1,200 member schools, athletics conferences and interested organizations. The NCAA was organized in 1906 at the behest of President Theodore Roosevelt to study and minimize violence in the sport of football after 18 student-athletes died in 1905. The NCAA promulgates rules governing play of contests, amateurism, recruiting, eligibility, length of season, equipment, and the like, to maintain amateur athletic competition as an integral part of a scholastic tradition. CSF ¶1.[1] This suit concerns the sport of Division IA football. The NCAA does not conduct a national championship in Division IA

---

[1] References to "CSF __" are to the NCAA's Concise Statement of Material Undisputed Facts submitted in support of this motion.

140322.1

football.  Postseason play in Division IA football is comprised of Bowl Games across the country organized by third-party promoters such as ASI.  CSF ¶1.  Bowl Games extend the season to reward teams that have had a successful regular season. Of the 117 teams in Division IA, currently 56 participate in Bowl Games based on their regular season performance.  The number of Bowl Games has increased from 18 in 1991-1992 to 28 in 2003-2004.  CSF ¶25.

The NCAA is charged with the responsibility of ensuring that third-party promoters meet minimum criteria to ensure a Bowl's success and acceptance in the local community.  The NCAA must also ensure that student-athletes gain a positive experience from participating in Bowl Games and are not exploited by third-party promoters.  The viewing public associates intercollegiate athletic competition with the NCAA.  Therefore, the NCAA enacts rules that govern Bowl Games and annually certifies those that meet certain criteria to ensure that the Bowl will be a success in the local community, provide a positive experience for student-athletes, and maintain the quality that is expected by the viewing public.  CSF ¶1.  ASI concedes that the NCAA has the authority and responsibility to oversee the operation of Bowl Games.  CSF ¶27.

**Aloha Sports Inc.**  ASI is a Hawaii corporation engaged in the business of promoting Bowl Games.  ASI promoted the Aloha Bowl from 1982 to 2000 and the Oahu Bowl from 1998 to 2000.  CSF ¶3.  Both Bowl Games were played on Oahu

during these years. ASI was sold by its principal owner, Leonard Klompus, to Frederick Rohlfing in 2000. CSF ¶3. In 2001, in an attempt to make its Bowl Games more profitable and attract better quality teams, the new ownership moved both Bowl Games to the mainland. CSF ¶3.[2] ASI moved the Oahu Bowl to Seattle, where it was certified by the NCAA as the Seattle Bowl and played in 2001 and 2002. CSF ¶4. After ASI's violation of several NCAA regulations, including its failure to pay its certification fee or post a letter of credit timely, its outstanding debts to NCAA members and conferences, poor business relations, and a poor reputation in the local community, the NCAA denied certification in May 2003 to the proposed 2003 Seattle Bowl. CSF ¶¶5, 6.

ASI alleges that in 2003 it entered into a contract for the sale of its business to Pro Sports and Entertainment, Inc. ("PSEI"). See First Amended Complaint ("Complaint") ¶30. The draft contract expressly required certification of the 2003 Seattle Bowl as a condition precedent to the sale. CSF ¶24. PSEI declined to purchase ASI after certification was denied to the proposed 2003 Seattle Bowl. ASI blames the NCAA for PSEI's decision not to proceed. This Court may interpret the NCAA's rules relating to certification as a matter of law in order to determine

---

[2] ASI sought to move the Aloha Bowl to San Francisco, but was unable to get it started despite the NCAA's support. CSF ¶¶4, 21. The NCAA withdrew its certification of the 2001 Aloha Bowl in September 2001, when it became apparent that ASI was not going to be able to hold the game that year. CSF ¶21. ASI is not challenging this decision by the NCAA.

whether the NCAA could legitimately deny certification to a Bowl Game that violated those rules, was of ill-repute and steeped in debt. Based on the undisputed evidence, the NCAA's conduct was lawful under its rules and ASI cannot meet its burden of proof for any claim. Therefore, pursuant to Fed. R. Civ. P. 56, the NCAA is entitled to summary judgment.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper when there is no genuine issue of material fact to be tried and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Once the moving party has met its initial burden of demonstrating that there is no genuine issue for trial, the opposing party must demonstrate material disputed facts and "cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial." Dalesandro v. Longs Drug Stores California, Inc., 383 F. Supp. 2d 1244, 1247 (D. Haw. 2005) (Ezra, J.). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts…Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986). Disputes over irrelevant and immaterial facts are insufficient to defeat a motion for summary judgment. Id. "[T]he moving party need not produce evidence negating the existence of an element for which the opposing party will bear the

ultimate burden of proof at trial." Western Sunview Properties, LLC v. Federman, 338 F. Supp. 2d 1106, 1113-1114 (D. Haw. 2004) (Ezra, J.).

Summary judgment is appropriate in antitrust cases and "may save the parties and the courts from unnecessarily spending the extraordinary resources required for a full-blown antitrust trial." Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991) (collecting cases in which the Ninth Circuit has found summary judgment appropriate on antitrust claims). Summary judgment is particularly appropriate in the instant case because ASI has failed "to make a showing sufficient to establish the existence of [elements] essential to that party's case, and on which [ASI] will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## ARGUMENT

### I.    ASI'S BREACH OF CONTRACT CLAIMS FAIL AS A MATTER OF LAW

#### A.    ASI's breach of contract claim for the Seattle Bowl is without merit

ASI claims that the NCAA breached a contract with ASI by "permanently decertifying" the Seattle Bowl. Complaint ¶34. Hawaii law requires ASI to prove the following elements to survive summary judgment on this claim: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Office of Hawaiian Affairs v. State, 2005 Haw. LEXIS 475, *58 (Haw. Sept. 9, 2005) (for publication).

Despite the lack of any written agreement between the parties concerning certification, ASI claims a legally enforceable contract with the NCAA "evidenced by the NCAA Policies and Procedures, the NCAA Postseason Football Handbooks, as well as the course of conduct between the parties." CSF ¶29 (Ex. 67). However, there is nothing in these documents establishing an agreement by the NCAA to certify the 2003 Seattle Bowl. On the contrary, these documents, as well as the parties' course of conduct, demonstrate that ASI was annually required to file a renewed certification application, that every such certification was limited to one year, and that the decision whether to grant certification each year was discretionary, not promissory or obligatory. CSF ¶¶1, 2, 5, 27.

Even if a contract was created, ASI's admitted breaches excused the NCAA's subsequent performance. Certification of Bowl Games is governed by the NCAA's Manuals and Postseason Football Handbooks (the "Handbooks"). CSF ¶¶ 1, 5. Assuming *arguendo* that a "contract" is formed by the Handbook, ASI cannot prove the second element of this claim, i.e., the NCAA's breach of its Handbook. ASI's certification application for the 2002 and 2003 Seattle Bowl was governed by the 2001-02 Handbook and 2002-03 Handbook respectively.[3] Therefore, if the 2002

---

[3] The Handbooks are published in the Fall of every year governing certification which takes place in the Spring, and those Bowl Games which take place after the end of the season. For example, the 2002-03 Handbook was published in November, 2002 and listed the 2002 Seattle Bowl to be played in December, 2002 as already certified under the provisions of the previous Handbook. CSF ¶5.

6

Seattle Bowl was in violation of the requirements of 2001-02 Handbook, the NCAA could exercise penalties provided in that Handbook. As ASI's Rule 30(b)(6) witness testified:

> We agree that every single year there is [sic] requirements given in the Handbook, one of which was to fill out the application form. And that as long as we were within the requirements of the game, we would be recertified. And if we weren't, there were certain penalties that would be affixed to us.

CSF ¶5. The 2001-02 Handbook provides: "If the management of a certified game fails to comply with … the NCAA's approved policies and procedures, the subcommittee has the option to withhold certification for … one year or fine it a percentage of its gross receipts…" CSF ¶5. ASI concedes in its Complaint and in the testimony of its Rule 30(b)(6) witness that the terms of the Handbook clearly allowed the NCAA to withhold certification from a Bowl Game if ASI failed to comply with the certification requirements. CSF ¶5.

ASI admits that it repeatedly failed to comply with the certification requirements for its Bowl Games,[4] and thus cannot contest the NCAA's authority to withhold certification in 2003. Instead, ASI contorts reality by claiming that the

---

[4] In particular, ASI missed two deadlines for providing a Letter of Credit to the NCAA for the 2002 Seattle Bowl, CSF ¶9; ASI failed to reimburse the participating teams pursuant to its contracts with them, CSF ¶8; ASI had unpaid bills to its vendors, CSF ¶¶8, 7; ASI had not paid sales tax for its ticket sales to the State of Washington, CSF ¶7; ASI had lost its title sponsor for the 2003 Seattle Bowl, CSF ¶11; ASI had soured its relations with the Seattle Chamber of Commerce, CSF ¶10; ASI failed to pay its 2002 application/certification fee until 2003, CSF ¶6; and ASI failed to refund the Mountain West Conference its deposit of $250,000 per its contract with the Conference because there was no bowl eligible team from that conference in 2002, CSF ¶7.

NCAA improperly "permanently decertified" the Seattle Bowl.  This argument can be readily rejected because there is simply no such thing as "permanent decertification."

No game is certified, or denied, in perpetuity.  Rather, each year *all* Bowl Games apply anew for NCAA certification and their applications must promise and demonstrate, among other items, compliance with the NCAA's regulations, community support, projected financials, and stadium facility for that particular year.  CSF ¶¶1-2.  ASI concedes that the NCAA requires a new certification application each year.  CSF ¶¶1-2.

To support its claimed "permanent decertification" ASI relies only upon a May 1, 2003 Press Release, announcing the NCAA's decision to deny certification to the proposed 2003 Seattle Bowl.  On its face, however, this Press Release clearly states that the Seattle Bowl was denied certification *only* for the 2003-04 season.  Specifically, the Press Release states: "One new bowl received certification, 27 others were recertified and one bowl was decertified *for the 2003-04 season* this week by the NCAA Football Certification Subcommittee."  (emphasis added) CSF ¶6.[5]

---

[5] Mr. Rohlfing admitted in his deposition that this press release made clear that the Seattle Bowl was decertified for the 2003-04 season.  CSF ¶6.

There is no evidence showing that ASI was in any way prohibited from applying for certification again in 2004.[6]   On the contrary, the Seattle Bowl's Executive Director for 2001-2003, James Haugh, testified that during the meetings with the NCAA committee when the 2003 Seattle Bowl was denied certification, NCAA representatives asked ASI representatives whether they would consider taking a year "off" and applying again in one year.  CSF ¶6.  In fact, ASI has not applied for certification since 2003, and thus its "permanent decertification" claim is hypothetical and contradicted by the undisputed evidence.  CSF ¶6.  Because ASI cannot prove that the NCAA "breached" the alleged contract by "permanently decertifying" its Bowl Game, summary judgment should be granted.

### B.     ASI's breach of contract claim for the Aloha Bowl is without merit

ASI attempted to relocate its Aloha Bowl to San Francisco in 2001.  ASI wrote to the NCAA outlining the hurdles it faced in making the game successful in Hawaii, including *inter alia* the cost of travel to Hawaii, ASI's contractual commitments with its TV broadcaster and sponsor that required ASI to hold the game on Christmas morning which deterred local fans from buying tickets, etc.  CSF ¶¶19-20.  The NCAA granted certification to the Aloha Bowl in San Francisco, even exempting ASI from having to seek certification as a new Bowl.  The Aloha Bowl was thus certified in 2001 as the San Francisco Bowl.  CSF ¶4.  However, as late as

---

[6] PSEI in fact applied for a Seattle Bowl in 2004, but later withdrew its application. ASI didn't even apply.

September 2001 ASI had failed to put together the elements needed to conduct the Game. In particular, ASI did not have firm commitments from conferences, a sponsor, TV broadcaster or stadium facility. CSF ¶4. Therefore, the NCAA withdrew certification for the 2001 San Francisco Bowl and informed ASI that it could reapply for certification of the San Francisco Bowl in the following year even though it had not been played. CSF ¶4.

ASI did apply for recertification in 2002 of the San Francisco Bowl, but notwithstanding its earlier complaints, asked to move the Game back to Hawaii and rename it the Aloha Bowl. CSF ¶21. ASI's application lacked a sponsor, commitments from the Hawaii Stadium Authority or even teams to participate in the Game. CSF ¶21. Therefore, because ASI's application was deficient, because of all its prior and continuing breaches, and because the NCAA had received a complete application from ESPN for a new Hawaii Bowl, the NCAA decided to grant certification to ESPN and not the San Francisco/Aloha Bowl. CSF ¶21.

Again, ASI cannot establish the required elements for a breach of contract claim. There is no evidence that the NCAA promised to certify a game returning to Hawaii or that the NCAA breached any obligation.

## II.    ASI'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A MATTER OF LAW

### A.    ASI's intentional interference with contract claim is without merit

Under Hawaii law the tort of intentional interference with contract requires plaintiff to prove *all* of the following elements: 1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part; 5) the subsequent breach of the contract by the third party; and 6) damages as a consequence of the defendant's conduct.  Meridian Mortgage Inc., v. First Hawaiian Bank, 109 Hawaii 35, 44 (2005).

ASI cannot prove *any* of these elements.  First, ASI contends that it had entered into a valid contract for the sale of ASI to PSEI.  However, ASI's production contains only draft irrevocable letter of intent for the sale of ASI that is not signed by PSEI.  Mr. Feller, President of PSEI and primary negotiator with ASI, testified in deposition that he had only signed a non-binding letter of intent and had never signed a final contract.  CSF ¶24.  Mr. Feller also testified that it is the standard practice at PSEI to agree during initial discussions that a final written agreement must be executed before a contract is considered complete and that PSEI generally commemorates an agreement in writing.  CSF ¶24.  Given that neither ASI nor PSEI can produce a fully executed final written agreement, ASI cannot prove that it had a

valid agreement with PSEI.[7]  Even assuming *arguendo* that a valid agreement

existed between ASI and PSEI, ASI cannot prove the remaining elements of its

tortious interference claim.

ASI's must prove that the contract between itself and PSEI was ***actually***

***breached***.  The unsigned letter of intent makes the sale of ASI contingent upon three

conditions: 1) the certification of ASI's 2003 Seattle Bowl by the NCAA, 2) a valid

lease agreement for the Seattle Seahawks stadium, and 3) written consent of the

prior shareholders of ASI.   CSF ¶24.   These three conditions were conditions-

precedent to performance of the contract.  These conditions were negotiated by ASI

and PSEI without the NCAA's involvement.  CSF ¶24.  They simply made the

NCAA's independent actions a condition of PSEI's performance.  The conditions

were not fulfilled and the contract fell of its own weight.  PSEI never breached.  The

NCAA cannot be held responsible for tortious interference in the absence of a

breach.

---

[7]  ASI's 30(b)(6) witness, Mr. Daw, testified that although he believed Mr. Paul Feller, President of PSEI, had signed the letter of intent, ASI never received the signed letter. CSF ¶24.  Mr. Rohlfing, prior owner of ASI from 2000-2002 and current legal counsel to ASI, testified that he had not seen a signed letter of intent.  CSF ¶24.  Therefore, other than the speculative testimony of Mr. Daw who presumes that Mr. Feller must have signed the letter of intent, ASI has no other evidence to establish that Mr. Feller signed the letter of intent.  ASI has produced no evidence of a valid contract between ASI and PSEI.  The NCAA issued a third-party subpoena to PSEI for relevant documents, however documents produced in response to that subpoena also did not contain a letter signed by Mr. Feller.

When ASI's 2003 Seattle Bowl failed to receive certification, PSEI was not obligated to purchase ASI and elected not to do so.  PSEI's decision to not purchase ASI was not a breach of the contract -- it was simply an action resulting from the failure of a condition-precedent to be fulfilled.  In <u>Meridian Mortgage</u>, plaintiff argued that Hawaii had adopted the Restatement Second of Torts and therefore plaintiff was not required to prove actual breach of the contract as opposed to mere non-performance.  109 Hawaii at 44-45.  However, the Hawaii court of appeals explained that Hawaii had ***not*** adopted the Restatement Second and plaintiffs in Hawaii "***must show that a breach*** has occurred and must separately establish damages."  <u>Id</u>. (quoting <u>Weinberg v. Mauch</u>, 78 Hawaii 40, 50 (1995) and adding emphasis as indicated).  ASI cannot prove that its contract with PSEI was actually ***breached*** as a result of the NCAA's actions.  Rather performance by PSEI was excused because of a failed condition-precedent.

Furthermore, the NCAA had ample justifications, based upon ASI's violations of rules, for its refusal to certify the 2003 Seattle Bowl, as discussed in Section I *supra*.  Mr. Feller testified in deposition that when he attended the certification meeting in 2003 he had a doubt about the Seattle Bowl's recertification because of its past violations of NCAA regulations and financial mismanagement and that these were the reasons given by the NCAA for denying certification to the 2003 Seattle Bowl.  CSF ¶6.  ASI can point to no evidence to show that the NCAA induced PSEI

13

to abandon its purchase of ASI's business.  On the contrary, when Mr. Feller inquired about the NCAA's policy regarding transfer of rights when a Bowl Game is acquired by another party, he was informed that as long as the Bowl Game that was being acquired had complied with NCAA regulations, the NCAA had allowed such transfer of ownership in the past.  CSF ¶ 5.

ASI has failed to prove: 1) that there existed a valid contract between ASI and PSEI, 2) that PSEI in fact breached the contract, 3) that the NCAA intentionally induced PSEI to breach the contract, or 4) that the NCAA acted without justification. Without meeting its burden of proof on all of these elements ASI's tortious interference with contract claim approximates a frivolous claim and should be summarily dismissed.

**B.    ASI's tortious interference with prospective business advantage claim is without merit**

To prevail on its claim of tortious interference with prospective business advantage, ASI must prove each of the following elements:

> (1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff;  (2) knowledge of the relationship, advantage, or expectancy by the defendant;  (3) a purposeful intent to interfere with the relationship, advantage, or expectancy;  (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

Meridian Mortgage, 109 Hawaii at 47-48 (2005).

Although the NCAA believes ASI cannot prove *any* of these elements, the first as discussed above, and the complete lack of evidence concerning the third factor -- purposeful interference -- warrants summary judgment in favor of the NCAA. Concerning this third element, the Ninth Circuit has held:

> The third element, intent, denotes purposefully *improper* interference. The plaintiff must prove that the defendant either pursued an improper objective of harming the plaintiff or used wrongful means that caused injury in fact. Asserting one's rights to maximize economic interests does not create an inference of ill will or improper purpose.

Omega Environmental, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1166 (9th Cir. 1997) (internal quotation marks and citations omitted; emphasis in original). ASI cannot bear its burden of proving that the NCAA's decision was not a result of its admitted violations of NCAA regulations, its failure to pay its creditors and participating teams, its dwindling reputation in the local community and unpaid taxes to the State of Washington. CSF ¶¶7-11. Instead ASI keeps insisting that if the sale to PSEI had taken place these debts would have been paid. However, at the time of the certification application, no contract for the sale had been reached and the owner and President of ASI, Mr. Terry Daw, did not even attend the certification meeting with the NCAA. CSF ¶6. The NCAA must consider the future of all Bowl Games. The NCAA cannot assume that debts would have been paid if the sale had taken place, especially given that for the past several years PSEI's other Bowl Game, the Freedom Bowl, had not been conducted at all. CSF ¶24.

15

## III. ASI'S ANTITRUST CLAIMS FAIL FOR FAILURE TO BEAR ITS BURDEN UNDER SECTION 1 OF THE SHERMAN ACT

### A. The NCAA's postseason football reimbursement rules must be reviewed under the Rule of Reason.

ASI challenges the NCAA's postseason reimbursement rule[8] under section 1 of the Sherman Act. Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade..." 15 U.S.C. § 1. Because all commercial contracts and agreements restrain trade somewhat, section 1 only prohibits ***unreasonable*** agreements and contracts. Texaco, Inc. v. Dagher, 2006 U.S. Lexis 2023, *7 (February 28, 2006). Conduct challenged under section 1 can be analyzed under one of two rules of analysis: 1) the *per se* rule, which is reserved for those practices with which courts are so familiar that they can be disposed of without in-depth analysis, and 2) rule of reason analysis, under which courts must evaluate the anticompetitive effect and procompetitive justifications of a challenged practice. Id. at *7-8; see also Bhan, 929 F.2d at 1410.

Since the seminal Supreme Court opinion in NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85 (1984), no court has analyzed the NCAA's rules under the *per se* rule.[9] The NCAA's rule making function is an integral activity of the

---

[8] The postseason reimbursement rule is defined as the NCAA's rule that provides: "Institutions participating in a certified domestic postseason football game shall receive the greater of 75 percent of the gross receipts or $750,000 each, or an amount greater than $750,000 specified in a contract between the bowl and a conference." For the relevant time period, this rule is found in 2000-01 to 2002-03 Handbooks. CSF ¶12.

[9] The Supreme Court rejected application of the *per se* rule to the NCAA's regulations

16

organization.  Because it is not feasible for each member institution to make its own set of rules apart from its athletic competitors, a central body is needed to formulate uniform rules, and that authority is vested in the NCAA, as ASI has conceded.[10]  As Bd. of Regents acknowledged, the NCAA's rule making activities are procompetitive in that they make possible the existence of intercollegiate athletics.  468 U.S. at 102.  Therefore, the NCAA's rules must be analyzed under the full rule of reason.  See Tanaka v. Univ. of Southern California, 252 F.3d 1059, 1062-63 (9th Cir. 2001); Dagher, 2006 U.S. Lexis 2023 at *10, n. 3.  The Supreme Court explained in California Dental Ass'n v. FTC, 526 U.S. 756 (1999), where there are procompetitive justifications for a challenged restraint, the court should rule out an "indulgently abbreviated review" of the restraint and accord it a full rule of reason analysis.  526 U.S. at 778.  As discussed below in Section III (D), the NCAA's postseason reimbursement rule is supported by legitimate procompetitive justifications which must be considered in a full rule of reason analysis.

Courts have adopted a structured burden shifting analysis under the rule of reason: 1) plaintiff bears the burden of proving substantial anticompetitive effects to

_____

and adopted the rule of reason instead because "the great majority of the NCAA's regulations enhance competition among member institutions.  Thus,…a fair evaluation of their competitive character requires consideration of the NCAA's justifications for the restraints."  Id. at 103.  In fact, ASI concedes that the challenged rule should be analyzed under the rule of reason, although it advocates the abbreviated quick look rule of reason.  CSF ¶28.

[10] CSF ¶27.

consumers in a defined relevant market in the form of reduced output or increased prices above competitive levels; 2) if plaintiff is successful in proving substantial anticompetitive effects in a relevant market, defendant must present procompetitive justifications for the challenged restraint; and 3) once defendant presents legitimate procompetitive justifications, plaintiff must prove that there were other less-restrictive alternatives available to defendant to achieve the same result. McGlinchy v. Shell Chemical Co., 845 F.2d 802, 811 (9th Cir. 1988); Bhan, 929 F.2d at 1413.

ASI cannot meet its burden under this analysis: (1) ASI has not pleaded or defined the relevant market; and (2) ASI has failed to plead and cannot prove substantial anticompetitive effects in the form of reduced quantity or increased prices to consumers.

### B.    ASI has not defined a relevant market.

Ninth Circuit law is clear that the first step of the rule of reason analysis requires the definition of a relevant market. See Gough v. Rossmoor Corp., 585 F.2d 381, 389 (9th Cir. 1978), cert. denied, 440 U.S. 936 (1979) (before a court can consider an antitrust claim, it "must know with what field of competition we are concerned and the dimensions of that field. Market definition is essential."); see also Tanaka, 252 F.3d at 1063 (9th Cir. 2001). Plaintiff bears the burden of defining the relevant market. Tanaka, 252 F.3d at 1063; Spectrum Sports v. McQuillan, 506 U.S. 447, 455 (1993); Nat'l Hockey League Players' Ass'n v. Plymouth Whalers, 325 F.3d

712, 720 (6th Cir. 2003); Graphic Products Distrib. v. Itek Corp., 717 F.2d 1560,

1569 (11th Cir. 1983); Worldwide Basketball & Sports Tours, Inc. v. NCAA, 388

F.3d 955, 959 (6th Cir. 2004).

Moreover, "courts are not free to accept whatever market is suggested by the

plaintiff as fitting most persuasively with his contention that his power to compete

effectively has suffered injury." Gough, 585 F.2d at 389. Instead, "[t]he outer

boundaries of a product market are determined by the reasonable interchangeability

of use or the cross-elasticity of demand between the product itself and substitutes for

it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). See also Queen

City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997), cert.

denied, 523 U.S. 1059 (1998); TV Communications Network, Inc. v. Turner

Network Television, Inc., 964 F.2d 1022, 1025 (10th Cir. 1992); Adidas America,

Inc. v. NCAA, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999).

ASI's First Amended Complaint fails to allege, much less define, a relevant

market. In response to the NCAA's interrogatory requesting ASI to identify the

market in which it contends that competition was injured, ASI responded:

> ASI contends that ASI has **no obligation** to identify a relevant market
> pursuant to a full blown rule of reason analysis …. In the unlikely event that
> ASI is required by the court to identify a relevant market, it contends (subject
> to modification based upon discovery and expert analysis) that the NCAA and
> its member institutions restrained competition in the market for NCAA

Postseason College Football Bowl Games in the United States, in general, and in Hawaii, in particular.[11]

ASI could not be more in error about its burden as an antitrust plaintiff. As discussed above, this case must be analyzed under the full rule of reason which requires ASI to prove a relevant market.

ASI may not avoid its burden of proving the relevant geographic and product markets. First, by ASI's own contention it is not clear whether it is defining the geographic market to include the entire United States or only the State of Hawaii.[12] Second, ASI attempts to abstractly define a product market with no reference to the products themselves. It is manifest that the "product" market must be defined by reference to products that can be bought by consumers. A football contest is not a product. The products associated with Bowl Games include *inter alia* tickets, television broadcast rights, sponsorship rights, advertising segments, merchandise, etc. ASI's reckless market allegation makes no reference to such commercial products. ASI concedes that the NCAA's certification of Bowl Games creates the opportunity to capitalize on the noncommercial product of intercollegiate athletics to market commercial products such as tickets, sponsorship rights, etc. Complaint ¶9, CSF ¶23.

---

[11] Ex. 67, (Response to Interrogatory #9). ASI has not submitted an expert report, and the deadline to do so passed on April 3, 2006.

[12] See note 11. ASI's Complaint alleges that teams from all over the country travel to play in Bowl Games. Complaint ¶6.

Even putting aside the fact that "postseason football Bowl Games" is not a product market, see e.g., Adidas, 64 F. Supp. 2d 1097 and Worldwide Basketball, 388 F.3d 955 (rejecting such gerrymandered markets), this definition is in stark contrast to the deposition testimony of ASI's Rule 30(b)(6) witness:

> Q    So you did gain experience and you did have activity in trying to find sponsors?
>
> A    I did.
>
> Q    Did you find that to be a competitive activity in the sense there were lots of people trying to find sponsors?
>
> A    Oh, sure.
>
> Q    Against whom -- who were the other people trying to find the same sponsors that you were trying to find?
>
> A    Every business in America.  I mean, that is what happens, right?
>
> Q    Did you find that there were other sporting events trying to find the same sponsors that you were trying to find?
>
> A    Sure.
>
> Q    Were there non sporting events trying to solicit the same sponsors?
>
> A    I can only answer that in a general sense, in that the advertising dollars that are spent, which is what sponsors are doing, are competitively, you know, sent out across the country.  Advertising agencies and so forth are all involved in trying to obtain those dollars.
>
> Q    So you base that on your experience in trying to find sponsors in connection with this business?
>
> A    Yeah.

CSF ¶23.

In addition to admitting that ASI competed with sporting events and non-sporting events to sell sponsorship rights for the Bowl Games, Mr. Daw also admitted that ASI competed with various events while selling tickets to fans.  In

particular, Mr. Daw was asked "what did you consider to be the fans' alternate choices between buying a ticket to your game, if anything?" and he responded:

> Well, there were other kinds of events around town [Seattle] that they had choices that they could make. They could go to the NBA basketball game. They could go to a college basketball game, movies. There's so many entertainment dollars, they are going to spend them somewhere.

CSF ¶23. Mr. Daw aptly recognized through his business experience in running ASI's Bowl Games that sponsors and fans who buy the products of sponsorship rights and tickets associated with college football Bowl Games have restricted budgets and must allocate their dollars among the various available options. Fans will allocate their discretionary spending among various entertainment options available. Similarly, sponsors choose the best mechanism available at the time that meets their advertising needs and reaches their target demographic. ASI provides a prime example of a sponsor's substitution of events. Jeep Eagle, the longtime sponsor for ASI's Bowl Games in Hawaii, withdrew its sponsorship when ASI decided to move to the mainland. CSF ¶¶18, 23. Among the various reasons given to ASI for Jeep's cancellation was Jeep's decision to shift its advertising dollars away from college football to events that target women. As Mr. Daw testified: "There was a new ad agency we were told that took over and she was going to change her target market, and she didn't think our audience met her criteria anymore." CSF ¶¶18, 23.

By ASI's Rule 30(b)(6) witness' admissions, the relevant market is broader than that suggested by ASI. ASI has not met its burden of alleging or proving a

relevant market with reference to the rules of interchangeability to include all substitutes for the products associated with postseason college football Bowl Games, leaving its market "definition" murky at best.  If the product and geographic market is unclear the Court will not have a reference point to analyze the plaintiff's claim, "and if the claim makes no economic sense, a speculative inference from the jury will not help it."  Richards v. Neilson Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987) (citing Matsushita Electric, 475 U.S. 574).  ASI has not offered any recognizable market in which its claim could be presented to the jury, which warrants summary disposition in favor of the NCAA.  Tanaka, 252 F.3d at 1063-65; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### C.    ASI cannot show an adverse effect on competition.

The Sherman Act was not intended as protection for a competitor against the (sometimes harsh) outcome of competition, but instead as a proscription against consumer harm.  Am. Ad Mgmt. v. Gen. Tel. Co., 190 F.3d 1051, 1055 (9th Cir. 1999) ( "It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers."); Ralph C. Wilson Industries, Inc. v. Chronicle Broadcasting Co., 794 F.2d 1359, 1363 (9th Cir. 1986) ("it is not enough for [plaintiff] merely to show that it was harmed in its capacity as a competitor. … it is injury to the market, not to individual firms, that is significant.") (internal quotations omitted).  An antitrust plaintiff must therefore show that the defendant's

allegedly improper conduct injured consumers or competition as a whole, rather than just injured plaintiff.  Les Shockley Racing, Inc. v. Nat'l Hod Rod Ass'n, 884 F.2d 504, 508 (9th Cir. 1989) (plaintiffs must "plead and prove a reduction of competition in the market in general and not mere injury to their own positions as competitors"); Chicago Prof'l Sports Ltd. Pshp. v. NBA, 961 F.2d 667, 670 (7th Cir. 1992) ("The antitrust injury doctrine requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers.  Whenever producers invoke the antitrust laws and consumers are silent, this inquiry becomes especially pressing.") (internal citations omitted).

Consumer harm is measured by reduced output resulting in higher prices. Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1433 (9th Cir.), cert. denied, 516 U.S.  987 (1995) (an act violates the Sherman Act "only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their quality") (emphasis in original); Chicago Prof'l Sports Ltd. Pshp. v. NBA, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output. Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem.").[13]  In this case, ASI's complaint alleges

---

[13]  See also SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 963 (10th Cir. 1994) ("when we ask if a particular practice is 'reasonable' or 'unreasonable,' or if the practice is 'anticompetitive,' we use these terms with special antitrust meaning reflecting the Act's basic objectives, the protection of a competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods.") (internal quotation omitted).

an *increase* in output in the form of increased number of Bowl Games played which made it more difficult for ASI to compete with the other bowl games.[14]  Complaint ¶13.  Therefore, ASI is complaining of an *increase* in competition, which was beneficial to consumers by offering them more choices.  While this may have resulted in tougher competition for ASI, there has been no showing of consumer harm.  Ultimately, ASI has failed to make the essential showing of consumer harm in the form of reduced output or increased prices of products associated with Bowl Games.[15]  In the absence of any consumer harm, "[f]idelity to the language of the statute and its interpretation by the Supreme Court," require that summary judgment be granted to the NCAA.  Dedication and Everlasting Love to Animals v. The Humane Society of the United States, Inc., 50 F.3d 710, 713 (9th Cir. 1995).

### D.  The NCAA had ample procompetitive justifications for the postseason reimbursement rule

The NCAA enacted the postseason reimbursement rule to assist its function of ensuring that student-athletes gain a positive experience from participation in postseason play and that they are not exploited by third-party promoters.  Playing to an empty stadium is demoralizing for student-athletes.  The challenged rule requires

---

[14] ASI is complaining of an *increase* in output.  Furthermore, the NCAA does not dictate ticket prices or sponsorship rights' fees charged by promoters.  These prices are set and negotiated by ASI itself.  CSF ¶23.  As ASI's 30(b)(6) witness testified, ASI set its ticket prices after consultation with Ticket Master (a national ticketing agency for various entertainment events) regarding competitive events.  CSF ¶23.

[15] Perhaps because ASI cannot show a reduction in output or increase in prices of these consumer products, ASI has failed to define any product market with specificity as discussed in Section III (B) *supra*.

that in order to meet the minimum financial guidelines, Bowl operators ensure that the Bowl Game is embraced by the local community by attracting audiences and broadcasters. Most institutions must travel far to participate in postseason Bowl Games, especially if they are traveling from the mainland to Hawaii, and they take their band to provide support to the student-athletes. In fact, ASI's contracts with teams specified that the team would bring its pep band to the game. CSF ¶15. The number in the travel party of a participating team is significant and the challenged rule simply ensures that participating teams recuperate a substantial part of their travel expenses instead of burdening the institution's other sports and athletics programs, which would result in fewer opportunities for student-athletes in other sports.

The NCAA provides certified promoters with important assets, that they in turn market and use for their profit. These assets are many: 1) Bowl promoters use the goodwill built by the NCAA and its member institutions throughout the regular season, which generates heightened interest in postseason play,[16] 2) the viewing public associates the NCAA "brand" with postseason Bowl Games even though they are run by promoters, 3) promoters capitalize on "College Football" as a distinct non-commercial product to assist in the sale of commercial products, and 4)

_____

[16] ASI itself concedes, "The colleges and universities that compete in Division 1-A College Football participate in regular season games that culminate in the opportunity to play in College Football Bowl Games." Complaint ¶8.

promoters rely on the NCAA to debate, analyze and ultimately adopt rules of the game and equipment which they use for their Bowl Games. For all of these assets and for the right to market themselves as supporting the same principles of amateur sports and scholastic tradition, the NCAA is entitled to charge the Bowl Game promoters a minimum rights/license fee payable to participating teams.

The opportunities to stage a postseason Bowl Game are limited. As in every other sport, postseason play is a reward for teams with a successful and exemplary regular season. For this purpose, the NCAA rules provide that only teams with a winning season may participate in postseason Bowl Games. The NCAA's ability to set the season-length of a sport is uncontroversial and squarely established in case law holding that rules that govern athletic competition (as opposed to competition in commerce) are not within the purview of antitrust law.[17] As a result of this scarcity of teams to participate in Bowl Games there is the risk of bidding wars and exploitation of student-athletes. Therefore, the NCAA certifies Bowl Games that provide the best opportunities for participating teams and the most positive and

---

[17] See, e.g., Independent Ent'mt Group, Inc. v. NBA, 853 F. Supp. 333 (C.D. Cal. 1994) (rule prohibiting players from participating in events produced by third party promoters after the regular season reasonably prevented free riding); Toscano v. PGA Tour, Inc., 201 F. Supp. 2d 1106 (E.D. Cal. 2002) (restrictions on the ability of tour members to participate in non-tour events not anticompetitive); Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club, 325 F.3d 712 (6th Cir. 2003) (eligibility rule which "merely substitutes one arguably less skilled player for another arguably more skilled player" was not anticompetitive.); Worldwide Basketball, 388 F.3d 955 (6th Cir. 2004) (reversing injunction regarding season-length rule on relevant market grounds).

educational experience for student-athletes.  These are all legitimate procompetitive justifications.

## IV.    ASI'S CLAIMS UNDER HRS § 480 FAIL AS A MATTER OF LAW

### A.    Hawaii Revised Statute § 480-4 is modeled after the federal antitrust laws and ASI's claims under HRS § 480-4 should be dismissed for ASI's failure to meet its burden of proof under the rule of reason.

Hawaii Revised Statute § 480-4 is Hawaii's antitrust statute.  ASI has alleged violations of § 480-4(a) and § 480-4(b).[18]  Section 480-4(a) is based on § 1 of the Sherman Act and prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State…"  Island Tobacco Co. v. R.J. Reynolds Tobacco Co., 63 Haw. 289, 297 (1981) (overruled on other grounds, Robert's Hawaii School Bus, Inc., v. Laupahoehoe Transportation Co., 91 Haw. 224 (1999)).  Section 480-4(b) specifies certain acts that are declared per se illegal under state law.

"Courts applying Hawaii's antitrust laws have long interpreted them consistently with analogous federal statutes, and in 1981 the Hawaii legislature explicitly provided that § 480-4, among other provisions, 'shall be construed in accordance with judicial interpretations of similar federal antitrust statutes.'"  T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc., 809 F.2d 626, 636 (9th Cir.

---

[18] It should be noted that the Hawaii Revised Statute sections cited in ASI's prayer for relief are not correct and were not corrected despite the NCAA's counsel's efforts to alert ASI.  Complaint at 19.

1987) (citations omitted). ASI's state antitrust claims should be dismissed for the same reasons as its federal antitrust claims as discussed above. T.W. Electrical, 809 F.2d at 636; Hawaii v. Gannett Pac. Corp. 99 F. Supp. 2d 1241, 1248, n.7 (D. Haw. 1999).

**B.    ASI lacks standing to bring claims under HRS § 480-2 and has further failed to show any injury to its business or property to bring a claim under HRS § 480-2**

HRS § 480-2 contains two distinct causes of action:  (1) claims alleging "unfair or deceptive acts or practices" ("deceptive practices" claims); and (2) claims alleging "unfair methods of competition" ("unfair competition" claims). Paulson, Inc. v. Bromar, Inc., 775 F. Supp. 1329, 1337 (D. Haw. 1991).

Hawaii courts determine violations of § 480-2 according to the Federal Trade Commission Act's ("FTCA") regulations and decisions, as well as federal courts' interpretations of section 5(a)(1) of the FTCA. HRS § 480-2 (b); HRS § 480-3; Cieri v. Leticia Query Realty, Inc., 80 Haw. 54, 60 (1995); Paulson, 775 F. Supp. at 1337; T.W. Electrical, 809 F.2d at 636. The federal rulings serve as "guides to the interpretation and application of state law in light of the economic and business conditions of Hawaii," but the federal rulings are not to be "blindly accepted." Paulson, 775 F. Supp. at 1337; Island Tobacco, 63 Haw. at 299-300. Under these authorities, ASI lacks standing to bring either a deceptive practices claim or unfair competition claim under § 480-2.

### i.    Deceptive practices claims under HRS § 480-2

ASI lacks standing to bring a deceptive practices claim under § 480-2. Deceptive practices claims can only be brought by a consumer, the attorney general or the director of the office of consumer protection.  Haw. Rev. Stat. § 480-2(d); Cieri, 80 Haw. at 61-62.  A consumer is defined as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment."  HRS § 480-1.  Businesses cannot sue under the deceptive practices claims of § 480-2; Cieri, 80 Haw. at 61-62.  Because ASI is not a consumer of any of the products associated with Bowl Games; instead ASI is a business organized under the laws of the State of Hawaii, ASI cannot bring a suit under § 480-2 for deceptive practices claims.

### ii.    Unfair competition claims under HRS § 480-2

Prior to 2002, the Hawaii Supreme Court held that there was no private claim of relief for unfair competition claims under § 480-2.  Robert's Hawaii, 91 Haw. at 251.  HRS § 480-2 was amended in 2002 to allow "any person" to bring a private cause of action based on unfair methods of competition.  HRS § 480-2(e).  Even after the amendment, ASI lacks standing to bring unfair competition claims because: 1) ASI is not a competitor of the NCAA, and 2) § 480-2(e) cannot be applied retroactively.

30

ASI is not a competitor of the NCAA because the parties do not engage in the same commercial activities. The NCAA is not engaged in organizing or promoting Bowl Games, it does not sell tickets, sponsorship rights or TV broadcast rights to any Bowl Games, and it does not sell merchandise related to any Bowl Game. Simply put, the NCAA and ASI do not compete for the same consumers. Because ASI is not a competitor of the NCAA, it does not have standing to sue the NCAA under this statute. T.W. Electrical, 809 F.2d at 636 (Plaintiff did not state a claim under HRS 480-2 for unfair competition because the plaintiff did not compete with the defendant); Ochs v. Haw. Med. Serv. Ass'n, 2005 Haw. App. LEXIS 376, *3 (Haw. Ct. App. 2005) ("HRS section 480-2(e) (2002)…provides competitors with a private right of action"); Dash v. Wayne, 700 F. Supp. 1056, 1059 (D. Haw. 1988) ("Dash, as an individual, is neither a consumer nor a competitor in the context of this action…His situation is simply not contemplated by Hawaii Rev. Stat. § 480-2.").

Furthermore, the Hawaii legislature has made clear that "[n]o law has any retrospective operation, unless otherwise expressed or obviously intended." HRS § 1-3. HRS §§ 1-2 states: "No written law, unless otherwise specifically provided by legislative enactment…shall be obligatory without first being printed and made public." The Governor of Hawaii signed § 480-2(e) into law on June 28, 2002.[19]

---

[19] Although it is unclear when § 480-2(e) was published, it would have to be published *after* it was signed into law. Therefore, ASI cannot bring claims under § 480-2 because ASI's payments to the teams for the 1999-2001 Bowl Games were made

An amendment which involves substantive rights must not be construed as "operating retrospectively in the absence of a clear legislative expression that such operation is intended." <u>Clark v. Cassidy</u>, 64 Haw. 74, 77 (1981).[20] Section 480-2(e) creates a new substantive right. <u>See</u> <u>Dash</u>, 700 F. Supp. at 1059 (holding that § 480-2(d), creating private right of action for deceptive practice claims, creates a substantive right and does not apply retroactively); <u>Ochs</u>, 2005 Haw. App. LEXIS 376 at *3. The language of § 480-2(e) does not express that the statute should be applied retroactively. It can only be applied to events that occurred *after* the signing of the law on June 28, 2002.

Since ASI's claimed injury (if any) from the alleged antitrust violation is the difference between the payments it made to the teams under the postseason reimbursement rule and the payments it would have made but for the rule, ASI lacks standing to bring § 480-2 claims for unfair competition for ASI's Bowl Games played from 1999-2001 because those payments were made prior to June 28, 2002. CSF ¶3.

---

before June 28, 2002. CSF ¶3.

[20] Substantive rights are defined as "rights which take away or impair vested rights acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability in respect to transactions or considerations already past, as distinguished from remedies or procedural laws which merely prescribe methods of enforcing or giving effect to existing rights." <u>Cassidy</u>, 64 Haw. at 77.

The only Bowl Game that falls after the date of the amendment is the 2002 Seattle Bowl.[21]    However, ASI's claim that it was injured by the postseason reimbursement rule for the 2002 Seattle Bowl is absurd because in fact ASI contracted to pay each participating team a *greater* amount than required by the postseason reimbursement rule.  CSF ¶14.

In order to bring a claim for relief for a violation of HRS § 480-2, ASI must meet the requirements of HRS § 480-13, which require: (1) a violation of HRS Chapter 480; (2) injury to ASI's business or property; (3) proof of the amount of damages; and (4) a showing that the action is in the public interest.  Robert's Hawaii, 91 Haw. at 254; Ai v.  Frank Huff Agency, Ltd., 61 Haw. 607, 617 (1980) (overruled on other grounds, Robert's Hawaii, 91 Haw. at 250).  HRS § 480-13 requires that a plaintiff have sustained actual damages.  Jenkins v. Commonwealth Land Title Insurance Co., 95 F.3d 791, 799 (9th Cir. 1996).  "The mere existence of a violation is not sufficient ipso facto to support the action; forbidden acts cannot be relevant unless they cause a private damage."  Ai, 61 Haw. at 618.  Plaintiff must show that it "suffered an actual or threatened injury as a result of the defendant's wrongful conduct," and that "the injury is fairly traceable to the defendant's actions."  Cieri, 80 Haw. at 66.  But, ASI has failed to meet the requirement of a showing of injury

---

[21] The unfair competition claim for the 2002 Seattle Bowl would have to be adjudicated in accordance with ASI's federal and state antitrust claims, and should be dismissed for the same reasons, because ASI has limited its alleged injury to the payments made to participating teams pursuant to the postseason reimbursement rule.  Complaint ¶27.

because in 2002 it contracted with participating teams for a payment of $1 million each, an amount **greater** than required under the postseason reimbursement rule.[22] And, ASI has admitted that its contracts with participating teams were independent of the NCAA's rules and regulations.  CSF ¶16.  ASI has also admitted that even if the NCAA had given ASI a waiver from the postseason reimbursement rule, which ASI failed to seek, ASI would have to abide by the independent contracts that it signed with participating teams.  CSF ¶16.  Therefore, the NCAA's rule cannot be held responsible for ASI's independent negotiations with conferences and teams in which it contracted to pay a greater amount than required by the NCAA's rules.

## V.   CONCLUSION

For all the foregoing reasons, the NCAA respectfully requests this Court to grant its motion for summary judgment against claims brought by ASI.

DATED:  Honolulu, Hawaii, _____ JUN 1 4 2006 _____.

_____
WILLIAM C. McCORRISTON
KENNETH J. MANSFIELD
GREGORY L. CURTNER (*pro hac vice*)
ROBERT J. WIERENGA (*pro hac vice*)
ATLEEN KAUR (*pro hac vice*)

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION

---

[22] ASI also did not suffer **actual** injury because it did not actually reimburse the teams for the funds that it had contracted to pay them.  The teams' inability to get reimbursed by ASI was one of many complaints received by the NCAA.  CSF ¶8.

34

## CERTIFICATION OF WORD COUNT

I hereby certify, pursuant to Local Rules 7.5(b) and (e), that Defendant

NCAA's Brief in Support of its Motion for Summary Judgment Filed June 14,

2006 contains 8,887 words.

DATED:  Honolulu, Hawaii, _____ JUN 1 4 2006 _____.

WILLIAM C. McCORRISTON
KENNETH J. MANSFIELD
GREGORY L. CURTNER (*pro hac vice*)
ROBERT J. WIERENGA (*pro hac vice*)
ATLEEN KAUR (*pro hac vice*)

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION

140322.1