## BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
TWENTIETH FLOOR
611 WEST SIXTH STREET
LOS ANGELES, CALIFORNIA 90017
(213) 622-4222

FACSIMILE: (213) 689-1944
E-MAIL: MBLECHER@BLECHERCOLLINS.COM
WWW.BLECHERCOLLINS.COM

May 19, 2004

**VIA FACSIMILE & U.S. MAIL**

Gregory L. Curtner, Esq.
Miller, Canfield, Paddock & Stone, P.L.C.
101 North Main Street, Seventh Floor
Ann Arbor, Michigan 48104

Re:   Aloha Sports Inc. v. The National Collegiate Athletic Association

Dear Mr. Curtner:

Following up on the questions/issues raised during our conference call and your letter of last week:

(1) The references in the Complaint to Hawaii Revised Statutes 480(a) and (b) should read Hawaii Revised Statutes 480-4(a) and (b).

(2) Enclosed please find a draft copy of the February 20, 2003 Irrevocable Binding Letter of Intent between Pro Sports & Entertainment, Inc. ("Pro Sports") and ASI Acquisitions Inc.

(3) The "contract" referred to in the fourth and fifth causes of action for breach of contract is evidenced by the NCAA Policies and Procedures, the NCAA Postseason Football Handbooks, as well as the course of conduct between the parties. It is my understanding that these documents and the correspondence between the parties evidence the agreement between the NCAA and Aloha Sports Inc.

(4) With respect to damages, we are willing to provide a broad outline of the theory of damages sought in this case subject to the usual qualifications that said theories are preliminary and may be amended at any time based upon fact discovery and expert witness analysis. That said, we contemplate at least three theories of damages at this stage:

EXHIBIT "54"

## BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

Gregory L. Curtner, Esq.
May 19, 2004
Page 2

       (a) <u>Antitrust Damages</u>: There are two separate measures of damages.

       1. <u>Lost Profits</u>: Without the NCAA's price fixing agreement, Plaintiff would have been in a position to freely negotiate payouts to those schools interested in playing in Hawaii which, by all accounts, was and remains a highly desirable locale. Accordingly, in a "but for world," plaintiff contends that it would have negotiated significant reductions in the NCAA mandated minimums of $750,000 per school. Over a four year period of time (which would have included 6 total bowl games) plaintiff contends that it lost revenues in the millions of dollars. By way of illustration, plaintiff could have negotiated total payouts of $375,000 per team per bowl rather than the required $750,000 per team per bowl. Under that scenario, plaintiff would be entitled to $750,000 per bowl times the 6 bowls played during the 4 year damage period for total damages of $4,530,000 before trebling. Obviously, these numbers are simply for your consideration and will be fine-tuned during discovery.

       2. <u>Loss of Going Concern Value</u>: Alternatively plaintiff's antitrust damages may be calculated by looking to ESPN's operation of the Hawaii Bowl. This theory will require further discovery to flesh out.

       (b) <u>Tort Damages</u>: Separate and apart from the antitrust issues, the NCAA's decision to decertify the Seattle Bowl in contravention of NCAA policies resulted in the termination of an agreement with Pro Sports that was worth approximately $2.1 million before punitive damages. Furthermore, the NCAA's decision to decertify the San Francisco Bowl in contravention of NCAA policies resulted in lost profits that will be determined during the course of discovery.

       (c) <u>Contract Damages</u>: The NCAA's decertification of the Seattle and San Francisco Bowls was done in contravention of the terms set forth in the NCAA policies and procedures as well as the established course of conduct between the parties. These damages will be determined during the course of discovery.

## BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

Gregory L. Curtner, Esq.
May 19, 2004
Page 3

5) The time period of the lawsuit includes the 1999 Aloha Bowl and Oahu bowls, as the payments to the teams participating in those games were not made until late March 2000. Also included are the 2000 Aloha and Oahu Bowls, and the 2001 and 2002 Seattle Bowls.

(6) We do not believe the complaint omits any factual allegations necessary to bring antitrust claims against the NCAA. Horizontal price fixing by members of the NCAA is clearly governed by "quick look" rule of reason analysis. See Law v. National Collegiate Athletic Association, 134 F.3d 1010 (10th Cir. 1998); see also NCAA v. Regents of the University of Oklahoma, 468 U.S. 111 (1984). As the court in Law explained, "[u]nder quick look rule of reason analysis, anticompetitive effect is established, even without a determination of the relevant market, where the plaintiff shows that a horizontal agreement to fix prices exists, that the agreement is effective, and that the price set by such an agreement is more favorable to the defendant than otherwise would have resulted from the operation of market forces." Law, 134 F.3d at 1020.

I will be out of the office from May 20 through June 6. However, I have confirmed that Max and Fritz are available to continue the Rule 26 discussions on Monday, May 24.

Very truly yours,

DAVID W. KESSELMAN

DWK:dc
Enclosure

cc:   Maxwell M. Blecher, Esq.
      Frederick W. Rohlfing III, Esq.