Transcript of the Testimony of
# TERRY DAW
1
**Date:** November 14, 2005
**Case No.:** 04-00204 DAE KSC
**Case:** ALOHA SPORTS v. THE NATIONAL COLLEGIATE

Carnazzo Court Reporting Company, Ltd.
Phone: (808)532-0222
Fax: (808)532-0234
Internet: www.carnazzo.com

EXHIBIT " 55 "

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


ALOHA SPORTS INC., a Hawaii  ) CIVIL NO. CV04-000204 DAE/KSC
                             )
         Plaintiff,          )
                             )
    vs.                      )
                             )
THE NATIONAL COLLEGIATE      ) MORNING SESSION
ATHLETIC ASSOCIATION, an     ) VOLUME I
unincorporated association,  ) PAGES 1 THROUGH 120
                             )
         Defendant.          )
                             )
                             )



VIDEOTAPED DEPOSITION OF TERRY DAW

Taken on behalf of Defendant at the law offices of

McCorriston Miller Mukai MacKinnon LLP, Five Waterfront

Plaza, 4th Floor, 500 Ala Moana Boulevard, Honolulu,

Hawaii 96813, commencing at 9:21 a.m., on Monday, November

14, 2005, pursuant to Notice.



BEFORE:

    Donna Kohls, CSR 146
    Notary Public, State of Hawaii

369490b3-b5d1-4342-b3d0-7d9c737df0fe

```
 1   APPEARANCES:

 2   For Plaintiff:          DAVID W. KESSELMAN, ESQ.
                             COURTNEY PALKO, ESQ.
 3                           Blecher & Collins, P.C.
                             611 W. Sixth Street, 20th Floor
 4                           Los Angeles, California 90017-3120

 5                                   and

 6                           FREDERICK W. ROHLFING, ESQ.
                             Case Bigelow & Lombardi
 7                           2600 Mauka Tower
                             737 Bishop Street
 8                           Honolulu, Hawaii 96813

 9

     For Defendant:          GREGORY L. CURTNER, ESQ.
10                           ATLEEN KAUR, ESQ.
                             Miller Canfield Paddock & Stone, P.L.C.
11                           101 North Main Street, 7th Floor
                             Ann Arbor, Michigan 48104-1400
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CARNAZZO COURT-REPORTING CO., LTD.
532-0222

369490b3-b5d1-4342-b3d0-7d9c737df0fe

Page 4

TERRY DAW

called as a witness by and on behalf of Defendant, being

first duly sworn to tell the truth, the whole truth, and

nothing but the truth, was examined and testified as

follows:

MR. CURTNER:  I should state for the record that

with me at counsel table is Atleen Kaur from my firm.

EXAMINATION

BY MR. CURTNER:

Q    Good morning, Mr. Daw.  Could you state your full

name, please.

A    Terry Leroy Daw.

Q    Where do you live, sir?

A    I live in Kailua Kona, Hawaii.

Q    How long have you lived there?

A    Two years.

Q    What is your address?

A    75-111 Halahua Place, Kailua Kona, Hawaii 96740.

Q    You understand that you are here today, sir, to give

a deposition in the matter of Aloha Sports versus the

National Collegiate Association?

A    I do.

Q    You understand you have been designated by the

Plaintiff, Aloha Sports, Inc., as its representative

pursuant to the Federal Rules of Civil Procedure,

1    Q    I mean, was that something you handled or Mr.

2    Rohlfing handled or you both handled or did it change?

3    A    We had meetings with the conferences immediately

4    after the first game.  Before the first game, I don't

5    think I had too many conversations with the conferences.

6    But after that first year, we went and met with them and

7    got to know them a little better.

8    Q    Were you involved in the decision to move the two

9    bowls to the mainland?

10   A    I was.

11   Q    Was that something you were in favor of?

12   A    It was.

13   Q    And if I understand correctly, you were in favor of

14   that because you thought you could improve attendance and

15   that would allow you to attract higher quality teams by

16   paying them more, is that correct?

17   A    Yes.  And we thought we would be closer to a fan base

18   so it would be easier for the fans to attend the games.

19   We had contracts with the Pac 10 and we wanted to try and

20   locate one of the bowl games within their jurisdiction.

21   In fact, we wanted to locate both of them at that time,

22   one in San Francisco and one in Seattle, Washington.

23   Q    Was the Pac 10 urging you to move the bowls?

24   A    No.

25   Q    Did you discuss that with Mr. Hanson?

1    to play in the game.  So I assume they were in favor of it

2    or they wouldn't have supplied us with a game.

3    Q    Did he say anything about the move itself as opposed

4    to supplying a team?

5    A    They enjoyed Hawaii, he did tell me that.  I remember

6    him telling me that.  And I remember him telling me that

7    he thought Seattle was a great city.

8    Q    Was the contract with the ACC entered into before the

9    move or after the move?

10   A    Both.

11   Q    So there was a preexisting contract and then you

12   modified it, is that correct?

13   A    Uh-huh.

14   Q    You also dealt with the Mountain West Conference

15   during that time period, is that right?

16   A    We dealt with the Mountain West during-- we started

17   talks with the Mountain West when we were moving the game

18   to San Francisco.  No, I take that back.  We started

19   discussing that with them after the first game in

20   Seattle.  We came to an agreement that they would supply

21   us with a team for the second game in Seattle.

22   Q    But if I understand correctly, they couldn't supply a

23   bowl eligible team, right?

24   A    That's correct.

25   Q    But they had already given you an advance deposit of

1    250,000, correct?

2    A    That's correct.

3    Q    And you never refunded their deposit, correct?

4    A    No, we did not, that's correct.

5    Q    And they sued you and have a judgment outstanding for

6    250,000 plus interest and costs, correct?

7    A    They do.

8             MR. CURTNER:  Let's mark this as the next,

9    please,

10             (Exhibit 2 marked for identification.)

11             THE WITNESS:  What do I do with the first

12    exhibit?

13    Q    (By Mr. Curtner)  Put them up upside down in the

14    center of the table and then they will end up in order.

15    A    Good.

16    Q    Mr. Daw, Exhibit 2 is a copy of the First Amended

17    Complaint filed in this lawsuit.  Are you familiar with

18    this document?

19    A    I am.

20    Q    Did you authorize it to be filed?

21    A    I did.

22    Q    Did you review it before it was filed?

23    A    I did.

24             MR. KESSELMAN:  I don't want to get into any

25    privileged discussions he has had with counsel about the

1    with potential sponsors?

2    A    Yes.

3    Q    And did you have experience in trying to find

4    sponsors for the games over the years you were involved?

5    A    No.

6    Q    So that was something handled by Mr. Rohlfing?

7    A    Well, depends on what time frame we are talking about

8    when you ask me that question.  When I originally started,

9    I had no experience.  But I gained experience rapidly.

10    After that point in time, once I became involved, every

11    new contact was a new experience.

12    Q    So you did gain experience and you did have activity

13    in trying to find sponsors?

14    A    I did.

15    Q    Did you find that to be a competitive activity in the

16    sense there were lots of people trying to find sponsors?

17    A    Oh, sure.

18    Q    Against whom-- who were the other people trying to

19    find the same sponsors that you were trying to find?

20    A    Every business in America.  I mean, that is what

21    happens, right?

22    Q    Did you find that there were other sporting events

23    trying to find the same sponsors that you were trying to

24    find?

25    A    Sure.

Page 31

1   Q    Were there non sporting events trying to solicit the

2   same sponsors?

3   A    I can only answer that in a general sense, in that

4   the advertising dollars that are spent, which is what

5   sponsors are doing, are competitively, you know, sent out

6   across the country.  Advertising agencies and so forth are

7   all involved in trying to obtain those dollars.

8   Q    So you base that on your experience in trying to find

9   sponsors in connection with this business?

10  A    Yeah.

11  Q    Did you have experience in connection with Aloha

12  Sports in dealing with TV networks about rights fees and

13  their willingness to broadcast your events?

14  A    I did.

15  Q    And I gather you dealt with ESPN, ABC and maybe

16  others?

17  A    I did.

18  Q    Who else did you deal with besides those two?

19  A    We talked to Fox Sports.

20  Q    Anybody else?

21  A    No.

22  Q    And I gather you talked to Fox after ABC and ESPN

23  said they weren't interested in the San Francisco Bowl?

24  A    They never told us they were not interested.

25  Q    Well, you did have a dispute with ABC and ESPN about

Page 34

1    Q    But what did you consider to be the fans' alternate

2    choices besides buying a ticket to your game, if anything?

3              MR. KESSELMAN:  Lacks foundation.

4    Q    (By Mr. Curtner)  You can answer, if you can, sir.

5              MR. KESSELMAN:  I'm making an objection for the

6    record. Unless I instruct you not to answer, if you have

7    an understanding, you can give him your understanding

8              THE WITNESS:  Okay.  Would you repeat the

9    question?

10              MR. CURTNER:  Sure.  Would you read it back,

11    please.

12              (The preceding question was read back.)

13              THE WITNESS:  Well, there were other kinds of

14    events around town that they had choices that they could

15    make.  They could go to the NBA basketball game.  They

16    could go to a college basketball game, movies.  There's so

17    many entertainment dollars, they are going to spend them

18    somewhere.

19    Q    (By Mr. Curtner)  When you were deciding what price

20    to charge for your tickets, how did you go about making

21    that decision?

22    A    Fritz and I talked about it and decided that $50 was

23    the number that we wanted to charge.  And we offered some

24    tickets at other prices, as well.  But the premium seats

25    would be $50.  And in the last year, some of the premium

Page 35

1   seats were a hundred dollars.

2   Q    Did you consider what other kinds of events were

3   charging for tickets when you made that decision?

4   A    Yeah.  We talked with a ticket master a little bit

5   about it and we talked with our staff.  We talked with the

6   Chamber of Commerce.  We talked with-- that's basically

7   it.  We had been charging $50 for those tickets for a

8   number of years.

9   Q    So you looked at other kinds of sporting events,

10  including pro events, other kinds of entertainment events

11  in the same geographic area and what they were going for?

12  A    Sure.

13  Q    And that is the information you gathered from ticket

14  master and the Chamber?

15  A    The Chamber was more just general how they felt about

16  it.  The ticket master talked-- we also looked at-- you

17  pretty much know when you are in the bowl business what

18  other bowls are charging, how they distribute their

19  tickets.  There's always a question of whether or not you

20  are charging too much or too little.

21  Q    Would you look at page six of the Complaint, please.

22  A    Okay.

23  Q    In paragraph ten, there is a reference to the NCAA

24  Division 1 Manual, Constitution, Operating Bylaws,

25  Administrative Bylaws and, two, the Postseason Football

1    Q    Were there any other NCAA documents that you relied

2    on or felt you needed to be familiar with in order to be

3    in the bowl business besides the Manual, which includes

4    the Constitution and the Bylaws and the Handbook?

5    A    No.

6    Q    Would you look at the next paragraph of the

7    Complaint, please, paragraph 11.  It says that the

8    Handbook, and I'm paraphrasing, required that agencies pay

9    a certain minimum.  Do you see that?

10   A    I do see that.

11   Q    Is it accurate, sir, that from the time you moved the

12   bowls to the mainland, that Aloha Sports always proposed

13   to pay or agreed to pay more than the maximum?

14        MR. KESSELMAN:  More than the maximum?

15        MR. CURTNER:  The minimum.  Thank you.

16        THE WITNESS:  Would you restate that question?

17   Q    (By Mr. Curtner)  Sure.  In other words, the minimum

18   at that time was 750,000, but you, in fact, agreed and

19   proposed to pay to the teams one million dollars per team

20   in Seattle?

21   A    Not every year in Seattle, no.

22   Q    Wasn't that true in `01 and in `02?

23   A    No.

24   Q    Just in `02?

25   A    Yes.

1  Q    But, in fact, one of your reasons for moving to the

2  mainland was so that you could offer and pay more,

3  correct?

4  A    Yes, I would say.

5  Q    It's accurate, is it not, sir, that the Handbook does

6  not regulate the number or the price of the tickets that

7  you require the teams to buy as a condition of their

8  participation in the bowl?

9         MR. KESSELMAN:  The document would speak for

10  itself on that subject matter.  It's the Best Evidence

11  Rule.

12         MR. CURTNER:  His understanding is pertinent.

13         MR. KESSELMAN:  That is a different question.

14         THE WITNESS:  Am I supposed to answer the

15  question?

16  Q    (By Mr. Curtner)  Yes.

17  A    Okay.  There are parts of the NCAA Handbook that

18  restrict what you can sell tickets for.

19  Q    My question was the number and price at which you

20  sell the tickets to the teams.

21  A    No, there is no restrictions to that.  I take it

22  back.  There is a restriction to that.

23  Q    What is that, as you understand?

24  A    We have to sell a certain percentage of the tickets

25  in the stadium.  We can only require them to buy a certain

1  teams themselves.

2  Q    Do you know how many bowl games there were in 2000?

3  A    I don't remember.

4  Q    Do you know how many there were in 2001?

5  A    I don't know the exact amounts.  Twenty-eight or

6  something like that.

7  Q    What about 2002?

8  A    About the same.

9  Q    So if I told you it was 23, 25 and 25 for those three

10  years, would that sound right to you or not?

11  A    No.

12  Q    You thought it was higher?

13  A    Yes.

14  Q    Did you ever ask the NCAA to waive any of its rules

15  as expressed in the Handbooks?

16  A    We asked for an extension of time on the letter of

17  credit.

18  Q    And they gave you several extensions on that, right?

19  A    They did.

20  Q    Did you ever ask for any other waivers?

21  A    Not that I can recall.

22  Q    When the San Francisco Bowl was not held, you were

23  aware that that meant that you lost your certification,

24  correct?

25  A    That would be incorrect.

1    comply with Bylaw 30.9, the requirement for an audited

2    financial report for the immediate past game, or the

3    NCAA's approved policies and procudures, the subcommittee

4    has the option to withhold certification for the

5    postseason bowl game for one year or fine it a percentage

6    of its gross receipts, not to exceed 50 percent, from the

7    contest involved in the noncompliance, with the amount to

8    be determined by it and approved by the Division 1

9    Championships/Competition Cabinet."

10   Q    And so you understood that the subcommittee had the

11   option to withhold certification for the postseason bowl

12   game for one year, right, if there was noncompliance, in

13   its view?

14   A    Yeah.

15   Q    And you were aware that that language was in the

16   Handbook every year?

17           MR. KESSELMAN:   That may lack foundation.

18           THE WITNESS:   I assumed that it was.

19   Q    (By Mr. Curtner)  Do you know?

20   A    I think it was.

21   Q    Continuing with this same one, would you look at page

22   29, sir, the Initial Bowl Certification.

23   A    Yes.

24   Q    You were aware, were you not, that a proposal for a

25   new bowl certification had a one-year waiting period at

1    not at a deposition.

2              MR. KESSELMAN:  We can debate that.

3              MR. CURTNER:  No, we can't.  Actually the

4    Federal Rules are pretty clear on that.  The only

5    objections that are to be made at depositions are those

6    that can go to the form of the question so that the

7    question can be rephrased.  The others are all preserved.

8              MR. KESSELMAN:  That's fine.  But it still

9    serves its purposes in showing documents to the client.

10   But in any event, we'll move forward.

11   Q    (By Mr. Curtner)  Exhibit 3, sir, is the Handbook for

12   the 2002-2003 year, correct?

13   A    Is this Exhibit 3?  Yes, it is.

14   Q    And this was something you were familiar with at the

15   time?

16   A    Yes.

17   Q    Would you look at page 33.

18   A    Sure.

19   Q    Okay.  You see it says New Certification Criteria for

20   the `03,`04 NCAA Postseason Games?

21   A    Uh-huh.

22   Q    So you were aware that there were new criteria in

23   effect as of that time?

24   A    I don't know if I was aware of this or not.

25   Q    Will you confirm for me on page 38 that the language

Page 50

1  relating to penalties is exactly the same as it was in the

2  prior Handbook, at least that first sentence that you read

3  into the record is the same as it was in the prior period.

4  A    It appears to be.

5  Q    Would you look at page 12 of that document, please.

6  A    Of the 2003-2004?

7  Q    Yes.

8         MS. KAUR:  2003-2004?

9         MR. CURTNER:  `02,`03.

10  Q    (By Mr. Curtner)  That is the one in front of you.

11  A    What page am I looking for, again?

12  Q    12.

13  A    All right.

14  Q    You see under the heading Minimum Guarantee, which

15  has the minimum 750,000 or 75 percent language?

16  A    Yes.

17  Q    The last sentence there reads, "A waiver of this

18  provision may be granted to a closed game."

19  A    I do see that.

20  Q    I did read it correctly, right?

21  A    It says, "A waiver of this provision may be granted

22  to a closed game."

23  Q    And applies to the minimum guarantee, right?

24         MR. KESSELMAN:  You can ask him his

25  understanding of how it would apply.

1    Q    (By Mr. Curtner)  It's in the same paragraph,

2    correct?

3    A    Actually not.

4    Q    I'm sorry.  I didn't hear your answer.

5    A    I said, I don't know if it's in the same paragraph or

6    not.

7    Q    It's in the same heading.  It's under the heading

8    Minimum Guarantee?

9    A    Yes.  Let me read this.  Okay?

10    Q    Sure.

11    A    Yes, it does say that.

12    Q    Did you ever seek such a waiver?

13    A    We did not.

14    Q    Did you ever make inquiry of the NCAA about that

15    waiver?

16    A    No.  At the time we were doing this, we had long term

17    agreements and this would not have come into effect until

18    our next negotiation.  So this had no effect on us

19    whatsoever, the waiver portion of that.  We were still

20    bound by the old rules because our contracts were also a

21    part of the old discussions.

22    Q    When you say-- I'm sorry.  Go ahead.

23    A    Any waiver of this, we couldn't have waived it if we

24    would have wanted to waive it at this point in time.  Now,

25    come a new negotiation, we could have asked the NCAA for

Page 52

1    some consideration.  But at the time we were involved in

2    the bowl games, this wouldn't have been a factor at all.

3    Q    So the long-term contracts you are talking about are

4    the contracts with the conferences?

5    A    That's correct.

6    Q    So you are saying the contracts with the conferences

7    were what you were governed by as opposed to this rule in

8    the Handbook?

9    A    No.  I'm saying we are governed by both.  You enter

10   into agreements that exceed one year, and these are all

11   one year agreements.  So anything that they change in this

12   agreement you really can't do anything about until after

13   your contract is expired that you have also entered in

14   with the conference for a dollar amount.  Under the old

15   agreement, we were required to pay the 750,000 and there

16   wasn't an exception.  So we were required to pay that

17   amount, period.

18   Q    It's your understanding, sir, that this waiver

19   language didn't exist in prior years?

20   A    I would have to read through it.  You would have to

21   refresh my memory if it does.

22   Q    So you don't really know, do you?

23   A    Not as we sit here, no.

24   Q    Would you look at the version of the Handbook that is

25   attached to your Complaint on page 10.

Page 54

1    and with-- his name slips my mind.  He was in charge of

2    the football portion of the NCAA's football division.

3    Q     Keith Martin?

4    A     Keith Martin, yes.

5    Q     Did you discuss this subject--

6    A     We discussed the minimum payouts and how much the

7    teams had to receive and so forth and so on.  And in all

8    those discussions, there was never an indication they were

9    willing to deal or negotiate on those issues at all.

10         Would have they, I guess we don't know because we

11   didn't ask.

12   Q     So you never raised it and your recollection is they

13   never raised it?

14   A     We never officially asked them for waiver, if that is

15   what you are asking me.

16   Q     You never even asked how one goes about it or how it

17   works?

18   A     No, I never did.

19   Q     Do you know whether any other bowls ever got waivers?

20   A     I do not.

21   Q     Of any portions of the rules?

22   A     I do not.

23   Q     Did you make it your business when you were involved

24   on behalf of ASI, Mr. Daw, to review the minutes of the

25   Certification Subcommittee of the NCAA?

Page 59

1   legitimately charged the teams for, right?

2   A    I couldn't charge the teams anything that the teams

3   didn't agree to buy.  So it wasn't something I could

4   charge the teams just because I wanted to charge them.

5   Q    Right.  But if the--

6   A    They wouldn't pay, either.

7   Q    -- operator and the team agreed, they could agree to

8   buy tickets equal to the $750,000, right?

9   A    As long as we thought we could sell tickets for the

10  same amount, I guess.

11  Q    And, in fact, for the Seattle Bowl, Wake Forest and

12  Oregon were each obligated to buy $662,000 worth of

13  tickets, correct, against the minimum of 750,000?

14  A    No, that is incorrect.

15  Q    The rule minimum was 750, although your contract

16  called for one million, right?

17  A    That is also incorrect.

18  Q    How is that incorrect?

19  A    Because we have all kinds of things that play into

20  what we pay versus just the minimum payment that you are

21  talking about.  The minimum payment is not really a

22  payment in terms of it guarantees that teams will get a

23  certain amount of money, but it also does not restrict

24  them from receiving more.  They can receive basically an

25  unlimited amount of money.

Page 60

1    Q    But sticking with my question, for the year that

2    Oregon and Wake Forest played in the Seattle Bowl, they

3    were each contractually obligated to buy $662,000 worth of

4    tickets, correct?

5    A    I'm not familiar with the total number amount.  But

6    if that is what it says in the contract, I would agree

7    with it.

8    Q    And, in fact, when you settled up with them, you

9    offset $662,000 against the payment, right?

10   A    We paid them one million dollars per team.  They took

11   as portion of their payment tickets, and what they did

12   with those tickets I don't know.  But I know that they

13   sold a lot of tickets and they had the ability to sell as

14   many tickets as we sold.

15   Q    But you gave them tickets, you didn't give them cash?

16   A    We gave them both.

17   Q    But for the 662, you gave them tickets.  On top of

18   that, you gave them cash?

19   A    If that is the number in the contract, yes.

20   Q    We have a document that shows that.  In fact, you

21   didn't pay them all of what you had contractually promised

22   to pay them for that year, correct?

23   A    We didn't at the time we were decertified.  However,

24   provisions were made for them to receive their money.

25   Q    In fact, they were not paid, correct, and they still

Page 78

1    doing it.

2    Q    My question was simply whether you discussed it with

3    the committee on that occasion?

4    A    No.  We did in our application.  This is-- you are

5    stretching my memory here.  But I think in our application

6    we did talk about affiliating ourselves with the WAC and

7    having the University of Hawaii play in the game.  And

8    ultimately, if you have the University of Hawaii play in

9    the game, it's a hometown team and you will sell your

10   tickets.

11   Q    Unfortunately, for you, Hawaii was eligible the year

12   you weren't there and wasn't eligible thereafter, right?

13   A    Well, it wouldn't have made any difference because we

14   wouldn't have been able to have them in our game anyway.

15   Q    Why?

16   A    Because we have long-term agreements with the Pac 10,

17   ACC, the Big East and so forth.  So they wouldn't have

18   been able to play-- in fact, it would have been worse for

19   us because then the fans would have even been madder.

20   Q    They would have been even madder at you, wouldn't

21   they?

22   A    Right.  So that may not have been the best situation

23   even then.  But the point is, you would never know until

24   the very last second.  With the BCS in its place, that is

25   the nature of the beast now.

Page 79

1   Q    So the difference between when you left Hawaii and

2   when you tried to bring one game back to Hawaii was that

3   you had an agreement with the WAC, is that right?

4   A    What Carl Benson told us-- an agreement would be

5   overstating what we had.  What we had was an agreement

6   with Carl Benson that if they did not certify the ESPN

7   game, then we in fact would have an agreement.

8   Q    So you didn't actually have a conference tie-in.  You

9   just had an understanding that you might get one if

10  somebody else didn't get the certification?

11  A    Well--

12  Q    Is that correct?

13  A    That would be correct.

14  Q    Thank you.  Could you look at page nine of the

15  Complaint, please.

16  A    Yes.

17  Q    It says, in the middle of the page, in paragraph 15,

18   "ABC required that the games be split in 2000."  Do you

19  see that?

20  A    Let me get my glasses on and maybe I can.  Yes, I do

21  see that.

22  Q    Now, is that statement accurate or not?

23  A    That depends.

24  Q    On what?

25  A    Well, bowl games are complicated, number one.  They

Page 86

1  Q    Did they sue you?  I saw some draft press releases

2  relating to lawsuits by ABC and ESPN.

3  A    I don't know.  I can't remember whether it was

4  formally filed or not, but they were certainly threatening

5  to sue us.

6  Q    Over this subject?

7  A    Over this subject.

8  Q    In other words, their position, if I understand

9  correctly, was that you were obligated to hold the games

10  in Hawaii on Christmas?

11        MR. KESSELMAN:  He, meaning his understanding of

12  their position?

13        THE WITNESS:  I can give you my understanding,

14  that's correct.  ABC was willing to broadcast the game if

15  we did one thing and one thing only, and that is if we

16  held it on Christmas Day.  Even if it was in San

17  Francisco, they were willing to do it.

18      But I was unwilling to hold another game on Christmas

19  Day.  The risk for a Christmas Day game far exceeded the

20  amount of money that ABC was willing to compensate you to

21  play on that date.

22  Q    (By Mr. Curtner)  So ABC wanted it on a particular

23  day, mainly Christmas, and they had a contract that

24  allowed them to insist on that, correct?

25        MR. KESSELMAN:  May call for legal conclusion.

Page 87

1    THE WITNESS:  I don't know if they had a

2  contract or not.

3  Q    (By Mr. Curtner)  So you don't know?  That's what the

4  contract said, as you understood it, right?

5    MR. KESSELMAN:  Same objection.

6    THE WITNESS:  As I understood the contract, they

7  were trying to impose terms that made it impossible for us

8  to comply with.

9  Q    (By Mr. Curtner)  And your concern was, although it

10  might get good TV audience and ratings, which was good for

11  ABC, it wouldn't get very good attendance, which was bad

12  for you?

13  A    That is correct.  And even in Hawaii, we wanted to

14  move the game off Christmas Day desperately and could

15  never get them to do that either.  So it was a very

16  difficult thing.  We knew ABC's position.  We knew how it

17  would affect our ticket sales and so we took a very

18  aggressive position against that.

19    The NCAA actually supported us in that decision

20  because they voted to recertify the game in Seattle

21  without and even over the objections of the ESPN.  And

22  they also did it for San Francisco, knowing that this was

23  all in place at the time.

24    So at the time we certified the games, ABC and ESPN

25  had both notified the NCAA by letter that, if they did so,

Page 95

1   Q    We haven't seen such a letter.  Do you remember

2   getting one?

3   A    I don't remember getting the letter.  But again, I

4   was reading a lot of documents at the time.

5   Q    Can you tell me who on behalf of the shareholders

6   told you they agreed to that?

7   A    Not with any degree of certainty.

8   Q    So you don't remember?

9   A    I don't.  I talked with-- I talked to Brian DiMartino

10  and I talked with Dick Schaller.  Those are the basic

11  people I talked with.

12  Q    Did Mr. Klompus ever tell you that he would sell for

13  that amount?

14  A    I didn't have discussions with Mr. Klompus.  Their

15  group representative did tell us-- Paul Feller I know told

16  me that he had a letter stating that in fact he had that

17  done.  It was my understanding at the time that that was

18  the case.

19  Q    Did you have dealings after you became involved with

20  Jeep or Chrysler, Daimler Chrysler, I guess it became,

21  about their sponsorship relationship with the bowls?

22  A    Yes.

23  Q    What was-- were you involved in the discussions with

24  them when they objected to you moving the bowls to the

25  mainland?

1   A    Yes, to some degree.

2   Q    With whom did you deal?

3   A    It don't-- I can't remember, to be honest.  There was

4   a new ad agency we were told that took over and she was

5   going to change her target market.  If I remember right,

6   she was going after women, and she didn't think our

7   audience met her criteria anymore.

8   Q    So they objected to the move to the mainland and

9   ended their sponsorship, correct?

10   A    I don't know if they objected to the move to the

11   mainland as much as they wanted-- the sponsorship had

12   changed since the sponsorship we had with Jeep, and they

13   saw it as a method of ending their sponsorship.

14   Q    But in any event, they said although there was a

15   contract for the sponsorship to continue for several years

16   further, that they would not continue it?

17   A    Yes, because we were no longer going to be on

18   Christmas Day in Honolulu, Hawaii.  But we were told that

19   the new ad agency thought that they could spend their ad

20   dollars better in response after a different market.

21   Q    Who told you that?

22   A    Someone in the Jeep organization, but I can't give

23   you a name because I don't know.

24   Q    Did you get copies of the minutes of the football

25   subcommittee or certification subcommittee identifying

Page 119

1        I, TERRY DAW, do hereby certify that I have read the

2    foregoing typewritten pages 1 through 118, inclusive, and

3    corrections, if any, were noted by me; and that same is

4    now a true and correct transcript of my testimony.

5

6        Dated

7

8

9

10

11

12

13    Signed before me this

14    day of          , 2005.

15

16

17

18

19

20

21

22

23

24

25

369490b3-b5d1-4342-b3d0-7d9c737df0fe

Page 120

STATE OF HAWAII )
)

I, DONNA KOHLS, C.S.R., a Notary Public in and for the State of Hawaii, do hereby certify:

That on November 14, 2005, at 9:21 a.m., appeared before me TERRY DAW, the witness whose testimony is contained herein, that prior to being examined, the witness was by me duly sworn; that the proceedings were taken in computerized machine shorthand by me and were reduced to print; that the foregoing represents to the best of my ability, a correct transcript of the proceedings had in the foregoing matter;

That the witness, if applicable, was notified through counsel, by mail or by telephone to appear and sign; that if the transcript is not signed, either the reading and signing were waived by the witness and all parties, or the witness failed to appear and the original is therefore kept on file without signature pursuant to Court Rules.

I further certify that I am not counsel for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption.

Dated:


Donna Kohls, C.S.R., No. 146
Notary Public, State of Hawaii
My commission expires: 7-21-2009

369490b3-b5d1-4342-b3d0-7d9c737df0fe

# Transcript of the Testimony of
# **TERRY DAW**

2

**Date:** November 14, 2005
**Case No.:** 04-00204 DAE KSC
**Case:** ALOHA SPORTS, INC. v. THE NATIONAL COLLEGIATE

Carnazzo Court Reporting Company, Ltd.
Phone: (808)532-0222
Fax: (808)532-0234
Internet: www.carnazzo.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


ALOHA SPORTS INC., a Hawaii ) CIVIL NO. CV04-000204 DAE/KSC
                     )
        Plaintiff,       )
                     )
    vs.                 )
                     )
THE NATIONAL COLLEGIATE    ) AFTERNOON SESSION
ATHLETIC ASSOCIATION, an    ) VOLUME II
unincorporated association,   ) PAGES 121 THROUGH 267
                     )
        Defendant.      )
                     )
                     )


VIDEOTAPED DEPOSITION OF TERRY DAW

Taken on behalf of Defendant at the law offices of

McCorriston Miller Mukai MacKinnon LLP, Five Waterfront

Plaza, 4th Floor, 500 Ala Moana Boulevard, Honolulu,

Hawaii 96813, commencing at 1:38 p.m., on Monday, November

14, 2005, pursuant to Notice.


BEFORE:

     Donna Kohls, CSR 146
     Notary Public, State of Hawaii

725086d3-dd8e-478a-8546-cd1c65eeff42

Page 122

1    APPEARANCES:

2    For Plaintiff:         DAVID W. KESSELMAN, ESQ.
                            COURTNEY PALKO, ESQ.
3                           Blecher & Collins, P.C.
                            611 W. Sixth Street, 20th Floor
4                           Los Angeles, California 90017-3120

5                               and

6                           FREDERICK W. ROHLFING, ESQ.
                            Case Bigelow & Lombardi
7                           2600 Mauka Tower
                            737 Bishop Street
8                           Honolulu, Hawaii 96813

9

     For Defendant:         GREGORY L. CURTNER, ESQ.
10                          ATLEEN KAUR, ESQ.
                            Miller Canfield Paddock & Stone, P.L.C.
11                          101 North Main Street, 7th Floor
                            Ann Arbor, Michigan 48104-1400

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CARNAZZO COURT-REPORTING CO., LTD.
532-0222

725086d3-dd8e-478a-8546-cd1c65eeff42

1                          TERRY DAW

2    called as a witness by and on behalf of Defendant, being

3    first duly sworn to tell the truth, the whole truth, and

4    nothing but the truth, was examined and testified as

5    follows:

6                 A F T E R N O O N   S E S S I O N

7                      EXAMINATION (Resumed)

8    BY MR. CURTNER:

9    Q    Good afternoon, Mr. Daw.  Have you ever been deposed

10   prior to today?

11   A    Never.

12   Q    Have you ever given testimony under oath in a prior

13   proceeding?

14   A    I never have.

15   Q    You mentioned this morning that you knew Mr. Rohlfing

16   before you became involved with ASI.  How did you know

17   him?

18   A    One of my best friends is his brother-in-law and our

19   kids played together because of that.  And he also is a

20   member of the same church that I'm a member of.  So we had

21   some association there.

22   Q    Who is the person, the brother-in-law?

23   A    Mark Mockelson (phonetic), one of my best friends.

24   Q    How do spell that?

25   A    I don't know how to spell his name, to be honest.

1   understanding.

2           THE WITNESS:  We consulted legal counsel and he

3   told us he thought we were okay to move.

4           MR. KESSELMAN:  Hold on.  I don't want you to

5   get into what you discussed with your counsel.

6           THE WITNESS:  Okay.

7           MR. KESSELMAN:  You can tell him what you may

8   have relayed back to ESPN, but I don't want the sum and

9   substance of your conversation with counsel.

10          THE WITNESS:  We relayed back to ESPN,

11  regardless of this, we were going to apply to move the

12  game.

13  Q    (By Mr. Curtner)  Did you seek ESPN's consent before

14  you made the decision and asked the NCAA for permission?

15  A    Their consent, no, we did not.

16  Q    I take it you would agree with me that the NCAA was

17  more supportive of your position to move the bowl than

18  ESPN was?

19  A    They agreed to do it.  So I assumed they were more

20  supportive.

21  Q    He goes on to say, we have serious concerns, and I'm

22  paraphrasing, about the continued viability of the Jeep

23  title sponsorship if the move is implemented.  And in fact

24  Jeep did withdraw, correct?

25  A    They did.

Page 132

1    was not my business.  Their revenue-- I wouldn't know.  It

2    would be hard to know.

3    Q    He says, "In addition, as you know, there are certain

4    issues with ABC regarding team selection that must be

5    resolved prior to even any discussion."  What are those

6    issues?  What were those issues?

7    A    In our contract with ABC, if I remember correctly,

8    they approved the final selections of the teams in the

9    games, but they couldn't unreasonably withhold their

10   approval.

11   Q    So were you planning to change the team selection

12   from what it had been the year prior in Hawaii?

13   A    At the time we moved, we were not, no.

14   Q    So you had the SEC, the ACC, The Big East and the

15   Pac Ten.  And this bowl you were talking about was the

16   Oahu where you had a SEC and the ACC, right?

17   A    No, the Big East and the ACC.

18   Q    Wasn't the Oahu Bowl Georgia and Virginia?

19   A    That was a one year contract because we couldn't get

20   a team out of the other conference.

21   Q    But it was in fact the SEC and the ACC?

22   A    For one year, yeah.  But that was on only as a

23   substitute.  The SEC was a substitute conference.

24   Q    So the contract for Oahu was the Big East and Pac 10?

25   A    I think that's right.  And the one for the Aloha was

Page 141

1    Q    That was your contract, right?

2    A    That's correct.

3    Q    And you showed as an income item for ticket sales

4    1.342 for the schools, right?

5    A    That's correct.

6    Q    But the way you actually handled that as a matter of

7    cash was, when you settled up with the schools, you

8    deducted from what you were paying them the amount that

9    they were being charged for the tickets?

10   A    We did exactly what the contract between us and the

11   schools required.

12   Q    But that is in fact the way you did it, correct?

13   A    We took all the expenses plus all the money they

14   spent in addition to ticket sales, and they spent more

15   money than just ticket sales, and we deducted that from

16   the amount of money we owed them.

17   Q    And you paid the difference?

18   A    And we paid the difference.

19   Q    At least in this year?

20   A    That is how we did it every year.

21   Q    Some years you didn't pay at all?

22   A    Some years we did not-- some years we did not agree

23   to finish it, that's correct, as in one year.

24   Q    Oregon and Wake Forest were never made the full

25   amount that they were contracted to receive, correct?

1   A    Then that would have been what they charged.

2   Q    Now, why did you charge the five percent King County

3   ticket tax on the tickets that were sold or obligated to

4   be sold by Stanford?

5   A    Because that is what the King County ticket tax was.

6   Q    But, in fact, you never paid that tax to King County,

7   did you?

8   A    No, because there is a question of who was supposed

9   to collect it.

10  Q    So you charged the schools for a tax but then you

11  didn't turn it over to the taxing authorities?

12  A    We had already paid the tax through to the other

13  side.  We were just passing that tax on to Stanford.

14  Q    No.  In fact, you never made that tax, isn't that

15  true?

16  A    That is the claim.  But that is not necessarily the

17  case.

18  Q    King County says you owe them hundreds of thousands

19  of dollars even today, isn't that true?

20  A    They do.

21  Q    And they claim that you never made this tax even

22  though you collected it from the schools?

23  A    That is what they claim.

24  Q    Are you claiming they are wrong?

25  A    Yeah.  We had an agreement with the ticket agency

Page 159

1   that was supposed to collect the tax.

2   Q    How could the ticket agency collect the tax on the

3   tickets that were being purchased directly from you by

4   Stanford?

5   A    There is more than just this involved in the taxes

6   and how they were paid.

7   Q    Well, explain it to me.  I don't understand.

8   A    We sold all kinds of tickets to the game.

9   Q    I understand the public tickets or the ticket agency

10  or whoever was selling them would collect the tax.  But

11  when you are selling the tickets--

12  A    You said to me that we owed a hundred and some

13  thousand dollars in taxes, and I'm telling that you it's

14  not just this amount.  It's also involved with the amount

15  of money that was paid by our ticket agency, and they

16  never turned the tax money over to the state.

17  Q    I see.  Not only did ASI not pay the tax money to

18  King County but the ticket agency also did not pay the

19  taxes to King County.  Is that what you are saying?

20  A    I'm saying that is what I'm saying, yeah

21               (Exhibit 16 marked for identification.)

22  Q    (By Mr. Curtner)  Exhibit 16, sir, is another

23  settlement statement, is that right?

24  A    It is.

25  Q    Who is Mike Finn you are sending this to?

Page 165

1   they had letters.

2   Q    They told you that they had objections from those

3   schools that they hadn't been paid?

4   A    No, they didn't even say objections.

5   Q    What did they say?

6   A    They said that they were decertifying the game.  It

7   was about a two-sentence discussion and that they were

8   decertifying it because-- what did they say?  They

9   mentioned something about the letter of credit and then

10  they mentioned-- I can't remember exactly what.  It's a

11  very, very brief conversation.

12  Q    Is it accurate they told you that they were refusing

13  to certify the bowl because of financial irregularities,

14  the letter of credit, and that your application was

15  irregular?

16  A    No, they never mentioned my application ever.

17  Q    They mentioned the other things but not that?

18  A    They mentioned the letter of credit and they

19  mentioned the teams were owed money still.  But that is

20  all they mentioned.  But at the same time at that

21  certification meeting, they were also given assurances and

22  in fact deposit bank slips indicating the money would be

23  paid.  All they had to do was recertify and they would

24  have gotten their money, all of it, and all the things you

25  talked about would have all been paid.

Page 176

1    and purposes, I will concede that they might have been.

2    Q    But it was a sponsor that promoted the name Sheraton?

3    A    Yeah, absolutely.

4    Q    And even though there was an agency--

5    A    I can't remember the name of the agency.  But they

6    owned and managed the Sheraton Hotels.

7    Q    But then there was also an agreement for the Sheraton

8    Waikiki and the Sheraton Moana Surfrider and the Sheraton

9    Princess Kaiulani to give you rooms at a discount, right?

10   A    No, I don't think they gave us rooms at a discount.

11   Q    Didn't they pay you a rebate based on the number of

12   rooms that you charged or that you sold to the teams?

13   A    Did they pay us a direct rebate, I think we did get

14   some rebate from them.

15   Q    About $30.00 a room?

16   A    That could be about right.

17   Q    Per night?

18   A    That would be probably right, yeah.

19   Q    And so it was about a hundred people per team or

20   more?

21   A    Not a hundred rooms.  The official travel parties

22   were something like 105 or something like that in terms of

23   players in the games.

24   Q    And then there were also others who came, school

25   officials, advisers and coaches?

Page 177

1   A    Yeah.  How many of those were part of the traveling

2   party I don't know.  They also had alumni that came and

3   all kinds of people that came.

4   Q    So how many rooms would you typically sell in those

5   days?

6   A    I don't know.  I don't have-- off the top of my head,

7   I can't tell you.

8   Q    But you got a rebate on each and every one that you

9   sold?

10  A    We got a rebate on all the rooms that were

11  contractually obligated by the teams to purchase.

12  Q    So the teams would pay 135 or 160 or something like

13  that and you would get a rebate of $30.00?

14  A    Uh-huh.  They got a very competitive rate on the

15  hotel room, actually.

16  Q    And you got an even more competitive rate?

17  A    We got a rebate back from the hotel rooms, that's

18  true.  I guess we could have got it in the form of a

19  sponsorship.  It would have been the same.

20  Q    It's all money, right?

21  A    That's correct.  Some bowl games did it this way.

22  Some bowl games got sponsorships.

23          (Exhibit 20 marked for identification.)

24  Q    (By Mr. Curtner)  Exhibit 20, Mr. Daw is a letter

25  from Mr. Rohlfing to Mr. Chastain relating to the amount

Page 184

1    notified that that was a decertification of the game.

2              (Exhibit 22 marked for identification.)

3    Q    (By Mr. Curtner)  This Exhibit 22 is an Application

4    for Recertification Seattle, corrects?

5    A    It looks like it is, yes.

6    Q    It's transmitted March 31, 2001, right?

7    A    Uh-huh.

8    Q    And so you understood that you had to apply to get

9    recertified, correct?

10   A    We agree that every single year there is requirements

11   given in the Handbook, one of which was to fill out the

12   application form.  And that as long as we were within the

13   requirements of the game, we would be recertified.  And if

14   we weren't, there were certain penalties that would be

15   affixed to us.

16   Q    Did you help prepare this document?

17   A    I'm sure I had some hand in it.

18   Q    What was your role?

19   A    I would have been reviewing and helping with the

20   document.

21   Q    But did you prepare it or did Mr. Rohlfing basically

22   prepare it?

23   A    Mr. Rohlfing prepared it.

24   Q    Would you look at Item 46 of the application itself.

25   A    Okay.

Page 186

1    that true?

2    A    Uh-huh.

3    Q    So the NCAA could have refused certification for this

4    year if they had wanted to, correct?

5    A    They could have.  But it was the practice of the NCAA

6    not to.

7    Q    They were trying to help you out, weren't they?

8            MR. KESSELMAN:  That calls for speculation as to

9    what they were or were not trying to do.

10   Q    (By Mr. Curtner)  They extended you every courtesy

11   and every possible extension of time, did they not, to try

12   to keep your bowl going?

13   A    Depends on what point in time we are talking about.

14   Q    During this point of time.

15   A    Did they try to help us, I guess they looked at these

16   rules with some degree of leniency.  That was certainly

17   their choice to do that and they did.

18   Q    Item No. 55, it says, "Will your bowl pay $12,000 fee

19   to the NCAA upon notice of certification," and you

20   answered yes.  So you see that?

21   A    Uh-huh.

22   Q    In fact, you didn't do that, did you?

23   A    It was paid late, but it was eventually paid.

24   Q    It was not paid until the following spring when you

25   submitted the application for recertification for the

1 following year, right?

2 A That's correct.

3 Q So you submitted the `02 certification fee in `03,

4 right?

5 A We would have probably always submitted it in `03,

6 but we-- no, that would be incorrect.  The answer to that

7 question is yes.

8 Q So that was another way in which you were not in

9 compliance with the NCAA rules?

10 A Uh-huh.  They wrote us saying if we had it in by a

11 certain date, we would be fine, and we did.

12 Q Do you have a letter saying it was okay to submit the

13 $12,000 in March or April of `03?

14 A I think it was from Nicky Watson, if I remember

15 right.

16 Q Has that been produced?

17 A I don't know if we have it still.

18 Q There is no such letter that I have seen.

19 A Then you want to ask the NCAA if they have it,

20 because they probably do.

21 Q I will.  I asked them for everything, too.

22 A We have produced boxes and boxes and boxes of

23 documents.  So the fact that one letter would be missing

24 wouldn't surprise me.

25 Q It's your testimony, sir, under oath that Nicky

Page 188

1    Watson wrote you a letter saying that you could put the

2    `02 certification fee in in `03, is that right?

3    A    I didn't say that it was okay.  I didn't say that.  I

4    said they accepted the money and they took it.

5    Q    So you are not now claiming that you have a letter

6    from Nicky Watson that said it was okay?

7    A    I'm saying Nicky-- I told you that Nicky Watson sent

8    us a letter telling us that we had to get the money in by

9    a certain date, which we did.

10   Q    Even though you concede it was late?

11   A    Yes, I do concede it was late.

12                (Discussion held off the record.)

13                (Exhibit 23 marked for identification.)

14   Q    (By Mr. Curtner)  Exhibit 23, sir, is the Application

15   for Recertification of the San Francisco Bowl, right?

16   A    Okay.

17   Q    And this is a transmittal of March 31, 2001, right?

18   A    That is what it indicates, yes.

19   Q    And you participated in the preparation of this?

20   A    I think I would have, yeah.

21   Q    And it was accurate?

22   A    I assume it was accurate, yes.

23   Q    Now, it says, "It is our desire to significantly

24   increase the team payouts from the Bowl.  In order to

25   accomplish this goal, we believe that the Bowl needs to be

1  Q    There's a famous poem: "Standing on the sidelines

2  gnawing on his rectitude."

3  A    Are we done with that one?

4  Q    But you were aware of that, that that was the

5  position of the NCAA, correct?

6  A    I was aware that they sent us that letter.

7           (Exhibit 27 marked for identification.)

8  Q    (By Mr. Curtner)  This is something from McNeil

9  Wilson Communications to Mr. Rohlfing dated May 10, 2001

10  with some draft press releases.  Are you familiar with

11  this or is this something only Mr. Rohlfing knows about?

12  A    Well, he was writing lots of this kind of stuff, and

13  quite frankly, this was something that Fritz basically

14  handled with him.  I was involved in meetings and general

15  discussions about stuff.

16  Q    Patrick Dugan of McNeil Wilson Communications was

17  your publicity person or public relations person?

18  A    It was a PR firm that we hired to help us, yeah.

19  Q    And, in fact, you never paid him, right?

20  A    We paid him some, yeah.

21  Q    But you owed him money.  In fact, he has a judgment

22  against you?

23  A    He does, that's correct.

24  Q    For $30,000 or something like that?

25  A    Uh-huh.

Page 199

1    Q    Because you didn't pay him for this work?

2    A    That would be correct.

3    Q    This indicates that Jeep was withdrawing as a

4    sponsor.  That's accurate, right?  Jeep did say they

5    didn't want to continue to be a sponsor if you were moving

6    to Seattle?

7    A    They told us they didn't want to be a sponsor.  And

8    they thought that, since we were moving the game, they

9    didn't have to continue with our sponsor.

10   Q    This draft says at the bottom of the page relating to

11   Jeep--

12   A    Which page is that?

13   Q    It's the second page of the exhibit.  "Enhancing the

14   overall sponsorship packages for both games is essential

15   to increasing the bowl payouts and attracting higher

16   ranked teams."  Do you see that?

17   A    Uh-huh.

18   Q    That was your position in May of 2001, correct?

19   A    Yeah.

20   Q    And the next sentence reads, "In Honolulu, the

21   Christmas Day bowl games failed because the preexisting

22   contracts with the networks and sponsors did not generate

23   enough revenue to draw the higher ranked teams needed to

24   attract Hawaii fans."  Do you see that?

25   A    That was one of many reasons.  But that is what this

Page 207

1          (Exhibit 29 marked for identification.)

2     Q     (By Mr. Curtner)  Exhibit 29, Mr. Daw, is a letter

3     dated to Mr. Rohlfing from Michael Tranghese, Commissioner

4     of the Big East, right?

5     A     Uh-huh.

6     Q     Do you remember meeting with or talking to the Big

7     East about their interest?

8     A     Fritz really did the discussions with the Big East.

9     Q     This states that, by July of 2001, the Big East was

10    saying that they were concerned about the viability of the

11    relocation of the second game to the West Coast, San

12    Francisco.  Do you see that?

13    A     Where are you talking?  Where are you saying this

14    says this at?

15    Q     It says that under the paragraph marked number one.

16    A     Yeah.

17    Q     So you didn't have the San Francisco Bowl mechanisms

18    together by this point in time, July or the summer of

19    2001, right?

20    A     Well, the question I have for you is, what do you

21    mean by didn't have the mechanisms?  We are not required

22    to have agreements with any conferences, even before

23    playing--even until the time of the game.  In fact, we are

24    never required to have an agreement with the conference.

25    Q     But they say they are concerned about the viability

1    of the relocation.  In other words, you didn't have an

2    agreement with the park.  You didn't a variety of things

3    in place, right?

4    A    It doesn't say this.

5    Q    But you didn't have an agreement with the park at

6    that point, right?

7    A    No, we didn't.

8    Q    And you didn't have an agreement--

9    A    We could have had one.

10    Q    You didn't have an agreement with staff to work on

11    it, isn't that right?

12    A    We had our own staff.

13    Q    Just your Hawaii staff?

14    A    No.  We probably would have run the same staff we ran

15    the Seattle bowl with.

16    Q    And you didn't have the commitment from any

17    conference, right?  You had interest but no commitment?

18    A    No, we didn't.  It's not required, but we didn't have

19    it.

20    Q    My question is, would you have it?  And you were

21    having a dispute with ESPN and ABC, right?

22    A    I don't know if there was still a dispute at this

23    point or not.  There may not have been at this point.

24    Q    At some point in the summer, you started considering

25    other cities besides San Francisco, right?

725086d3-dd8e-478a-8546-cd1c65eeff42

1    A    Uh-huh.

2    Q    You considered Anaheim and Jacksonville, right?

3    A    No.

4    Q    Anaheim and--

5    A    Columbia, South Carolina.

6    Q    Any others?

7    A    We looked at a lot of cities.

8    Q    Why were you looking at cities other than San

9    Francisco?

10    A    Because we were trying to locate the game closer to

11    what we thought was going to attractive football markets

12    before we committed to it.  We were still committed to San

13    Francisco at the time.  We were just trying to decide

14    whether not we get a better offer elsewhere, whether or

15    not we could increase our chance of success in another

16    city.  And we knew if we did this, we would have to apply

17    for recertification or from a move the NCAA, none of which

18    we did.

19        But we were just exploring other business

20    opportunities.  If they would present themselves and

21    things were favorable enough, we would have gone to the

22    NCAA and said, "Here is what we want to do. What do you

23    think?"  But that ever occurred.

24    Q    So even by August of 2001, you hadn't settled on a

25    location or teams or TV sponsors--

Page 210

1   A    No.  While this was still going on, we were still

2   working on the game and whether it was going to be held in

3   San Francisco or not.  We were still working on the game.

4   Q    But you were shopping it around, right?

5   A    We were shopping it around.  We were shopping an

6   opportunity that we thought some city may be interested in

7   helping us more than San Francisco would

8           (Exhibit 30 marked for identification.)

9   Q    (By Mr. Curtner)  This exhibit 30 is an article from

10  the Honolulu Advertiser of August 8, 2001.  You were

11  familiar with this at the time?

12  A    I don't know if I read this article or not.  I

13  probably did, yeah.

14  Q    "Honolulu, San Francisco, Columbia, Anaheim, Azusa,

15  Cucamonga," he says. "At this point, it's anybody's guess

16  where it might wind up."  Was that accurate?

17  A    No, it's inaccurate completely.

18  Q    You weren't considering Azusa and Cucamonga--

19  A    I don't consider Fred Lewis, a staff columnist for

20  the Honolulu Advertiser, as an authority on our game or

21  what we were doing.

22  Q    That is why I'm asking, sir, whether it's accurate.

23  A    I told you it wasn't.

24  Q    But you were considering Columbia, Anaheim or any

25  city that would take it?

1    Fritz Rohlfing in his September 9 letter and updated

2    information provided by William during his in-person

3    presentation were considered."  Does this help you

4    remember who William Hevenor was?

5    A    Someone that Fritz knew, but I'm not really sure who

6    he is.

7    Q    Do you know anything about the person?

8    A    No.

9    Q    And this says, "After carefully reviewing the matter,

10   the NCAA Football Certification Subcommittee determined

11   that adequate arrangements and commitments had not been

12   made by those involved to ensure the proposed bowl would

13   be a quality product and experience for the

14   students-athletes that would participate in the game.  For

15   these reasons, the subcommittee has withdrawn

16   recertification of the San Francisco Bowl for the 2001-02

17   bowl season."  Do you see that?

18   A    I do.

19   Q    And you understood that to be the NCAA's position in

20   September of `01, correct?

21   A    We did.

22   Q    And you then had some subsequent conversations with

23   NCAA representatives after this, right?

24   A    Yeah, basically, because there is no provision for

25   them to decertify a game that has been certified.

1  was moved to San Francisco and then not held but you

2  reapplied in April of 2002 to move it back to Honolulu,

3  that you agreed in your application that you had not

4  complied with the NCAA rules and regulations relating to

5  ticket sales the last time that bowl had been held?

6  A    That is a lot in one mouthful.  Repeat that one more

7  time.

8  Q    Let's try and save time.

9  A    I'm trying to understand your question.

10  Q    In other words, it was some of the questions I asked

11  earlier about some of the other applications for

12  recertification that you admitted that you hadn't complied

13  with all the ticket rules?

14  A    I guess my testimony would stand on that.

15  Q    And that was true of the application for moving it

16  back to Hawaii that you submitted in April of 2002?  I'll

17  show it to you.  I don't mean to be cute with you, sir.

18  A    I'm not trying to be cute.

19  Q    I'm just trying to do it fast.

20        (Exhibit 39 marked for identification.)

21  Q    (By Mr. Curtner)  Exhibit 39 is the Application for

22  Recertification, correct?

23  A    Yes.

24  Q    What does the word recertification mean to you, sir?

25  A    Well, that would be defined by the NCAA Handbook.

1    Q    April 1, 2002 was the date of it, correct?

2    A    Well, I assume so.

3    Q    And at that point in time, you had no commitments

4    from TV, correct, to televise the game.

5    A    No, we did not.

6    Q    And at that point, you had no title sponsor, correct?

7    A    Correct.

8    Q    At that point, you had no subsidiary corporate

9    sponsors, correct?

10    A    Correct.

11    Q    At that point, you had no commitments with

12    conferences?

13    A    We had tentative commitments, yes.

14    Q    You had discussions but no commitments, correct?

15    A    We had commitments if certain things happened, yes.

16    Q    In other words, the Pac 10 said we might be

17    interested if you have a game that we should be interested

18    in, right?

19    A    It wasn't the Pac 10.

20    Q    It was the WAC and who else?

21    A    The WAC, in particular, said basically that if in

22    fact they don't recertify-- if they don't certify the ESPN

23    Bowl, we would like to participate in the game.

24    Q    So they said we are going to go with whoever gets the

25    certification, right?

725086d3-dd8e-478a-8546-cd1c65eeff42

1   A    That is basically what they said.

2   Q    And you had no commitment with the stadium, either,

3   correct?

4   A    No formal commitment, no.

5   Q    They said we will give it to whoever gets certified,

6   right?

7   A    That's basically it, yeah.

8   Q    And you admitted in your application that you had not

9   averaged 25,000 tickets or 50 percent?

10  A    There is an explanation, but yes.

11  Q    And you also admitted that you had not sold a number

12  of tickets equal in value to the combined contractual

13  obligations of the teams, right, in the last year that you

14  had held it?

15  A    If you refer to something.

16  Q    I'm looking at 46 and 47.

17  A    That is correct, because we were not able to do

18  that.  It was a limited number of tickets and we couldn't

19  sell enough tickets to equal that amount.  It would be

20  impossible.

21  Q    But in fact you had not complied with the rules?

22  A    I don't know if we complied or not.  I would have to

23  take some interpretation of what they decided that meant.

24  Q    Question No. 45 says, "Was your game held in the

25  academic year for which it was certified," and you

1    MR. KESSELMAN:  I just want to inform you that

2   Mr. Daw advised that his last flight out is at 7:00.  He

3   has to leave here no later than 6:00.

4    MR. CURTNER:  Well, I expect to quit by then.

5   But it's not my obligation.  You guys were late this

6   morning.

7    MR. KESSELMAN:  I'm just advising you. We can

8   discuss logistics afterwards if you don't finish.

9   Q    (By Mr. Curtner)  Is it accurate, Mr. Daw, that you

10  entered into a settlement agreement with ESPN whereby ESPN

11  would pay part of the money that it was agreeing to pay to

12  you for the Seattle Bowl to ABC to discharge an obligation

13  of ASI to ABC?

14  A    Absolutely accurate.

15  Q    Is it also accurate that part of that was to be paid

16  out of the `03 Seattle Bowl revenues from ESPN which never

17  took place?

18  A    That is also accurate.

19  Q    And so ASI still owns money to ABC?

20  A    That is also accurate.

21  Q    How much?

22  A    I think 190,000, something like that.

23  Q    Is it accurate, sir, that there were three people,

24  three different groups, trying to get a bowl game back in

25  Hawaii for the `02-`03 year at the end of `02 football

1  season?

2  A    I think that is accurate, yes.

3  Q    And your group was one of them.  The others were ESPN

4  and Global Event Management, GEM, which runs the Motor

5  City Bowl?

6  A    Correct.

7  Q    Was it accurate that the ESPN group was tied in with

8  the Western Athletic Conference and Conference USA?

9  A    That's accurate.

10  Q    Is it accurate that you told the Star-Bulletin that

11  your group was in negotiations with major conferences?

12  A    We were.

13  Q    But you did not have an agreement with the stadium,

14  correct?

15  A    Not a written agreement, no.

16  Q    But they said that if you were lucky enough to get

17  it, they would probably go with you, is that right?

18  A    Yeah.

19  Q    And you did not have an agreement with a network?

20           MR. KESSELMAN:  Has this not been asked and

21  answered several times?

22           MR. CURTNER:  Yes. I'm just trying to make sure.

23           THE WITNESS:  No, we didn't at this time.

24  Q    (By Mr. Curtner)  The newspaper quotes you to

25  contrary, that is why I'm asking, whether they misquoted

Page 258

1   of the million?

2   A    Uh-huh.  A hundred thousand was going to go to--

3   Q    The sellers?

4   A    The sellers.

5   Q    But you didn't have that in writing?

6   A    I think that is in writing.

7   Q    You don't have a copy of such a writing?

8   A    I do not.

9   Q    Nor do I.

10  A    That could be.  But most of those letters were sent

11  directly-- we had them faxed directly to Paul Feller,

12  because that is what he wanted.

13  Q    Was the contract with Pro Sports ever signed by Mr.

14  Feller?

15  A    Let me tell you what I was told.  Okay.  I was-- when

16  we signed our agreement, we faxed it to the hotel where

17  the subcommittee was meeting.  Paul Feller had his

18  secretary fax me back his agreement.  At the time, my fax

19  machine jammed and the meeting went on.  And by the time I

20  got back to Paul, he told me that they it had been

21  decertified and there was no deal.

22  Q    So you never had a signed copy?

23  A    I had a verbal agreement and I had a signed copy that

24  was sent.  I never received it because of an electronic

25  error.

Page 259

1   Q   You never actually saw it?

2   A   Never did.

3   Q   And the one that was produced to us is not signed by

4   Mr. Feller?

5   A   No.  But I think Mr. Feller in his interview with the

6   NCAA indicated that he had a deal with me.  In fact, I'm

7   pretty sure of that.

8   Q   You weren't there, so you don't know what was said?

9   A   Only what Mr. Feller told me and Mr. Haugh.

10           (Exhibit 44 marked for identification.)

11   Q   (By Mr. Curtner)  This is the proposed agreement

12   which Pro Sports entered, right?

13   A   Yeah.

14   Q   And this is one that you never saw a signed copy of?

15   A   Uh-huh.

16   Q   Would you look at page seven and eight.

17   A   Uh-huh.

18   Q   Maybe it's seven, eight-- I guess it's seven and

19   eight.  There is two groups of liabilities and that is

20   what I'm a little confused about.  Can you explain that.

21   Is one the parent company and one the subsidiary?

22   A   Yeah, probably.

23   Q   So Exhibit-- page six is liabilities at the parent

24   company level, assets and liabilities, is that right?

25   A   Yeah, probably.  I would say yes.

Page 264

1  actually, but I think it was Phoenix.

2  Q    So Mr. Feller was in Phoenix but his secretary was in

3  Southern California?

4  A    Santa Barbara.

5        (Exhibit 45 marked for identification.)

6  Q    (By Mr. Curtner)  Mr. Daw, Exhibit 45 is the NCAA

7  News Release dated Thursday, May 1, 2003, indicating that,

8  among other things, the committee did not recertify the

9  Seattle Bowl due to financial issues and failure to adhere

10  to administrative requirements.  Do you see that?

11  A    Uh-huh.

12  Q    Is that the same thing they told you over the

13  telephone?

14  A    Yeah, I would say, in essence, that is what they told

15  me.

16  Q    Is this the only writing that you got from the NCAA?

17  A    I didn't get this from the NCAA.

18  Q    Did you see this at the time?

19  A    We read a release in the paper the next day.

20  Q    That said this same information?

21  A    You know, I don't remember. Something to this effect,

22  yeah.

23  Q    Did you see any other writing from the NCAA on this

24  subject?

25  A    No.

Page 266

1      I, TERRY DAW, do hereby certify that I have read the

2   foregoing typewritten pages 1 through 265, inclusive, and

3   corrections, if any, were noted by me; and that same is

4   now a true and correct transcript of my testimony.

5

6      Dated

7

8

9

10

11

12

13   Signed before me this

14   day of          , 2005.

15

16

17

18

19

20

21

22

23

24

25

725086d3-dd8e-478a-8546-cd1c65ecff42

Page 267

1    STATE OF HAWAII             )
                                )
2        I, DONNA KOHLS, C.S.R., a Notary Public in and for

3    the State of Hawaii, do hereby certify:

4        That on November 14, 2005 at 1:38 p.m., appeared

5    before me TERRY DAW, the witness whose testimony is

6    contained herein, that prior to being examined, the

7    witness was by me duly sworn; that the proceedings were

8    taken in computerized machine shorthand by me and were

9    reduced to print; that the foregoing represents to the

10   best of my ability, a correct transcript of the

11   proceedings had in the foregoing matter;

12       That the witness, if applicable, was notified through

13   counsel, by mail or by telephone to appear and sign; that

14   if the transcript is not signed, either the reading and

15   signing were waived by the witness and all parties, or the

16   witness failed to appear and the original is therefore

17   kept on file without signature pursuant to Court Rules.

18       I further certify that I am not counsel for any of

19   the parties hereto, nor in any way interested in the

20   outcome of the cause named in the caption.

21       Dated:

22

23

         Donna Kohls, C.S.R., No. 146
24       Notary Public, State of Hawaii
         My commission expires: 7-21-2009
25