# Transcript of the Testimony of
# FREDERICK ROHLFING, III

VOLUME I
**Date:** November 15, 2005
**Case No.:** CV04-00204
**Case:** ALOHA SPORTS v. THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

Carnazzo Court Reporting Company, Ltd.
Phone: (808)532-0222
Fax: (808)532-0234
Internet: www.carnazzo.com

EXHIBIT "56"

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

ALOHA SPORTS INC., a Hawaii  ) CIVIL NO. CV04-000204 DAE/KSC
                             )
         Plaintiff,          )
                             )
     vs.                     )
                             )
THE NATIONAL COLLEGIATE      )
ATHLETIC ASSOCIATION, an     )
unincorporated association,  )
                             )
         Defendant.          )
                             )
                             )

VIDEOTAPED DEPOSITION OF FREDERICK ROHLFING, III

Taken on behalf of Defendant at the law offices of McCorriston Miller Mukai MacKinnon LLP, Five Waterfront Plaza, 4th Floor, 500 Ala Moana Boulevard, Honolulu, Hawaii 96813, commencing at 9:05 a.m., on Tuesday, November 15, 2005, pursuant to Notice.

BEFORE:

    Donna Kohls, CSR 146
    Notary Public, State of Hawaii

Page 2

```
 1   APPEARANCES:

 2   For Plaintiff:        DAVID W. KESSELMAN, ESQ.
                           COURTNEY PALKO, ESQ.
 3                         Blecher & Collins, P.C.
                           611 W. Sixth Street, 20th Floor
 4                         Los Angeles, California 90017-3120

 5   For Defendant:        GREGORY L. CURTNER, ESQ.
                           ATLEEN KAUR, ESQ.
 6                         Miller Canfield Paddock & Stone, P.L.C.
                           101 North Main Street, 7th Floor
 7                         Ann Arbor, Michigan 48104-1400

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1         FREDERICK W. ROHLFING, ESQ.
2    Called as a witness by and on behalf of Defendant, being
3    first duly sworn to tell the truth, the whole truth, and
4    nothing but the truth, was examined and testified as
5    follows:
6                           EXAMINATION
7    BY MR. CURTNER:
8    Q    Good morning.
9    A    Good morning.
10   Q    Let me state for the record that this is the
11   deposition of Frederick Rohlfing, III, being taken
12   pursuant to notice for all purposes permitted by the
13   Federal Rules of Civil Procedure.
14        You are here today pursuant to notice and subpoena,
15   is that right, sir?
16   A    That is correct.
17   Q    And you are here as a fact witness, correct?
18   A    Yes, Mr. Curtner, I am.
19   Q    Now, you are a lawyer, correct?
20   A    I am a lawyer.
21   Q    And you are also counsel of record in this matter?
22   A    I am.
23   Q    So I understand that there may be privilege issues
24   and we'll all be alert to those.
25   A    Thank you.

1    games being played.
2         I don't recall being involved in discussions with Mr.
3    Feller subsequent to that time, other than a few contacts
4    in the spring or late winter or-- in the winter and spring
5    of 2003.
6    Q    You sat through yesterday's deposition. Although you
7    weren't here for the whole time, you were here for a good
8    part of the time yesterday of Mr. Daw's deposition, right?
9    A    I was here.
10   Q    And we discussed and had marked as an exhibit the
11   proposed agreement between Pro Sports, Mr. Feller's
12   business, and ASI to buy stock?
13   A    I was not here when that agreement was presented.
14   Q    My question is whether you were involved in that, in
15   negotiating or documenting that proposed transaction?
16   A    I was involved in some of the documentation. I
17   recall being involved in negotiating or-- I'm sorry, that
18   would be an incorrect word-- in evaluation the releases or
19   consents on the part of my children, for whom I am a
20   custodian, as to loans I had made to ASI Acquisition, Inc.
21   on their behalf. And I may have-- and I did have some
22   discussions with Mr. Daw regarding the purchase agreement
23   that he entered into.
24        I did not-- I guess that is what I will leave it at.
25   Q    Did you ever see a copy of the purchase agreement

1  signed by Mr. Feller on behalf of Pro Sports?

2  A     I did not.

3  Q     Have you to this day ever seen such a document?

4  A     I have not.

5  Q     Do you know whether Mr. Feller ever signed it?

6  A     I think I do.

7  Q     What do you think?

8  A     It's based on information that I received from my
9  client.

10 Q     From Mr. Daw?

11 A     Yes.

12 Q     And so you believe it to be privileged?

13 A     Yes, I do.

14           MR. CURTNER:  Are you instructing him on this?

15           MR. KESSELMAN:  He is the one that has to assert
16 the privilege himself, but I can certainly instruct him.
17 If it is information that is communicated in the course of
18 representation of the client in this litigation, then I
19 instruct you not to answer the question.

20           MR. CURTNER:  I'm not going to fight about it.  I
21 just want to make sure we got a clean record.

22           MR. KESSELMAN:   Okay.

23           MR. CURTNER:  I'm not going to fight about it at
24 this moment.

25           MR. KESSELMAN:   I think you have elicited Mr.

```
 1   Daw's knowledge on the subject, so I'm not sure you need
 2   any more.
 3           MR. CURTNER:  Mr. Daw may have said something
 4   different, too.  I don't know.
 5   Q    (By Mr. Curtner)  Do you know anything about the
 6   claim that the agreement was signed and faxed, that the
 7   fax machine failed to operate?
 8   A    I think that would get into attorney/client
 9   privileged matters, and I'm not going to answer that
10   question.
11           MR. CURTNER:  So were are at the same position
12   on that?
13           MR. KESSELMAN:  Yes.
14   Q    (By Mr. Curtner)  Have you ever discussed that
15   subject with Mr. Feller?
16   A    Which subject?
17   Q    Whether or not he signed the agreement.
18   A    I believe I have discussed that with Mr. Feller.
19   Q    What did he say to you?
20   A    My recollection is that he said he didn't recall
21   whether he signed it or not.
22   Q    I asked you because the copy of the document we got
23   when we subpoenaed Pro Sports, Mr. Feller's business, was
24   not signed.  So I gather your knowledge is-- that you are
25   not aware of any signed copy ever existing?
```

1  A    That would not be my testimony.  I do not know where
2  a signed copy would be right now.
3  Q    And you can't state of your own personal knowledge
4  that there ever was a signed copy?
5  A    I have not seen a signed copy.
6  Q    And you have no firsthand knowledge of there ever
7  being a signed copy?  And by firsthand, I mean other than
8  what somebody told you.
9           MR. KESSELMAN:  I think it's been asked and
10 answered.  The witness can respond to the extent it
11 doesn't impinge on privilege in any way.
12          THE WITNESS:  I have not seen a signed company.
13 Q    (By Mr. Curtner)  At the time that transaction was
14 being considered, there was some effort to get consents
15 from the original selling shareholders to that transaction
16 and to compromise their outstanding claims for, I think,
17 $100,000.  Were you involved in any of those discussions?
18 A    To which discussions are you referring?
19 Q    Discussions with the original selling shareholders
20 about whether or not they would agree to a compromise.
21 A    I don't recall being in any discussions with the
22 selling shareholders regarding their compromising their
23 claims under the promissory notes.
24 Q    Do you who was involved in those discussions, if they
25 took place at all?

Page 65

```
 1   A     I don't recall having any conversations with anyone
 2   from the NCAA during the year 2003 who was on the NCAA
 3   staff or a member of the Football Certification
 4   Subcommittee.
 5   Q     It has been claimed by people on behalf of ASI that
 6   the NCAA in the spring of 2003, quote, permanently
 7   decertified, closed quote, the Seattle Bowl.  Are you
 8   aware of any communications in which the NCAA said we are
 9   permanently decertifying the Seattle Bowl?
10   A     Yes.
11   Q     What are you aware of?
12   A     I'm aware of a press release that stated that--
13   either stated that the Seattle Bowl had been decertified
14   or had not been recertified.
15   Q     But my question was permanent.  Are you aware of
16   anything that says permanent?
17   A     No, I'm not aware of anything that says permanent
18   that came from the NCAA regarding the Seattle Bowl in
19   writing.
20   Q     Are you aware of anything not in writing from the
21   NCAA that says permanent?
22   A     Yes.
23   Q     What is that?
24   A     That there has been no communication from the NCAA
25   that certification had been withheld for one year pursuant
```

CV04-00204                                    ALOHA SPORTS v. THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

Page 66

1  to the Football Handbook.
2  Q    Is this the announcement from the NCAA, Exhibit 45,
3  that you are talking about?
4  A    Exhibit 45 is the announcement with which I'm
5  familiar.
6  Q    It does not use the word permanent, correct?
7  A    It uses the word decertify.
8  Q    But it doesn't use the word permanent? Could you
9  answer my question, please?
10 A    If I may have a moment to review it.
11 Q    Sure.
12 A    Well, it uses the word decertify. It does not use
13 the word permanent.
14 Q    May I see it, please. The first paragraph of the
15 document reads, "Indianapolis. One new bowl received
16 certification, 27 others were recertified and one bowl was
17 decertified for the 2003-04 season this week by the NCAA
18 Football Certification Committee." Did I read that
19 correctly?
20 A    May I ask the court reporter to read back, Mr.
21 Curtner's statement.
22      (Record read)
23      THE WITNESS: Only in the respect that the last,
24 the final word of the sentence is subcommittee, not
25 committee.

11/15/2005                                                          FREDERICK ROHLFING, III

a32ead11-2e9e-44ff-8b91-56a9b93ac846

1  Q    (By Mr. Curtner)  But the operative words are, "One
2  bowl was decertified for the 2003-04 season," correct?
3  A    Incorrect.
4  Q    I would say the operative words are the entire
5  sentence.
6  Q    But the reference to the Seattle Bowl is that it was
7  decertified for the 2003-04 season, correct?
8  A    The reference to the 2003-2004 season applies to the
9  bowl that received certification.  The 27 others that were
10 recertified as well as, and by implication, the Seattle
11 Bowl, they were all either certified, recertified or
12 decertified for the 2003-2004 season.
13        MR. CURTNER:  Okay.  Let's change the tape and
14 take a break.
15        (Recess held 11:16 to 11:37).
16 Q    (By Mr. Curtner)  Mr. Rohlfing, I saw a reference
17 somewhere that Doug Dickie from the committee had been on
18 the committee or the subcommittee, the break out group for
19 ASI.  Did you ever deal directly with Mr. Dickie?
20 A    I don't recall ever dealing with Mr. Dickie.
21 Q    I'm trying to understand the relationship between the
22 two different accounting firms, or at least the two that
23 you used.  Mr. Hee's firm did accounting work for ASI and
24 then the Becker firm, or whatever the proper name is, also
25 did work in connection with auditing the financials for

CV04-00204                                    ALOHA SPORTS v. THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

                                                                    Page 84

1    A    Right.
2    Q    So you understood that to be at least an extension,
3    if not a waiver?
4    A    Yes.
5    Q    And in fact you had trouble getting the letter of
6    credit in the fall of 2002, as well, correct?
7    A    Yes, Aloha Sports, Inc. had trouble getting that in.
8    Q    But you were involved personally?
9    A    I'm sorry?
10   Q    You were involved?
11   A    Not directly.  I was only giving legal advice at that
12   time.
13   Q    But you were involved in trying to get the LOC from
14   the bank, right?
15   A    LOC, the letter of credit?
16   Q    Yes.
17   A    I may have had some communications with the bank.
18   But I was by no means the primary contact between Aloha
19   Sports, Inc. and the bank at that time.  I recall very
20   little.  I may have been asked to provide some information
21   that I had that, you know, financial documents or
22   something that for some reason I had in my legal files and
23   the company did not have.  But I was not involved in the
24   negotiations either with the bank or the NCAA with regard
25   to the 2002 game letter of credit.

11/15/2005                                              FREDERICK ROHLFING, III

a32ead11-2e9e-44ff-8b91-56a9b93ac846

1  Q    But you are aware that the 2002 letter of credit was
2  late and Aloha Sports missed several deadlines and the
3  NCAA finally said if you don't get it in by X, we are
4  going to decertify you?
5  A    No, I'm not aware of that.  I am aware that-- I
6  understood that the letter of credit for the 2002 Seattle
7  Bowl was not issued on or prior to the deadline in NCAA
8  the handbook.  As to the other statements, your other
9  statements, I just don't know if that is the case or not.
10 Q    The conferences involved were asked to give some
11 subordination agreements in order to help the bank
12 facilitate issuance of that letter of credit.  Were you
13 involved in that?
14 A    I was not.
15 Q    I thought I saw your name on those, but I guess I was
16 wrong.
17         MR. KESSELMAN:  Can we come to a consensus on
18 lunch?
19         MR. CURTNER:  You want to break now?  It's fine
20 with me.
21         THE WITNESS:  Do you have an idea of how much
22 more time you need with me?
23         MR. CURTNER:  I don't think we will go all
24 afternoon.
25         THE WITNESS:  Okay.  That's good.  Is that an

Page 135

1    I'm close to done.
2              (Recess held 3:30 to 4:02)
3              (Exhibit 64 marked for identification.)
4    Q    (By Mr. Curtner)  This is an email from you to Mr.
5    Heftel, dated July 9, 2002?
6    A    Exhibit 64 appears to be just that.
7    Q    And Mr. Heftel at this point in time was somebody you
8    were considering or were asking to consider investing in
9    the business?
10   A    Yes.
11   Q    And you say you made one great decision and one very
12   bad decision, right?
13   A    Right.
14   Q    And you said the good decision was moving the Oahu
15   Bowl to Seattle, right?
16   A    Yes.
17   Q    And the bad decision was attempting to move the Aloha
18   Bowl to San Francisco?
19   A    Yes.
20   Q    And you say that this caused ASI to lose Jeep as a
21   sponsor, lose ABC as a broadcaster, lose Starwood Hotels
22   as a secondary sponsor, and lose team ticket commitments
23   of $750,000, right?
24   A    Yes, that is what the emails says.
25   Q    And then you go on to say, "We tried to move the

1  telephone conversations.

2      But it's been over a year that I-- I'm certain that
3  it has been more than a year that I last spoke to Mr.
4  Farmer about this topic.

5          MR. CURTNER:  That is all the questions I
6  have for today.  We have not used our full seven hours.
7  And I understand that the witness still has some documents
8  that he needs to finish searching for.  So there may be
9  some follow up questions at some point in time, but we
10 will attempt to do so in a way that is convenient for
11 everyone's schedule and requires the minimum amount of
12 travel.

13     Thank you, sir.

14         THE WITNESS:  Thank you.  (At.
15         4:16 p.m., the deposition adjourned)

Page 143

1   I, FREDERICK ROHLFING, III, do hereby certify that I
2   have read the foregoing typewritten pages 1 through 142,
3   inclusive, and corrections, if any, were noted by me; and
4   that same is now a true and correct transcript of my
5   testimony.
6
7       Dated
8
9
10
11
12
13
14  Signed before me this
15  day of              , 2005.
16
17
18
19
20
21
22
23
24
25

Page 144

1    STATE OF HAWAII              )
                                   )
2         I, DONNA KOHLS, C.S.R., a Notary Public in and for
3    the State of Hawaii, do hereby certify:
4         That on November 15, 2004, at 9:05 a.m., appeared
5    before me FREDERICK ROHLFING, III, the witness whose
6    testimony is contained herein, that prior to being
7    examined, the witness was by me duly sworn; that the
8    proceedings were taken in computerized machine shorthand
9    by me and were reduced to print; that the foregoing
10   represents to the best of my ability, a correct transcript
11   of the proceedings had in the foregoing matter;
12        That the witness, if applicable, was notified through
13   counsel, by mail or by telephone to appear and sign; that
14   if the transcript is not signed, either the reading and
15   signing were waived by the witness and all parties, or the
16   witness failed to appear and the original is therefore
17   kept on file without signature pursuant to Court Rules.
18        I further certify that I am not counsel for any of
19   the parties hereto, nor in any way interested in the
20   outcome of the cause named in the caption.
21        Dated:
22
23
              Donna Kohls, C.S.R., No. 146
24            Notary Public, State of Hawaii
              My commission expires: 7-21-2009
25