Transcript of the Testimony of
# JAMES HAUGH

**Date:** February 16, 2006
**Case No.:** 04-00204
**Case:** ALOHA SPORTS v. THE NATIONAL COLLEGIATE ATHLETIC
ASSOC.

Carnazzo Court Reporting Company, Ltd.
Phone: (808)532-0222
Fax: (808)532-0234
Internet: www.carnazzo.com

EXHIBIT "57"

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


ALOHA SPORTS INC., a Hawaii )  CIVIL NO. CV04-00204
corporation,                )            DAE/KSC
                            )   (Antitrust)
            Plaintiff,       )
                            )
vs.                         )
                            )
THE NATIONAL COLLEGIATE      )
ATHLETIC ASSOCIATION, an     )
unincorporated association,  )
                            )
            Defendants.      )
_____)


DEPOSITION OF JAMES L. HAUGH,

        Taken on behalf of Plaintiff, at the Law Offices of

Case, Bigelow & Lombardi, 737 Bishop Street, Suite 2600 Mauka

Tower, Honolulu, Hawaii, commencing at 9:33 a.m., on

Thursday, February 16, 2006, pursuant to Notice.


BEFORE:  CYNTHIA M. SMITH, C.S.R. NO. 153

CARNAZZO COURT REPORTING CO.
(808) 532-0222

Page 2

1              Notary Public, State of Hawaii

2

      APPEARANCES:
3

      Attorneys for Plaintiff:     COURTNEY A. PALKO, ESQ.
4                                  (Pro Hac Vice)
                                   Blecher & Collins, P.C.
5                                  515 So. Figueroa Street
                                   17th Floor
6                                  Los Angeles, California 90071
                                            -and-
7                                  FREDERICK W. ROHLFING, III, ESQ.
                                   Case, Bigelow & Lombardi
8                                  737 Bishop Street
                                   Suite 2600 Mauka Tower
9                                  Honolulu, Hawaii 96813

10     Attorney for Defendant:     GREGORY L. CURTNER, ESQ.
                                   Miller, Canfield, Paddock
11                                 And Stone, P.L.C.
                                   101 North Main, 7th Floor
12                                 Ann Arbor, Michigan 48104

13
      TELEPHONIC REPRESENTATION
14
      Attorney for Witness:        RANDALL THOMSEN, ESQ.
15                                 999 Third Avenue
                                   44th Floor
16                                 Seattle, Wa.  98104

17

18

19

20

21

22

23

24

25

CARNAZZO COURT REPORTING CO.
(808) 532-0222

4d702324-c44e-4458-9f75-8b25401c2d23

Page 3

1                         I N D E X

2

3    EXAMINATION BY:                                    PAGE:

4          Ms. Palko                                      4

5          Mr. Rohlfing                                  24

6          Mr. Curtner                                   48

7          Mr. Rohlfing                                 115

8

     EXHIBITS MARKED FOR IDENTIFICATION:                PAGE:
9

           No. 101   NCAA 2001-02 Postseason Handbk.    62
10

           No. 102   Complaint, Haugh v. Aloha Sports   87
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1    (Pursuant to Rule 14 of the Rules Governing Court

2  Reporting in Hawaii, the Reporter's Disclosure was made

3  available and is attached hereto.)

4                JAMES L. HAUGH,

5    called as a witness on behalf of the Plaintiff,

6  having been duly sworn, was examined and testified as

7  follows:

8                EXAMINATION

9  BY MS. PALKO:

10   Q.    Good morning, Mr. Haugh.  First of all I want to

11  thank you for appearing here today to answer a few questions.

12  My name is Courtney Palko and I represent the Plaintiff Aloha

13  Sports Inc.

14    Would you please state your full name and address for

15  the record?

16   A.    James L. Haugh.  94-349 Hokuahiahi,

17  H-o-k-u-a-h-i-a-h-i, Street.  Number 314.  Mililani, 96789.

18   Q.    Have you ever been deposed before?

19   A.    No.

20   Q.    Are you familiar with the procedures we will be

21  following today?

22   A.    My attorney went through them, yes.  Yesterday.

23   Q.    Okay.  Just so there is so no misunderstanding, I

24  will explain briefly the basic ground rules.  The deposition

25  is a procedure of taking your testimony under oath in

4d702324-c44e-4458-9f75-8b25401c2d23

Page 12

1    Q.      Do you know why Mr. Daw did not attend?

2    A.      We felt it was in the best interest with Pro Sports

3    purchasing the game that he not be attending.

4    Q.      Who felt that?  Just that was the general --

5    A.      -- concensus between Paul and Terry and myself.

6    Q.      Do you recall what happened at the certification

7    meeting?

8    A.      There were several meetings.

9    Q.      Can you just tell me about what happened this

10   weekend?  Or these four days?

11   A.      Well, there is a -- We met with the subcommittee,

12   Paul Fuller, myself, and Frank, and James to go over -- you

13   know, there is a report that the NCAA requests as far as an

14   evaluation report on how the bowl game went.  And they went

15   over that evaluation with us during that meeting.

16   Q.      So this is just the subcommittee?

17   A.      Yes.

18   Q.      And then what happened after that?

19   A.      Well, they gave us the report of both schools.

20   Obviously the losing team a lot of times gives you a kind of

21   a negative report.  And that is pretty typical.

22           There was also at the meeting the question asked to

23   myself and Paul if this game gets decertified would you be

24   considering taking a year break and coming back next year.

25   Q.      Did they state what the basis was?

4d702324-c44e-4458-9f75-8b25401c2d23

Page 33

1    A.    Um, yeah.  The letter of credits, the missed letter

2    of credits.

3    Q.    When you say missed letter of credit?

4    A.    The deadline the letter of credit that was missed.

5    Q.    So it's your understanding Aloha Sports missed a

6    deadline for giving the NCAA a letter of credit; is that

7    right?

8    A.    Yes.

9    Q.    For the 02 game?

10   A.    Correct.

11   Q.    And when Dennis Pope talked about a letter of credit

12   that is what you understood he was talking about?

13   A.    Yes.

14   Q.    Do you know whether Aloha Sports did obtain a letter

15   of credit for the 02 game?

16   A.    Yes.

17   Q.    And they did?

18   A.    Yes.

19   Q.    Okay.  And the game went forward in 02?

20   A.    Yes.

21   Q.    Were there any other questions, were there any

22   questions from the NCAA people in that meeting as to whether

23   Mr. Feller would consider holding off a year, not having the

24   game in 03?

25   A.    No.

4d702324-c44e-4458-9f75-8b25401c2d23

1    A.    No.

2    Q.    And did you see Mr. Feller come out of that meeting?

3    A.    Yes.

4    Q.    How long after you left did he come out?

5    A.    About ten minutes.

6    Q.    And did anyone else come out with him?

7    A.    Yes.  Dennis and Mike also left with him.

8    Q.    Did you speak with Dennis or Mike at the time they

9    were leaving?

10    A.    No.  They knew I was pretty upset to say the least.

11    Q.    But you spoke to Mr. Feller at that time?

12    A.    Correct.

13    Q.    And what did he tell you about -- Did he tell you

14    anything about what they had discussed in the meeting when

15    you weren't there?

16    A.    About would he still be interested in moving the game

17    forward, and taking a year off.

18    Q.    At any time during this week of meetings, you know,

19    the several meetings that you attended and you were there,

20    right?  At any time did anybody give, from the NCAA side, did

21    anybody give an explanation of why they did not want an 03

22    game to go forward?

23              MR. CURTNER:  Object to the form.

24              THE WITNESS:  I mean, other than it was the letter of

25    credit, it was the fall-out in the community.  And the

4d702324-c44e-4458-9f75-8b25401c2d23

Page 42

1    uncertainty of there was some suspicion of whether Terry was

2    still going to be involved in the game or not.  There was

3    always that during the week of questions, and people, you

4    know, they wanted that reassurance, that Terry was not going

5    to be involved with the game.

6            But it was those two major points.  The missed

7    deadline, and making sure the bills were paid, and then

8    moving the game forward and so forth.  Those were kind of

9    what we drew out of that week.

10   Q.    (By Mr. Rohlfing)  All right.  Did Mr. Feller tell

11   you anything else about what went on at that meeting after

12   you had left the room?  We are going back to that third

13   meeting.

14   A.    Other than the NCAA, they just wanted to deal with

15   Paul.  They were willing to go ahead and cut a deal with him.

16   Q.    He told you they told him that?

17   A.    Yes.

18   Q.    Did he say who specifically of the NCAA told him

19   that?

20   A.    Mike and Dennis.

21   Q.    Did he give any explanation as to what deal they

22   wanted to cut with him?

23   A.    No.  Other than that they liked to see the game

24   continue in Seattle.  They thought Seattle was a great city.

25   They thought we had the pieces in place in order to move the

CARNAZZO COURT REPORTING CO.
(808) 532-0222

4d702324-c44e-4458-9f75-8b25401c2d23

Page 50

1    Q.     And where are those documents located?

2    A.     Some are in Seattle and some are here in Hawaii.

3    Q.     The ones that are in Hawaii are at your residence?

4    A.     That's correct.

5    Q.     And what is your residence address?

6    A.     94-349 Hokuahiahi Street.  Unit 314, Mililani,

7    Hawaii, 96789.

8    Q.     The documents that are in Seattle, in whose custody

9    are those?

10   A.     Those are in my wife's parents' basement.

11   Q.     What is the address there?

12   A.     Um, I can't remember.  They're in Seattle.

13   Q.     What is their name?

14   A.     Herbert and Setsko Mori, M-o-r-i.

15   Q.     Now, at the time that you appeared before the

16   certification committee in Sani Diego in the spring of 03 did

17   you have a signed sponsorship contract for the 03 Seattle

18   Bowl?

19   A.     Many of our agreements were multi-year agreements.

20   Based on two, three year sponsorships.

21   Q.     Who had been the title sponsor the prior year?

22   A.     We did not have a title sponsor for the 02 game.

23   Q.     Who had been the lead sponsor?

24          MR. ROHLFING:  Objection to the form of the question.

25   Lacks foundation.

4d702324-c44e-4458-9f75-8b25401c2d23

Page 51

1    THE WITNESS:  We had a number of presenting sponsors.

2    Q.    (By Mr. Rohlfing)  Who were they?

3    A.    Washington Mutual.  Boeing.  Let's see.  I can't

4    remember.  It was about a half a dozen presenting sponsors

5    that we had.

6    Q.    (By Mr. Curtner)  Is it your testimony, sir, that you

7    had a written contract with Boeing and/or Washington Mutual

8    that covered the 03 bowl?

9    A.    Yes.

10    Q.    And you have a copy of such a document?

11    A.    I don't think I have it any more.

12    Q.    Is it accurate that Sony had been a sponsor of the 02

13    Seattle Bowl?

14    A.    No.  Sony was a sponsor of the 01 game.  We had an

15    offer on the table for Sony to be the title sponsor for the

16    02 game, at 400 thousand dollars.  And Terry decided not to

17    take that offer.  Sony was very interested in continuing with

18    us.  But Terry felt that the money wasn't right.  So --

19    Q.    At the time you appeared before the committee in the

20    spring of 03 did you have an executed contract with a venue,

21    with a stadium for the next year's bowl?

22    A.    Yes.

23    Q.    Had you submitted that to the NCAA?

24    A.    Yes.

25    Q.    Are you sure?

4d702324-c44e-4458-9f75-8b25401c2d23

Page 52

1    A.    Yes.

2    Q.    Do you have a copy of such a document?

3    A.    Um, yes, I think I still have a copy of that.

4    Q.    With whom did you have such an agreement?

5    A.    With First and Goal which manages Qwest Field.  To my

6    knowledge it was a three-year agreement.

7    Q.    So you're saying that the agreement continued from

8    the prior two years into the third year?

9    A.    From 02, for the next three years, with a 20-

10   thousand dollar deposit that would be moved forward for the

11   following year for the game.

12   Q.    Now, was there a new stadium, was Seahawks Stadium

13   being built in Seattle about that time, or was it just a

14   change in name?

15   A.    Yes, it was a change.  Our 01 game was at Safeco

16   Field and our 02 game was at Seahawk Stadium which now is

17   renamed 20 to Qwest Field.

18         But during 01 we negotiated our game to be moved to

19   the new stadium.  Okay.  In 02 and for the next I think it

20   was three or five years.  Our agreement with that $20,000

21   deposit.

22   Q.    You mentioned someone by the name of Barbara Hedges

23   being on that committee and at that meeting, right?

24   A.    Yes.

25   Q.    And you knew who she was?

Page 53

1    A.    Yes.

2    Q.    She was the athletic director at University of

3    Washington?

4    A.    That's correct.

5    Q.    And you had had some dealings with her?

6    A.    Yes.

7    Q.    In the community?

8    A.    Yes.

9    Q.    And you knew that she was aware that there were

10   people in the community who were unhappy with the way the 02

11   game had been run?

12   A.    Yes.

13         MR. ROHLFING:  Object to the question.  Lacks

14   foundation.

15   Q.    (By Mr. Curtner)  Is that right?

16   A.    Yes.

17   Q.    And she expressed that to you?

18   A.    Yes.

19   Q.    Both before and at the meeting?

20   A.    Yes.

21   Q.    And what was -- who was unhappy?

22   A.    Um, we had a number of people --

23         MR. ROHLFING:  Wait.  I object to the form of the

24   question.  Again it lacks foundation.

25   Q.    (By Mr. Curtner)  You may answer.

Page 54

1    A.    Yes.  We had a number of people on our committee, a

2    number of vendors in the community that weren't paid.  And

3    people that spoke from the community that were involved

4    either with the game as a volunteer, organizations got to

5    Barbara that they were unhappy being not paid.

6    Q.    Had those people also expressed their displeasure to

7    you?

8    A.    Yes.

9    Q.    Tell me who all had expressed their displeasure to

10   you about the way the game had been operated from the Seattle

11   community?

12   A.    Several committee members.  David Evans.  Jack

13   Thompson.  Which were co-chairs of our Seattle Bowl

14   committee.  Vendors that had not been paid.

15   Q.    Anyone else?

16   A.    No.

17   Q.    The two gentlemen you mentioned, Mr. Evans and

18   Mr. Thompson, what were their positions?

19   A.    They were volunteers.  They were co-chairs of the

20   Seattle Bowl committee.

21   Q.    And what was the Seattle Bowl committee?

22   A.    It was a group of business and community leaders to

23   help support the game, of finding volunteers, sponsors,

24   selling tickets.  Etcetera.

25   Q.    So what was Mr. Evans' position in the community?

4d702324-c44e-4458-9f75-8b25401c2d23

Page 55

1    A.       He was a retired executive with Sheraton Hotels.

2    Q.       What was Mr. Thompson's position in the community?

3    A.       He was into commercial real estate.

4    Q.       They were both prominent people in the Seattle

5    community?

6             MR. ROHLFING:  Objection to the form of the question.

7    Lacks foundation.

8             THE WITNESS:  Jack was.

9    Q.       (By Mr. Curtner)  And had they expressed to you the

10   basis for their displeasure with the way the bowl had been

11   operated?

12   A.       Again, I guess two points.  Is one they were unhappy

13   hearing -- they were unhappy with the letter of credit

14   deadline being missed.  Because that was obviously front page

15   on The Seattle Times.  And you know, they were a part of the

16   Seattle Bowl committee.  There was a lot of distrust with the

17   committee with Terry Daw.  And again, hearing rumors that,

18   you know, vendors have not been paid.

19   Q.       Was it true that vendors had not been paid?

20   A.       Yes.  By the time the game finished there were

21   probably, outside of the two teams and the $250,000 was owed

22   to the Mountain West, there were probably less than 6 vendors

23   not paid when we went to that meeting in San Diego.  And it

24   was probably less than ten thousand dollars.

25   Q.       So just so I understand, there were 6 approximate

Page 56

1   vendors who had not been paid in full, right?

2    A.      Either in full.  No, either they were partially paid,

3   but they were still owed money.

4    Q.      The two teams, Oregon, and Wake Forest and their

5   conferences had not been paid, correct?

6    A.      Fully.

7    Q.      But they'd been paid in part but not in full?

8    A.      Correct.

9    Q.      The Mountain West conference that had put a $250,000

10  deposit down, but then was unable to supply a team had not

11  gotten their 250,000 back, correct?

12   A.      Correct.

13   Q.      Isn't it also accurate that the officials had not

14  been reimbursed for their travel?

15   A.      No.  That is not correct.

16   Q.      Isn't it true that the officials made a claim for

17  some amount of money that they claimed they hadn't been paid,

18  from the Big 12 conference?

19   A.      It was late but they were paid in full.  All the

20  officials were paid.  Because, again, we had to give them a

21  check for their expenses for reimbursement there at the game.

22  So they were paid.

23   Q.      Isn't it accurate they claimed they were still owed

24  money after the game?

25          MR. ROHLFING:  Objection.  Asked and answered.

CARNAZZO COURT REPORTING CO.
(808) 532-0222

Page 60

1    basketball and the Seattle Bowls, any other experience with

2    NCAA events?

3        A.      Not that I can recall.

4        Q.      What about college sports events?

5        A.      Yes.  Here in Hawaii, involved with hosting, when I

6    was out at the Turtle Bay Hilton golf and tennis resort, we

7    started an invitational with about 14 NCAA tennis teams

8    coming over for two, three years out at the Turtle Bay.

9        Q.      Any others?

10       A.      No.

11       Q.      Now, the people who were not paid in connection with

12   the 02 Seattle Bowl, was that because of decisions you made

13   or decisions that Mr. Daw made?

14       A.      Mr. Daw.

15       Q.      So he was the one who decided he didn't have enough

16   money to pay them?

17       A.      Correct.

18       Q.      The letter of credit deadlines that were missed, was

19   that your doing or Mr. Daw's doing?

20       A.      Mr. Daw.

21       Q.      Were you involved in that at all?

22       A.      No.  Other than just helping prepare paper work, if

23   Terry needed in support of.  But it involved his working with

24   his bank and securing the letter of credit and whatever.  But

25   I was pretty much out of the picture of that.  It was his

4d702324-c44e-4458-9f75-8b25401c2d23

Page 61

1    responsibility to get the letter in, get all the documents

2    into the NCAA.

3            I was aware of, again, the missed deadlines and that

4    was it.

5    Q.    Now, is it accurate that the deadline was missed on

6    several occasions?

7    A.    Two.

8    Q.    Two.  It was extended by the NCAA and then missed and

9    then extended again?

10   A.    Yes.

11   Q.    And then finally met?

12   A.    That's correct.

13   Q.    And you were aware that the NCAA rules required a

14   letter of credit by a certain deadline?

15   A.    Yes.

16   Q.    Were you familiar with the NCAA handbook that applied

17   to that bowl?

18   A.    Yes.

19   Q.    How did you become familiar with that?

20   A.    Read it.

21   Q.    How did you get a copy of it?

22   A.    Through Dennis Pope's office.  They supplied us with

23   a, when I worked on the 01 game we were given a copy.  And

24   for the 02 game I got it off of the web site.

25   Q.    So when you applied for the 02 game it was in the

4d702324-c44e-4458-9f75-8b25401c2d23

Page 62

1   spring of 02; is that right?

2   A.      Correct.

3   Q.      So you applied in the spring for the event that was

4   held in December of 02?

5   A.      Correct.

6   Q.      And at that time you would have been working with the

7   01, 02 handbook; is that right?

8   A.      Correct.

9   Q.      And do you know what time of the year the new

10  handbook was published?

11  A.      No.

12  Q.      You don't know when the new ones came out?

13  A.      I think it was after the certification meetings, but

14  I am not positive.

15  Q.      Did the handbook list the events that were certified

16  for that particular year?

17  A.      I can't remember.

18  Q.      So at the time you were working on the 02 bowl the

19  one where the deadlines for the letter of credit were missed

20  you had a copy of the handbook from the prior year 01, 02; is

21  that right?

22  A.      Yes.

23          MR. CURTNER:  Let's mark this, as I happen to know,

24  as 101.

25                          (Exhibit No. 101 marked for

CARNAZZO COURT REPORTING CO.
(808) 532-0222

4d702324-c44e-4458-9f75-8b25401c2d23

Page 74

1        THE WITNESS:  Go ahead.  I am sorry.

2        MR. THOMSEN:  Jim, do you need a break?

3        THE WITNESS:  No, I am fine.

4        MR. CURTNER:  Could I have the last question, please?

5        (Whereupon the requested portion of text was read

6   back.)

7   Q.    (By Mr. Curtner)  Now, was anything said about the

8   Seattle Bowl when they read off the names one way or the

9   other?  Or was is just omitted?

10  A.    No.  They said it was decertified.

11  Q.    Did they use the word "decertified"

12  or did they just omit it?

13  A.    No, decertified.

14  Q.    Did they say decertified or not certified for the

15  03-04 year?

16  A.    Correct.

17  Q.    Did you see a press release that came out?

18  A.    Yes.

19  Q.    That same day or the next day?

20  A.    The next day.  And I saw it, read in the newspaper.

21  It just read all the games that was certified, and then it

22  said the Seattle Bowl would be, was decertified for 03.

23  Q.    Does it say was not certified for 03, 04?

24  A.    Yes.

25  Q.    Those were the exact words as you recall it?

Page 75

1    A.    Yes.

2    Q.    That is what appeared in the paper?

3    A.    Yes.   Seattle Times.

4    Q.    Okay.   So to you the word decertified and not

5    certified for 03-04 really meant the same thing?

6    A.    I don't understand your question.

7    Q.    You didn't draw any distinction between not

8    recertified for 03, 04, and decertified, that was all the

9    same thing to you?

10   A.    Correct.

11   Q.    Had you read the section of the rule book by then

12   that dealt with the penalties that could be imposed if a bowl

13   did not comply with the rules?

14   A.    Yes.

15   Q.    So you were aware that the committee had the power to

16   not re-certify?

17   A.    Correct.

18   Q.    And you knew that it was up to them to make a

19   decision as to whether to certify for the next year or not?

20   A.    Correct.

21   Q.    You said you had seen a letter of intent between Pro

22   Sports and Aloha Sports, correct?

23   A.    Correct.

24   Q.    That called for a more definitive agreement to be

25   executed subsequently; is that right?

Page 76

1    A.       Yes.

2    Q.       Did you ever see a more definitive agreement

3    executed?

4    A.       I can't remember.

5    Q.       You said you saw a draft of such an agreement?

6    A.       Yes, I did.

7    Q.       My question is whether you have ever seen such an

8    agreement signed by Mr. Feller on behalf of Pro Sports?

9    A.       I can't remember.

10   Q.       I will represent to you that none of us have been

11   able to find such a document so that is why I am asking if

12   you have ever seen it.

13   A.       Okay.  I can't remember.

14   Q.       You don't recall ever getting a signature page from

15   Mr. Feller?

16   A.       No.

17   Q.       Or ever seeing one?

18   A.       No.  That was between basically Terry and Mr. Feller.

19   Q.       So to the best of your knowledge Mr. Feller on behalf

20   of Pro Sports never signed that draft?

21   A.       I am not aware of that.

22   Q.       You said that Mr. Feller had some prior experience

23   with the Freedom Bowl?

24   A.       That's correct.

25   Q.       What became of the Freedom Bowl?

Page 80

1    Q.    On one occasion or multiple occasions?

2    A.    Multiple.

3    Q.    Did you have that problem with any of the other

4    people involved with ASI?

5    A.    No.

6    Q.    Just Mr. Daw?

7    A.    Yes.

8    Q.    But Mr. Daw was the majority shareholder during the

9    time of the 02 and the application for the 03 bowls; is that

10   right?

11   A.    That's correct.

12   Q.    Did you have dealings directly with the commissioner

13   of the ACC?

14   A.    Yes.

15   Q.    And was he unhappy with the way the bowl was run?

16   A.    Only that Georgia Tech from the 01 game was still not

17   paid.  Other than that, John Swalford was very supportive of

18   the game.  And obviously both of their teams won you know,

19   the game each year.  So they were excited about it.

20        But his concern -- and I am trying to remember the

21   gentleman I dealt with at the ACC -- Mike Finn.  They wanted

22   the game to stay in Seattle.  They were very supportive.  In

23   fact it was the testimony during the letter of credit

24   deadlines that were missed that John Swalford, Tom Hansen,

25   Craig Thompson wanted this game to move forward.  And because

1    the NCAA and Dennis made it apparent that you guys need to be

2    on board because you guys are going to be holding the bag if

3    these guys are not going to be able to pay and move forward,

4    and so forth.

5          So they were all very supportive of the game.

6    Q.      You were aware in the fall of and early winter of 02

7    leading up to the 02 Seattle Bowl that the letter of credit

8    problem almost resulted in the certification being withdrawn;

9    is that right?

10   A.      Correct.

11   Q.      And the NCAA told you repeatedly that the letter of

12   credit problem was a serious problem; is that right?

13   A.      Yes.

14   Q.      And you were on notice they were very close to

15   withdrawing the certification in November and December of 02;

16   is that right?

17   A.      I don't know how close.  I know they were being very

18   patient, trying to be very patient with us.  But as far as

19   how close in reality of pulling the plug on the game I don't

20   know, based on past history of talking to other executive

21   directors that had similar missed deadlines and so forth.

22   What the ramifications are; are they really going to pull the

23   plug.

24          Like I mentioned, that is when the three

25   commissioners and then Rio Banner come into the picture

Page 82

1    reassuring that the financial stability of the game was in

2    place and so forth.

3    Q.    Is it accurate that by the time you were applying in

4    the spring of 03 that Georgia Tech still had not been paid in

5    full from the 01 Seattle Bowl?

6    A.    Yes.

7    Q.    Going back to the letter of credit deadlines being

8    missed in the fall of 02, and early winter of 02.  Without

9    regard to how close you really were did the committee and the

10   staff from the NCAA tell you repeatedly that the bowl was in

11   danger of having its certification withdrawn?

12       MR. ROHLFING:  Objection.  Lack of foundation as to

13   the December time period.

14       MR. CURTNER:  Coaching again.

15       THE WITNESS:  No.  No, not really.  I mean, we knew

16   we missed our deadlines.  I was -- they didn't say like this

17   is your last, last, last chance.  Of, you know, you need to

18   get this thing in by next week, we are not giving you any

19   notice.  I mean, they were being patient with us.  They

20   understood our struggles.

21       I was on the phone with Dennis and communicating with

22   Terry and keeping he and both, all three commissioners in the

23   loop.  Because obviously Craig Thompson was nervous about the

24   game being decertified and so forth.

25       So we were all working hard to get that thing in as

4d702324-c44e-4458-9f75-8b25401c2d23

1    Q.      When you left the Sports Events bureau of the Chamber

2    of Commerce in Seattle did he take over for you?

3    A.      No.

4    Q.      Was there a dispute between the Seattle Chamber of

5    Commerce and Aloha Sports in 2002?

6    A.      Yes.

7    Q.      What was the nature of that dispute as you understood

8    it?

9    A.      Two issues.  One, Aloha Sports wanted to terminate

10   the agreement they had with the Seattle Chamber of Commerce

11   in moving forward and running the game.  And number two,

12   unpaid bills.

13   Q.      So the Chamber was concerned about the fact that

14   they, the Aloha Sports had not paid all the bills relating to

15   the 2001 Seattle Bowl; is that correct?

16   A.      That is correct.

17   Q.      And do you recall an occasion when the Chamber

18   withheld a check from one of the hotels or hotel chains

19   because of the disputes with the Aloha Sports?

20   A.      Yes.

21   Q.      What do you recall about that?

22   A.      It was the Starwood Hotels retained a commission

23   check of I think around 432,000.  And gave that to the

24   Chamber directly rather than Aloha Sports because vendors

25   were not paid.

Page 92

1    Q.     And what became of that check?

2    A.     The Chamber kept that check.  I worked with the

3    Chamber and Aloha Sports in order to make sure those funds

4    paid off all bills, all those vendors for 2001.

5    Q.     You said it was a commission check.  What is a

6    commission check?

7    A.     It's a rebate from hotel rooms booked from fans and

8    teams that was due to Aloha Sports.

9    Q.     So when Georgia Tech or Wake Forest comes and buys

10   rooms --

11   A.     Correct.

12   Q.     -- the hotel chain like Starwood will give the

13   sponsor of the event a rebate for those rooms?

14   A.     Both teams and fans, correct.  Yes.

15   Q.     So the sponsor gets the rebate though, not the team

16   or the fans?

17   A.     That's correct.

18   Q.     Do you recall a dispute involving the Chamber and

19   Aloha Sports about the payment or painting of the end zone?

20   A.     Yes.

21   Q.     What was that about?

22   A.     We had a number of committee members that I felt that

23   were kind of stepping out of their boundaries of insisting

24   that the end zones be painted with the schools' colors and

25   names in the end zone.  And also the Safeco Field, the

1    infield be re-turfed with new grass, which would have cost 40

2    thousand dollars.

3              So our chairman of the Sports and Events Council  and

4    a couple of committee members had a very heated disagreement

5    with both Terry and Fritz, who own the game, about painting

6    the end zones and re-sodding that field.

7    Q.     So they wanted it painted and sodded, and the Aloha

8    Sports principals didn't want to pay that money; is that

9    right?

10   A.     That's correct.

11   Q.     And what happened?

12   A.     I kind of stepped in and kind of convinced Terry and

13   Fritz that we need to go ahead and paint the end zones.

14   Q.     And that was done?

15   A.     That was done.

16   Q.     Then there was a dispute about paying for that; is

17   that right?

18   A.     Um, yes.

19   Q.     And was the vendor for the painting of the end zones

20   ever paid?

21   A.     Yes.

22   Q.     Where did that money come from?

23   A.     Aloha Sports.

24   Q.     Do you recall an issue about payment not being made

25   for a G. M. nameplate?

4d702324-c44e-4458-9f75-8b25401c2d23

1    A.    No.

2    Q.    Do you recall a dispute about money not being paid

3    for advertisements in The Seattle Times?

4    A.    All those bills, that bill was paid.

5    Q.    But there was was a dispute, there was a delay before

6    it was paid?

7    A.    That's correct.

8    Q.    Were these amounts that were ultimately paid out of

9    the held rebate check?

10   A.    That's correct.  This is for the 01 game?

11   Q.    Yes.

12   A.    Yes, you're correct.

13   Q.    Was there a creditor by the name Tel A V audio

14   visual?

15   A.    Yes.

16   Q.    They were paid out of that same means?

17   A.    That's correct.

18   Q.    What did service did they provide?

19   A.    Telecommunications for the game, on field equipment.

20   From the sideline to the coaching booths upstairs.

21   Q.    Right.  And was the same thing true of an entity

22   called Thumb Print?

23   A.    Yes.

24   Q.    And another for an entity called One Stop Copy

25   Center?

4d702324-c44e-4458-9f75-8b25401c2d23

1    A.    Yes.

2    Q.    Same for Thrifty Rental Cars?

3    A.    Yes.

4    Q.    Same for something called EMP?

5    A.    Yes.

6    Q.    What was EMP?

7    A.    Experienced Music Project.  Where we had one of our

8    functions.

9    Q.    Didn't think Paul Allen could afford it?  And the

10   same for Puget Sound Digital?

11   A.    Yes.

12   Q.    The same for the Big 12 officials relating to the 01

13   game?

14   A.    Yes.

15   Q.    Was it the 01 game where there was an issue of them

16   coming out for the second half?

17   A.    You know, there could have been.  But I am not aware

18   of that.  Because at that point Terry was writing the

19   checks.  Terry and Fritz were writing checks for that.   I

20   did not write the checks.

21          I wrote checks and signed checks for the 02 game but

22   not the 01 game.

23   Q.    I understand.  And the Seattle police, you remember

24   an issue of them not getting paid?

25   A.    There was an issue, but they did get paid.

Page 103

1    Northwest of having a game, which I had a difficult time

2    understanding, of the snow and everything else and four wheel

3    vehicles.  But I did have conversations with Jeep.

4        Q.    Her demographics fit with Hawaii.  Were you

5    interviewed by the Seattle Star Bulletin after -- maybe it's

6    The Honolulu Star Bulletin.  Let me make sure -- the Honolulu

7    Star Bulletin after the Seattle Bowl was not certified for

8    2003?

9        A.    I probably was.

10       Q.    Did you tell them that you thought it really came

11   down to that the NCAA had issues with how the game was run

12   last year?

13       A.    I probably did.

14       Q.    Was that your view at the time?

15       A.    Yes.

16       Q.    Did you tell them that the bowl operators missed two

17   deadlines for providing the letter of credit and was

18   negligent in paying many of its debts?

19       A.    Yes.

20       Q.    And that was your view at the time?

21       A.    Yes.

22       Q.    Did you talk to the Seattle Post Intelligencer at

23   that time about that decision?

24       A.    I could have.

25       Q.    Sorry?

1    A.        No, I never did.

2    Q.        Did anybody ever tell you that there was an

3    arrangement or an agreement to satisfy them for a certain

4    amount of money?

5    A.        Um, Terry did.  Terry told me that he was working on

6    paying off the owners.  And also mentioned that his dealings

7    with Fritz, about buying Fritz out was all predicated on his

8    deal with Paul Feller.  But he didn't go into any detail on

9    that.  It was just very surface.

10    Q.        Did you ever see anything in writing between the

11    prior owners and Mr. Rohlfing or Mr. Daw?

12    A.        No.

13    Q.        You said a little bit ago that you counseled Fritz

14    and Terry to keep one of the bowls in Hawaii, and only move

15    one of them to the Mainland.  When did you give that counsel?

16    A.        In 01.  And then again in 02.

17           01 was a conversation I had with Barbara Hedges, when

18    I first broke the news to her that we were looking in

19    bringing a bowl game to Seattle.  Which she was shocked.  And

20    in discussing it with her, her question was again moving two

21    bowl games in the same year.  She was concerned with that.

22    And on the second year when the San Francisco game wasn't

23    going to happen I told basically Terry and Fritz to take a

24    time-out and not try to run two games in one year, and maybe

25    reconsider, which I helped with, of lobbying for bringing the

4d702324-c44e-4458-9f75-8b25401c2d23

1  game back to Hawaii in 02.

2  Q.    Do you know why they didn't take your advice in 01?

3  A.    Um, they felt they did not have the support from the

4  local community, financially, and didn't want to go ahead and

5  continue the game here.

6  Q.    They told you that?

7  A.    Yes, they did.

8  Q.    And by not having the support of the local community

9  it meant they were having trouble selling enough tickets?

10  A.    It was the Convention and Visitors Bureau, or Hawaii

11  Tourism Authority.  Putting in money, and having a double

12  header a game, you know, almost twelve hours apart was not

13  going to work.  And obviously they were in jeopardy -- they

14  were in a very difficult situation.  ESPN and ABC would not

15  allow them to move the game from Christmas Day, which is,

16  they again, you know, now that they own the game here they

17  have moved the game from Christmas Day.  But when Terry and

18  Fritz owned it they would not allow them to move the game

19  from Christmas Day.  That was a real contention having a game

20  running Christmas day.

21  So they were forced with low ticket sales, due to it

22  being on Christmas, and the time slot that they had.  And not

23  getting financial support that they would hope from an agency

24  I just mentioned.  That they weren't continuing to, you know,

25  write checks or lose money on the game in Hawaii.

CARNAZZO COURT REPORTING CO.
(808) 532-0222

1    Q.    And what you're telling me now is based on what Mr.

2    Rohlfing and Mr. Daw told you at the time?

3    A.    That's correct.

4    Q.    Did they tell you any other reasons as to why they

5    wanted to move?

6    A.    They thought that, again, moving the game either one

7    or both games out of Hawaii would be more successful

8    financially.  And that is why they looked at several cities

9    to relocate the game to.  And Seattle was one on their list.

10   Q.    Did they ever tell you they wanted to move because

11   they were unhappy with the NCAA rules?

12   A.    Um, for the ticket sales, yes, they did.

13   Q.    The minimum of ticket sales?

14   A.    That's correct.

15   Q.    Any others?

16   A.    No.  Just the ticket sales, and their beef with ESPN

17   and ABC and so forth, that was the kind of contention.

18   Q.    Earlier today you said that there was somebody from

19   the Big East named Mike, right?

20   A.    Uh-huh.  Yes.

21   Q.    And Mr. Rohlfing suggested that it might be Mike

22   Tranghese?

23   A.    Yes.

24   Q.    Do you know whether that is who it was?

25   A.    That's correct.  Yes, that's correct.

4d702324-c44e-4458-9f75-8b25401c2d23

1    the 2002 games in Seattle is it your opinion that the game

2    would have been financially more stable had the teams been

3    paid less for participating in those games?

4           MR. CURTNER:  Object to the form.

5           THE WITNESS:  Yes.

6    Q.    (By Mr. Rohlfing)  Is it true that -- I guess I'll

7    withdraw that.  I am done.  Re-cross?

8           MR. CURTNER:  I have nothing further.  Thank you,

9    sir.

10          MR. ROHLFING:  Thank you very much, Jim.  Good to be

11   with you again.  The deposition is adjourned.

12          MR. THOMSEN:  We will reserve signature.

13          MR. ROHLFING:  All right.

14          (Whereupon the deposition was concluded at 1:04 p.m.)

15

16

17

18

19

20

21

22

23

24

25

4d702324-c44e-4458-9f75-8b25401c2d23

Page 124

1          I, JAMES L. HAUGH, do hereby certify that I have read

2     the foregoing typewritten pages 1 through 123, inclusive, and

3     corrections, if any, were noted by me on the corrections

4     sheet, and the same is now a true and accurate transcript of

5     my testimony.

6

7

8

9                              Date:

10

11

12

13

14

15     Signed before me this

16          day of

17

18

19

20

21

22

23

24

25

4d702324-c44e-4458-9f75-8b25401c2d23

Page 125

STATE OF HAWAII              )
                             )   SS.
CITY AND COUNTY OF HONOLULU  )


        I, Cynthia M. Smith, a Notary Public in and for the
State of Hawaii, do hereby certify:
        That on Thursday, February 16, 2006, commencing at
9:33 a.m. appeared before me JAMES L. HAUGH, the witness
whose testimony is contained herein; that prior to being
examined, he was by me duly sworn; that the proceedings were
taken by me in machine shorthand and reduced by computer to
typewriting; that the foregoing represents, to the best of my
ability, a true and correct transcript of the proceedings had
in the foregoing matter.

        That, if applicable, the witness was notified through
counsel, by mail or by telephone, to appear and sign; that if
the deposition is filed without signature, either the reading
and signing were waived by the witness and all parties, or
the witness has failed to appear, and the original has been
sealed unsigned.
        That pursuant to HRCP 30(f)(1) the original will
be forwarded to noticing counsel for retention.

        I further certify that I am not attorney for any of
the parties hereto, nor in any way interested in the outcome
of the cause name in the caption.

    Dated:




                        Cynthia M. Smith
                        Notary Public, State of Hawaii
                        C.S.R. NO. 153

My commission expires:
6-6-2006

4d702324-c44e-4458-9f75-8b25401c2d23