ROHLFING & STONE
FREDERICK W. ROHLFING #3474
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 1520
Honolulu, Hawaii 96813
Telephone: (808) 534-1188
Facsimile: (808) 525-7507

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER (Pro Hac Vice)
DAVID W. KESSELMAN (Pro Hac Vice)
611 West 6th Street, 29th Floor
Los Angeles, California 90017
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

Attorneys for Plaintiff Aloha Sports Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ALOHA SPORTS INC., a Hawaii Corporation<br><br>    Plaintiff,<br><br>    vs.<br><br>THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br><br>    Defendant. | CIVIL NO. CV04-00204 DAE/KSC (Antitrust)<br><br>PLAINTIFF ALOHA SPORTS INC.'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES |

EXHIBIT " 67 "

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, plaintiff Aloha Sports Inc. ("ASI"), responds as follows to Defendant's First Set of Interrogatories.

## I.

## GENERAL OBJECTIONS

ASI interposes the following general responses and objections to each and every interrogatory propounded in defendant National Collegiate Athletic Association's ("NCAA") First Set of interrogatories to Plaintiff. These responses and objections are expressly incorporated into each of the specific objections and responses to the individual interrogatories.

1.     Plaintiff objects to any and all of defendant's interrogatories to the extent defendant seeks information protected by: (a) the work product doctrine; (b) the attorney-client privilege; and ©) any and all other applicable privileges and doctrines that entitle plaintiff to withhold information from its responses. Plaintiff will not provide such responses.

2.     Plaintiff does not waive: (a) any objections as to the admissibility, competency, relevancy, or materiality of any evidence; (b) any claims of privilege attaching to any document or information provided in any response; including the attorney-client privilege and attorney work product doctrine; or ©) the right to

object to other discovery requests or undertakings involving or relating to the subject matter of the interrogatories herein.

3.     Plaintiff objects to any and all of defendant's interrogatories on the ground that they are overbroad, unduly burdensome, unreasonably cumulative and not reasonably particular, and further objects on the grounds that some interrogatories actually contain sub-parts and are therefore compound.

## II.

## OBJECTIONS TO PREAMBLE, INSTRUCTIONS, AND DEFINITIONS

Plaintiff interposes the following objections to defendant NCAA's "Preamble" (the three opening paragraphs preceding the Instructions), "Instructions," and "Definitions" sections of defendant's interrogatories.  These objections are expressly incorporated into each of the objections and responses to the individual interrogatories:

1.     Plaintiff objects to each of the "Preamble," "Instructions," and "Definitions" to the extent they purport to enlarge and/or modify plaintiff's obligations under the applicable provisions of the Federal Rules of Civil Procedure.

2.     Plaintiff objects to the "Preamble," "Instructions," and "Definitions" to the extent they purport to demand information protected by attorney client

privilege and the attorney work product doctrine.

## III.

## SPECIFIC OBJECTIONS AND RESPONSES.

### INTERROGATORY NO. 1:

Please identify, by year, each conference, college, college football team, university, or university football team with which you had you [sic] communications or discussion about participation in ASI's Bowl Games or with which you entered into contracts for participation, for each year in which you claim that NCAA activities injured ASI. When responding to the interrogatory, please identify for each such communication whether the conference or team accepted or declined to participate and provide reasons given by conferences and teams for declining to participate.

### RESPONSE TO INTERROGATORY NO. 1:

ASI incorporates by reference each and every General Objection set forth above as though fully set forth herein. ASI specifically objects to this interrogatory on the grounds that it is vague and ambiguous. Moreover, discovery is ongoing and ASI's investigation into this matter is incomplete at this time. Accordingly, ASI reserves the right to supplement its response. Without waiving the foregoing objections, ASI responds to this interrogatory as follows:

As previously disclosed during the early meeting of counsel process, ASI contends that the time period of the lawsuit includes the 1999 Aloha and Oahu Bowls as payment for those bowls was not made until March 2000. Accordingly, ASI responds as follows:

**1999 Bowl Games**

    **A.**    **Oahu Bowl**

    (1)  ASI had communications with the Western Athletic Conference ("WAC") and the University of Hawaii with respect to the 1999 Oahu Bowl. The University of Hawaii accepted ASI's invitation to participate in the 1999 Oahu Bowl.

    (2)  ASI had communications with the Pacific-10 Conference ("Pac-10") with respect to the 1999 Oahu Bowl. On or about July 15, 1999, the Pac-10 and ASI entered into a written agreement that provided for a Pac-10 member institution to participate in the 1999 Oahu Bowl. The University of Oregon accepted ASI's invitation to participate in the 1999 Oahu Bowl.

    **B.**    **Aloha Bowl**

    (1) ASI had communications with the Pac-10 with respect to the Aloha Bowl. Pursuant to the July 15, 1999 written agreement between ASI and the Pac-10, the Pac-10 agreed to provide a member institution to participate in the 1999

-4-

Aloha Bowl. Arizona State University ultimately accepted an invitation to
participate in the 1999 Aloha Bowl.

(2) ASI had communications with the Atlantic Coast Conference ("ACC")
with respect to the 1999 Aloha Bowl. The ACC agreed to have one of its member
institutions participate in the 1999 Aloha Bowl. Wake Forest University accepted
an invitation to participate in the 1999 Aloha Bowl.

**2000 Bowl Games**

### A.    Oahu Bowl

(1) ASI had communications with the Mountain West Conference with
respect to the 2000 Oahu Bowl.

(2) ASI had communications with the Southeastern Conference ("SEC")
with respect to the 2000 Oahu Bowl. ASI had communications with the
University of Georgia which accepted ASI's invitation to participate in the 2000
Oahu Bowl. ASI had communications with the University of Arkansas about
participation in the 2000 Oahu Bowl but no agreement was reached. Upon
information and belief, the SEC wanted the University of Arkansas to participate
in the Las Vegas Bowl.

(3) ASI had communications with the ACC with respect to the 2000 Oahu
Bowl. On or about August 28, 2000, the ACC and ASI entered into a written

agreement that provided for an ACC member institution to participate in the 2000 Oahu Bowl. The University of Virginia accepted an invitation to participate in the 2000 Oahu Bowl.

(4) ASI had communications with North Carolina State about participation in the 2000 Oahu Bowl.

(5) ASI had communications with the Pac-10 with respect to the 2000 Oahu Bowl. Pursuant to the July 15, 1999 written agreement between ASI and the Pac-10, the Pac-10 was to provide a member institution to participate in the Oahu Bowl. However, the Pac-10 was unable to provide an eligible team to participate in the 2000 Oahu Bowl.

**B.    Aloha Bowl**

(1) ASI had communications with the Big East Conference ("Big East") with respect to the 2000 Aloha Bowl. On or about September 22, 2000, the Big East and ASI entered into a written agreement that provided for a Big East member institution to participate in the 2000 Aloha Bowl. Boston College accepted an invitation to participate in the 2000 Aloha Bowl.

(2)  ASI had communications with the University of Pittsburgh about participation in the 2000 Aloha Bowl.

(3) ASI had communications with the Pac-10 with respect to the Aloha

Bowl.  Pursuant to the July 15, 1999 written agreement between ASI and the Pac-10, the Pac-10 agreed to provide a member institution to participate in the 2000 Aloha Bowl.  Arizona State University accepted an invitation to participate in the 2000 Aloha Bowl.

(4) ASI had communications with the University of California, Los Angeles about participation in the 2000 Aloha Bowl.

**2001 Bowl Games**

A.    **Oahu Bowl/ Seattle Bowl**

(1) ASI had communications with the ACC with respect to the Seattle Bowl. Pursuant to the August 28, 2000 written agreement between ASI and the ACC, as amended by letter dated October 9, 2001, the ACC agreed to provide a member institution to participate in the 2001 Seattle Bowl.  Georgia Technological Institute accepted an invitation to participate in the 2001 Seattle Bowl.

(2) ASI had communications with the Pac-10 with respect to the Seattle Bowl.  Pursuant to the September 25, 2001 written agreement between ASI and the Pac-10, the Pac-10 agreed to provide a member institution to participate in the 2001 Seattle Bowl.  Stanford University accepted an invitation to participate in the 2001 Seattle Bowl.

## B.    Aloha Bowl/ San Francisco Bowl

(1) ASI had communications with the Big East with respect to the 2001 San Francisco Bowl.

(2) ASI had communications with the Mountain West Conference with respect to the 2001 San Francisco Bowl (as well as the Oahu Bowl and Aloha Bowl).

(3) ASI had communications with the WAC with respect to the 2001 San Francisco Bowl.  The WAC agreed to provide a member institution for the 2001 San Francisco Bowl.

## 2002 Bowl Games

### A.    Oahu Bowl/ Seattle Bowl

(1)  ASI had communications with the Big Ten with respect to long term agreement to participate in the Seattle Bowl for the years 2002 through 2005, or a second ASI Bowl Game.

(2) ASI had communications with the Big Twelve with respect to the 2002 Seattle Bowl.

(3) ASI had communications with the SEC with respect to long term agreement to participate in the Seattle Bowl for the years 2002 through 2005, or a

second ASI Bowl Game.

(4) ASI had communications with the Conference USA with respect to the 2002 Seattle Bowl.

(5) ASI had communications with the ACC with respect to the Seattle Bowl. Pursuant to the November 13, 2002 written agreement between ASI and the ACC, the ACC agreed to provide a member institution to participate in the Seattle Bowl for the years 2002 through 2004. Wake Forest University accepted an invitation to participate in the 2002 Seattle Bowl.

(6) ASI had communications with the Pac-10 with respect to the Seattle Bowl. The University of Oregon accepted an invitation to participate in the 2002 Seattle Bowl.

(7) ASI had communications with the WAC with respect to the 2002 Seattle Bowl. The WAC declined to participate in the 2002 Seattle Bowl because Boise State University reportedly preferred to play in the Humanitarian Bowl in its home city of Boise, Idaho.

(8) ASI had communications with the Mountain West Conference with respect to the Seattle Bowl. Pursuant to a written agreement between ASI and the Mountain West Conference, the Mountain West Conference agreed to provide a member institution to participate in the Seattle Bowl for the years 2002 through

2006. No eligible Mountain West Conference team was available to play in the 2002 Seattle Bowl, however.

**B.     Aloha Bowl**

(1) ASI had communications with the WAC with respect to the 2002 Aloha Bowl.

(2) ASI had communications with the University of Hawaii with respect to the 2002 Aloha Bowl.

**2003-2006 Bowl Games**

(1) ASI had a written agreement with the Mountain West Conference to participate in the Seattle Bowl for the years 2002 through 2006.

(2) ASI had a written agreement with the ACC to participate in the Seattle Bowl for the years 2002 through 2004.

**INTERROGATORY NO. 2:**

Please identify each and every fact and document that supports, contradicts, or relates in any way to the allegation in Paragraph 17 of your First Amended Complaint that "Plaintiff understood that its request for recertification of the Aloha Bowl in Hawaii 2002 would be given preference for recertification."

**RESPONSE TO INTERROGATORY NO. 2:**

ASI incorporates by reference each and every General Objection set forth

above as though fully set forth herein. ASI specifically objects insofar as it asks ASI to "identify each and every fact and document that . . . contradicts" the subject allegation because it is an improper request by the NCAA to ASI to perform legal work for the NCAA, as well as a request for ASI's attorneys' work product, thereby making it oppressive. ASI further objects to the request insofar as it requests that ASI "identify each and every fact and document that . . . relates in any way to" the subject allegation because it is an improper request by the NCAA to ASI to perform legal work for the NCAA, as well as a request for ASI's work product, thereby making it oppressive. Moreover, discovery is ongoing and ASI's investigation into this matter is incomplete at this time. Accordingly, ASI reserves the right to supplement its response. Without waiving the foregoing objections, ASI responds to this interrogatory as follows:

The then operative provisions of the NCAA Postseason Football Handbook ("the Handbook") provided existing bowls preference over news bowls with regard to certification in the following respects:

| Initial Bowl Certification | Recertification |
|---|---|
| Application for inauguration of contest must be received at the NCAA national office by mail or fax not later than January 15 (p. 33). | Application for recertification must be received at the NCAA national office by mail or fax not later than April 1 (p. 36). |
| Certification cannot be given until the year following the year in which the application is received (p. 33-34). | Recertification is given in the same year in which the application for recertification is received (p. 36). |
| Proposing sponsor must submit to the Subcommittee with its application form "a projected financial report showing financial soundness of the proposed game" (p. 34). | Not required. |
| $2.0 million irrevocable letter of credit (p. 34). | $1.5 million irrevocable letter of credit if bowl has not distributed an average minimum of $1 million to each participating institution during the preceding 3-year period (p. 37) |

| | |
|---|---|
| $2.0 million irrevocable letter of credit must be in effect from the time of the sponsoring agency's initial application (p. 30), which means it must be in effect by the January 15 application deadline, which is almost 2 years before the proposed game would be scheduled to be played. | $1.5 million irrevocable letter of credit must be in effect by November 1, which is about 2 months before the game would be scheduled to be played (p. 37). |
| All personnel who will serve on the game's governing board or management committee must be listed on the Initial Bowl-Certification Application Form (p. 35). | Only names of executive director and other executive officers of the sponsoring organization. |
| Evidence of the experience or association that the management personnel has had with collegiate football must be listed on the Initial Bowl-Certification Application Form (p. 35). | Not required. |

| | |
|---|---|
| The financial ability of management or the sponsoring agency to guarantee the success of the game must be demonstrated (p. 35). | Not required. |
| The amount of money on hand or to which there is access to guarantee game and team expenses must be identified (p. 35). | Not required. |
| The total gross receipts to be realized from the game must be estimated (p. 35). | Not required. |
| Proposals for promoting the game must be detailed (p. 35). | Not required. |
| Plans for selling tickets must be provided (p. 35). | Not required. |
| The number of tickets must be identified (p. 35). | Not required. |

| | |
|---|---|
| Evidence of the experience of the sponsoring group in conducting such games or similar affairs must be provided (p. 36). | Not required. |
| The organizational operating structure, including a chart or diagram, must be submitted, with and indication of the extent of active community involvement in game promotion and management (p. 36). | Not required. |
| Letters must be provided recommending certification of the bowl game signed by 25 Division I-A directors of athletics and / or conference commissioners who represent institutions that have participated in bowl games at least one time in the previous five years (p. 36). | Not required. |

During the entire period in which ASI had been a "sponsoring organization"

of the Aloha Bowl, up until the decertification of the Aloha Bowl in 2002, the course of dealing and the custom and usage of the NCAA was to recertify all bowls applying for recertification that had substantially complied with the Handbook.

Moreover, the Handbook nowhere provided for decertification, but instead expressly described the sanction available to the Subcommittee in the event a certified game failed to comply with NCAA approved policies and procedures as "the option to withhold certification for the postseason bowl game for one year or fine it a percentage of its gross receipts, not to exceed 50 percent, from the content involved in the noncompliance, with the amount to be determined by the Subcommittee and approved by the Division I Championships / Competition Cabinet" (p. 33).

In his telephone conversation with Mr. Daw (ASI) on September 18, 2001, Mr. Poppe (NCAA) stated that he would have the NCAA Football Certification Subcommittee ("Subcommittee") clarify in a letter that ASI could seek recertification of its second bowl for the 2002-2003 bowl season.

Subcommittee Chair Curley's September 20, 2001 letter to Mr. Daw stated that as to the 2002-03 bowl season, ASI would "not be required to submit an initial application form and undergo the one-year waiting period before the

-16-

subcommittee may consider [ASI's] application."

ASI's 2000 Aloha Bowl complied with all Handbook requirements, including:

(1) Providing the required $1.5 million letter of credit (p. 33 )

(2) Timely paying all amounts due participating institutions Boston College and Arizona State University (p. 10)

(3) Providing over 95 awards to student athletes (pp. 13-14)

(4) Paying the NCAA the required $12,000 certification fee (p. 13)

(5) Not discounting any tickets (p. 16)

(6) Holding the required pre-game meeting (pp. 22-23)

(7) Timely filing with the NCAA the Schedule of Gross Receipts Postseason Football Audited Financial Report on March 30, 2001 (p. 12)

On April 1, 2002, in reliance on the Handbook, course of dealing and the custom and usage of the NCAA, Mr. Poppe's September 18, 2001 telephone conversation with Mr. Daw, and Mr. Curley's September 20, 2001 letter, ASI timely submitted its Application for Recertification of the Aloha Bowl for the 2002-2003 bowl season with a scheduled playing date of December 31, 2002.  In applying for recertification of the Aloha Bowl, ASI utilized and properly filled out the official NCAA Application for Recertification form.

At no time did the Subcommittee take the position that the 2000 Aloha Bowl had not complied with the Handbook.

ASI's Chief Operating Officer, Mr. Daw, appeared in person before the Subcommittee in April 2002 in San Antonio at the Subcommittee's annual spring meeting and answered all questions the Subcommittee members had regarding the recertification of the Aloha Bowl, which Mr. Daw had helped manage since 2000.

**INTERROGATORY NO. 3:**

Please identify each and every fact and document that supports, contradicts, or relates in any way to the allegation in Paragraph 18 of your First Amended Complaint that "the NCAA permanently decertified the Seattle Bowl in violation of the terms and conditions of the agreement between Plaintiff and the NCAA as set forth in the Handbook."

**RESPONSE TO INTERROGATORY NO. 3**

ASI incorporates by reference each and every General Objection set forth above as though fully set forth herein. ASI specifically objects insofar as it asks ASI to "identify each and every fact and document that . . . contradicts" the subject allegation because it is an improper request by the NCAA to ASI to perform legal work for the NCAA, as well as a request for ASI's attorneys' work product, thereby making it oppressive. ASI further objects to the request insofar as it

-18-

requests that ASI "identify each and every fact and document that . . . relates in any way to" the subject allegation because it is an improper request by the NCAA to ASI to perform legal work for the NCAA, as well as a request for ASI's work product, thereby making it oppressive. Moreover, discovery is ongoing and ASI's investigation into this matter is incomplete at this time. Accordingly, ASI reserves the right to supplement its response. Subject to and without waiving the foregoing objections and limitations, ASI responds as follows:

During the entire period in which ASI had been a "sponsoring organization" of postseason college football bowl games, up until the decertification of the Aloha Bowl in 2002, the custom and practice of the NCAA had been to recertify all bowls applying for recertification that had substantially complied with the Handbook. Moreover, up until 2003, the NCAA had never decertified a bowl applying for recertification where the bowl had been played in the immediately preceding bowl season and had substantially complied with the Handbook.

The 2002-2003 Handbook nowhere provided for decertification, but instead expressly described the sanction available to the Subcommittee in the event a certified game failed to comply with NCAA approved policies and procedures as "the option to withhold certification for the postseason bowl game for one year or fine it a percentage of its gross receipts, not to exceed 50 percent, from the content

involved in the noncompliance, with the amount to be determined by the

Subcommittee and approved by the Division I Championships / Competition

Cabinet."

ASI's 2002 Seattle Bowl complied with 2002-2003 Handbook requirements

in all material respects, including:

(1) Providing the required $1.5 million letter of credit

(2) Timely paying the minimum $750,000 each to participating institutions

Wake Forest and the University of Oregon

(3) Providing over 95 awards to student athletes

(4) Paying the NCAA the required $12,000 certification fee

(5) Not discounting any tickets

(6) Holding the required pre-game meeting

(7) Timely filing with the NCAA the Schedule of Gross Receipts Postseason

Football Audited Financial Report

On or before April 1, 2003, in reliance on the Handbook and the course of

dealing and the custom and usage of the NCAA, ASI timely filed its application

for recertification of the Seattle Bowl for the 2003-2004 bowl season. In applying

for recertification of the Seattle Bowl, ASI utilized the official NCAA Application

for Recertification form.

Seattle Bowl Executive Director Jim Haugh appeared in person before the Subcommittee in April 2003 in San Diego at the Subcommittee's annual spring meeting to answer any questions the Subcommittee members had regarding the recertification of the Seattle Bowl.

Paul H. Feller, Chief Executive Officer of Pro Sports Entertainment, Inc., ("Pro Sports") also appeared in person before the Subcommittee in April 2003 and presented evidence of Pro Sports being ready, willing, and able to satisfy all outstanding debts of ASI provided the Subcommittee recertified the Seattle Bowl.

Nevertheless, on May 1, 2003, the NCAA issued a press release stating that the Seattle Bowl had been "decertified."

## INTERROGATORY NO. 4:

Please identify each and every contract that you allege existed between Plaintiff and the NCAA, including the date of formation of the contract(s), parties to the contract(s), representatives of the Plaintiff and the NCAA who entered into the contract(s), terms of the contract(s), date of breach of the contract(s), and specify any fact or document which you contend constitutes a material breach of the contract(s).

## RESPONSE TO INTERROGATORY NO. 4:

ASI incorporates by reference each and every General Objection set forth

-21-

above as though fully set forth herein. Moreover, discovery is ongoing and ASI's investigation into this matter is incomplete at this time. Accordingly, ASI reserves the right to supplement its response. Without waiving the foregoing objections, ASI responds to this interrogatory as follows:

**Aloha Bowl/San Francisco Bowl**

Date of formation: April/May 1994, when the NCAA certified the Aloha Bowl for the 1994-95 bowl season.

Parties: ASI and NCAA.

Representatives:

    NCAA: Subcommittee Chair

    ASI: Marcia Klompus

Terms of the contract:

    (1) NCAA 1994-95 Postseason Football Handbook, as amended from time to time by the NCAA and published in succeeding Postseason Football Handbooks.

    (2) NCAA Division I Manual regulations as to bowl games, as amended from time to time by the NCAA.

    (3) ASI's Applications for Recertification for the 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, and 2002 games.

(4) Letters of credit for the 1994, 1995, 1996, 1997, 1998, 1999, and 2000 games.

(5) ASI's Schedule of Gross Receipts Postseason Football Audited Financial Report for the 1994, 1995, 1996, 1997, 1998, 1999, and 2000 games.

(6) Correspondence and oral conversations between the NCAA to ASI regarding the games from 1994 through the present, including Subcommittee Chair Curley's September 20, 2001 letter to Mr. Daw stating that as to the 2002-03 bowl season, ASI would "not be required to submit an initial application form and undergo the one-year waiting period before the subcommittee may consider [ASI's] application."

(7) NCAA's course of dealing and custom and usage from 1994 to the present in dealing with bowl game "sponsoring organizations" in general and ASI in particular.

Dates of breach:

(1) August 2001

(2) September 14, 2001

(3) May 17, 2002

Facts or documents evidencing material breaches of contract:

(1) ASI substantial compliance with NCAA Handbook.

(2) Presentation of 2000 Aloha Bowl.

(3) Payment of teams.

(4) 2000 Aloha Bowl Schedule of Gross Receipts Postseason Football
Audited Financial Report.

(5) Application for Recertification of Aloha Bowl.

(6) In August 2001, Mr. Poppe informed Mr. Daw in a telephone
conversation that NCAA would require a letter of credit on or before a
Subcommittee meeting in Philadelphia on September 11, 2001, or the
certification for the game would be withdrawn for 2001.

(7) By letter dated September 14, 2001, Subcommittee Chair Tim Curley
informed Mr. Daw that the Subcommittee had withdrawn certification of the
game for the 2001-02 bowl season.

(8) Letter dated May 17, 2002 from Tim Curley to Mr. Daw citing the
Aloha Bowl's failure to "meet some of the certification guidelines that had
been established prior to the meeting" and stating that "it was the opinion of
the subcommittee that another proposal for a bowl game in Hawaii more
adequately met the certification guidelines." The "guidelines" referred to by

-24-

Curley had not been agreed to by ASI, and were not in the Handbook. Moreover, the Handbook nowhere limits the number of bowl games that may be certified for a particular city to a single game.

**Oahu Bowl/Seattle Bowl**

Date of formation: The date the NCAA certified the Oahu Bowl for the 1998-99 bowl season.

Parties: ASI, NCAA.

Representatives:

> NCAA: Subcommittee Chair
>
> ASI: Marcia Klompus

Terms of the contract:

> (1) The NCAA 1998-99 Postseason Football Handbook, as amended from time to time by the NCAA and published in succeeding Postseason Football Handbooks.
>
> (2) NCAA Division I Manual regulations as to bowl games, as amended from time to time by the NCAA.
>
> (3) ASI's Initial Bowl-Certification Application Form
>
> (4) ASI's Applications for Recertification for the 1998, 1999, 2000, 2001,

2002, and 2003 games.

(5) Letters of credit for the 1998, 1999, 2000, 2001, and 2002 games.

(6) ASI's Gross Receipts Reports for the 1998, 1999, 2000, 2001, and 2002 games.

(7) Correspondence and oral conversations between the NCAA to ASI regarding the games from 1998 through the present.

(8) NCAA's custom and practice from 1994 to the present in dealing with bowl game "sponsoring organizations" in general and ASI in particular.

Dates of breach:

May 1, 2003

Facts or documents evidencing NCAA material breaches of contract:

(1) ASI substantial compliance with NCAA Handbook.

(2) Presentation of 2002 Seattle Bowl

(3) Payment of teams

(4) NCAA letter dated January 17, 2003 (regarding recertification fee)

(5) ASI check payable to NCAA in the amount of $12,000.

(6) 2002 Seattle Bowl Gross Receipts Report.

(7) Application for Recertification of Seattle Bowl.

(8) Letter from bank stating amount on deposit credited to Pro Sports.

-26-

(9)  NCAA press release dated May 1, 2003 announcing decertification of

Seattle Bowl.

**Hula Bowl**

Date of formation: 1994, when the NCAA certified the Hula Bowl for the 1994-95

bowl season.

Parties: ASI and NCAA.

Representatives:

NCAA: Subcommittee Chair

ASI: Marcia Klompus

Terms of the contract:

(1) NCAA 1995-96 Postseason Football Handbook, as amended from time

to time by the NCAA and published in succeeding Postseason Football

Handbooks.

(2) NCAA Division I Manual, as amended from time to time by the NCAA.

(3) ASI's Applications for Recertification for the 1995, 1996, 1997, 1998,

1999, and 2000 games.

(4) Letters of credit for the 1995, 1996, 1997, 1998, 1999, and 2000 games.

(5) ASI's Gross Receipts Reports for the 1995, 1996, 1997, 1998, 1999, and

2000 games.

(6) Correspondence and oral conversations between the NCAA to ASI regarding the game from 1995 through March 31, 2000.

(7) NCAA's custom and practice from 1995 to the present in dealing with college all-star bowl game "sponsoring organizations" in general and ASI in particular.

No breach of contract alleged regarding Hula Bowl at this time.


## INTERROGATORY NO. 5:

Please identify each and every fact and document that supports, contradicts, or relates in any way to the allegation in Paragraph 37 of your First Amended Complaint that "The NCAA breached the terms and conditions of the Handbook and the understanding between Plaintiff and the NCAA when it refused to recertify the Aloha Bowl which was to be played in Hawaii in 2002."

## RESPONSE TO INTERROGATORY NO. 5:

ASI incorporates by reference each and every General Objection set forth above as though fully set forth herein. ASI specifically objects insofar as it asks ASI to "identify each and every fact and document that . . . contradicts" the subject allegation because it is an improper request by the NCAA to ASI to perform legal

work for the NCAA, as well as a request for ASI's attorneys' work product, thereby making it oppressive. ASI further objects to the request insofar as it requests that ASI "identify each and every fact and document that . . . relates in any way to" the subject allegation because it is an improper request by the NCAA to ASI to perform legal work for the NCAA, as well as a request for ASI's work product, thereby making it oppressive. Moreover, discovery is ongoing and ASI's investigation into this matter is incomplete at this time. Accordingly, ASI reserves the right to supplement its response. Without waiving the foregoing objections, ASI responds to this interrogatory as follows:

The provisions of the 2001-2002 Handbook provided existing bowls preference over new bowls with regard to certification in the following respects:

| Initial Bowl Certification | Recertification |
|---|---|
| Application for inauguration of contest must be received at the NCAA national office by mail or fax not later than January 15 (p. 33). | Application for recertification must be received at the NCAA national office by mail or fax not later than April 1 (p. 36). |
| Certification cannot be given until the year following the year in which the application is received (p. 34). | Recertification is given in the same year in which the application for recertification is received (p. 36). |

| | |
|---|---|
| Proposing sponsor must submit to the Subcommittee with its application form "a projected financial report showing financial soundness of the proposed game" (p. 34). | Not required. |
| $2.0 million irrevocable letter of credit (p. 34). | $1.5 million irrevocable letter of credit if bowl has not distributed an average minimum of $1 million to each participating institution during the preceding 3-year period (p. 37) |
| $2.0 million irrevocable letter of credit must be in effect from the time of the sponsoring agency's initial application (p. 34), which means it must be in effect by the January 15 application deadline, which is almost 2 years before the proposed game would be scheduled to be played. | $1.5 million irrevocable letter of credit must be in effect by November 1, which is about 2 months before the game would be scheduled to be played (p. 37). |

| | |
|---|---|
| All personnel who will serve on the game's governing board or management committee must be listed on the Initial Bowl-Certification Application Form (p. 35). | Only names of executive director and other executive officers of the sponsoring organization are listed on the Application for Recertification. |
| Evidence of the experience or association that the management personnel has had with collegiate football must be listed on the Initial Bowl-Certification Application Form (p. 35). | Not required. |
| The financial ability of management or the sponsoring agency to guarantee the success of the game must be demonstrated (p. 35). | Not required. |
| The amount of money on hand or to which there is access to guarantee game and team expenses must be identified (p. 35). | Not required. |

| | |
|---|---|
| The total gross receipts to be realized from the game must be estimated (p. 35). | Not required. |
| Proposals for promoting the game must be detailed (p. 35). | Not required. |
| Plans for selling tickets must be provided (p. 35). | Not required. |
| The number of tickets must be identified (p. 35). | Not required. |
| Evidence of the experience of the sponsoring group in conducting such games or similar affairs must be provided (p. 36). | Not required. |
| The organizational operating structure, including a chart or diagram, must be submitted, with and indication of the extent of active community involvement in game promotion and management (p. 36). | Not required. |

| Letters must be provided | Not required. |
| recommending certification of the | |
| bowl game signed by 25 Division I-A | |
| directors of athletics and / or | |
| conference commissioners who | |
| represent institutions that have | |
| participated in bowl games at least one | |
| time in the previous five years (p. 36). | |

During the entire period in which ASI had been a "sponsoring organization" of the Aloha Bowl, up until the decertification of the Aloha Bowl in 2002, the course of dealing and custom and usage of the NCAA was to recertify all bowls applying for recertification that had substantially complied with the Handbook.

Moreover, the Handbook nowhere provided for decertification, but instead expressly described the sanction available to the Subcommittee in the event a certified game failed to comply with NCAA approved policies and procedures as "the option to withhold certification for the postseason bowl game for one year or fine it a percentage of its gross receipts, not to exceed 50 percent, from the content involved in the noncompliance, with the amount to be determined by the

Subcommittee and approved by the Division I Championships / Competition Cabinet" (p. 33).

In his telephone conversation with Mr. Daw on September 18, 2001, Mr. Poppe stated that the Subcommittee would clarify in a letter that ASI could seek recertification of its second bowl for the 2002-2003 bowl season.

Consistent with Mr. Poppe's verbal representation to Mr. Daw, Subcommittee Chairman Curley stated in his letter dated September 20, 2001 addressed to Mr. Rohlfing/Mr. Daw, in pertinent part that as to the 2002-03 bowl season, ASI would "not be required to submit an initial application form and undergo the one-year waiting period before the subcommittee may consider [ASI's] application."

ASI's 2000 Aloha Bowl complied with all Handbook requirements, including:

(1) Providing the required $1.5 million letter of credit (p. 33 )

(2) Timely paying all amounts due participating institutions BC and ASU (p. 10)

(3) Providing over 95 awards to student athletes (pp. 13-14)

(4) Paying the NCAA the required $12,000 certification fee (p. 13)

(5) Not discounting any tickets (p. 16)

-34-

(6) Holding the required pre-game meeting (pp. 22-23)

(7) Timely filing with the NCAA the Schedule of Gross Receipts Postseason Football Audited Financial Report on March 30, 2001 (p. 12)

On April 1, 2002, in reliance on the Handbook, the course of dealing and custom and usage of the NCAA, Mr. Daw's September 18, 2001 telephone conversation with Mr. Poppe, and Mr. Curley's September 20, 2001 letter, ASI timely filed its Application for Recertification of the Aloha Bowl for the 2002-2003 bowl season with a scheduled playing date of December 31, 2002. In applying for recertification of the Aloha Bowl, ASI utilized and properly filled out the official NCAA Application for Recertification form.

At no time did the Subcommittee take the position that the 2000 Aloha Bowl had not complied with the Handbook.

Yet instead of recertifying the Aloha Bowl for the 2002-2003 bowl season in accordance with the Handbook and the NCAA's course of dealing and custom and usage, the NCAA decertified the Aloha Bowl.

Moreover, the Subcommittee waived the Handbook requirement as to the Hawaii Bowl, certifying the Hawaii Bowl a full year prior to the time provided by the Handbook for new bowls to obtain initial certification.

A letter dated May 17, 2002 from Mr. Curley to Mr. Daw cited the Aloha

Bowl's failure to "meet some of the certification guidelines that had been established prior to the meeting" and stating that "it was the opinion of the subcommittee that another proposal for a bowl game in Hawaii more adequately met the certification guidelines."

Yet the "guidelines" referred to by Mr. Curley had not been agreed to by ASI, and were not in the Handbook.

Moreover, the Handbook did not limit the number of bowl games that may be certified for a particular city to a single game.

## INTERROGATORY NO. 6:

Please identify each and every communication between you and the NCAA (including any member or agent of the NCAA) regarding any actual or proposed NCAA rule relating to any aspect of football. For each communication identified, state the date of the communication; the parties to the communication; whether the communication was oral, written or both; and the substance of the communication.

## RESPONSE TO INTERROGATORY NO. 6:

ASI incorporates by reference each and every General Objection set forth above as though fully set forth herein. ASI specifically objects to this interrogatory on the grounds that it is overly burdensome and oppressive, seeks information that is as easily accessible to the NCAA as to ASI, and seeks

-36-

information that is not calculated to lead to the discovery of admissible evidence.

Moreover, discovery is ongoing and ASI's investigation into this matter is

incomplete at this time. Accordingly, ASI reserves the right to supplement its

response. Without waiving the foregoing objections and limitations, ASI responds

to this interrogatory as follows:

As to the NCAA's rules regarding the management and conduct of post-

season bowl games, the NCAA communicated with ASI by regularly forwarding

to ASI an updated version of the Handbook each year. In 2000, ASI also ordered

and received the NCAA Division I Manual ("Manual"). Furthermore, ASI

regularly accessed the NCAA's Handbook and Manual which the NCAA posted

on its official website.

With respect to written communications between the NCAA and ASI

regarding the management and conduct of post-season bowl games in general, and

ASI's games in particular, ASI has provided, or will provide, all such written

communications in its possession, custody, or control.

The number of oral communications between NCAA and ASI regarding the

management and conduct of post-season bowl games in general, and ASI's games

in particular, are so numerous that it is unreasonable to require ASI to state the

date of each such communication, the parties to the communication, and the

substance of each communication.

## INTERROGATORY NO. 7:

Please identify each and every fact and document that supports, contradicts, or relates in any way to the allegations in Paragraph 31 of your First Amended Complaint that "The NCAA knew or should have known of the business relationship between Plaintiff and Pro Sports...."

## RESPONSE TO INTERROGATORY NO. 7:

ASI incorporates by reference each and every General Objection set forth above as though fully set forth herein. ASI specifically objects insofar as it asks ASI to "identify each and every fact and document that . . . contradicts" the subject allegation because it is an improper request by the NCAA to ASI to perform legal work for the NCAA, as well as a request for ASI's attorneys' work product, thereby making it oppressive. ASI further objects to the request insofar as it requests that ASI "identify each and every fact and document that . . . relates in any way to" the subject allegation because it is an improper request by the NCAA to ASI to perform legal work for the NCAA, as well as a request for ASI's work product, thereby making it oppressive. Moreover, discovery is ongoing and ASI's investigation into this matter is incomplete at this time. Accordingly, ASI reserves the right to supplement its response. Without waiving the foregoing objections,

ASI responds to this interrogatory as follows:

In the weeks prior to the NCAA's decision to decertify the Seattle Bowl, Mr. Daw of ASI had communications with at least the following NCAA representatives about the business relationship between ASI and Pro Sports & Entertainment Inc. ("Pro Sports"):

(1) Karl Benson, Commissioner of the WAC

(2) Craig Thompson, Commissioner of the Mountain West Conference

(3) Mike Finn, Assistant Commissioner of the ACC

Furthermore, Paul Feller, President and Chief Executive Officer of Pro Sports advised Mr. Daw that he (Mr. Feller) had communications with those same NCAA representatives (and possibly others). Furthermore, as set forth in response to Interrogatory No. 3, Mr. Feller of Pro Sports and Mr. Haugh of ASI appeared in person before the Subcommittee in April 2003 at the Subcommittee's annual spring meeting to answer questions and discuss the business relationship between ASI and Pro Sports. Nevertheless, on May 1, 2003, the NCAA issued a press release stating that the Seattle Bowl had been "decertified," thereby destroying the business relationship between ASI and Pro Sports.

**INTERROGATORY NO. 8:**

Please identify each and every fact and document that supports, contradicts,

or relates in any way to the allegations in Paragraph 32 of your First Amended

Complaint that the alleged interfering acts "were done by NCAA knowingly,

willfully, and maliciously and with the intent to injure and oppress Plaintiff."

Please identify with particularity each and every act of "interference and

disruption" you allege, each and every fact or document that supports or

contradicts the NCAA's alleged intention to interfere with the alleged contract or

business relationship between plaintiff and Pro Sports, each and every fact or

document that supports or contradicts your allegation that Pro Sports' cancellation

of any contract or business relationship was caused by acts of the NCAA, and each

and every fact or document that shows the NCAA's reasons for taking the alleged

acts of "interference and disruption."

## RESPONSE TO INTERROGATORY NO. 8:

ASI incorporates by reference each and every General Objection set forth

above as though fully set forth herein. ASI specifically objects insofar as it asks

ASI to "identify each and every fact and document that . . . contradicts" the subject

allegation because it is an improper request by the NCAA to ASI to perform legal

work for the NCAA, as well as a request for ASI's attorneys' work product,

thereby making it oppressive. ASI further objects to the request insofar as it

requests that ASI "identify each and every fact and document that . . . relates in

any way to" the subject allegation because it is an improper request by the NCAA to ASI to perform legal work for the NCAA, as well as a request for ASI's work product, thereby making it oppressive. Moreover, discovery is ongoing and ASI's investigation into this matter is incomplete at this time. Accordingly, ASI reserves the right to supplement its response. Without waiving the foregoing objections, ASI responds to this interrogatory as follows:

See ASI's responses to Interrogatory Nos. 3 and 7. Furthermore, in 2003, Pro Sports and ASI entered into a business relationship that was only conditioned upon NCAA certification (or conditional certification) of the 2003-2004 Seattle Bowl. After the NCAA wrongfully denied certification of the Seattle Bowl for the 2003-2004 season, the business relationship between ASI and Pro Sports was destroyed.

Furthermore, ASI is informed and believes that, in April 2003, one or more members of the NCAA Subcommittee advised Mr. Feller of Pro Sports that decertifying ASI's Seattle Bowl would actually be advantageous for Pro Sports because then Pro Sports could reapply the following year without the necessity of paying off ASI's debts. These comments further demonstrate the NCAA's knowledge of the business relationship and the knowing, willing, and malicious nature of the interference by the NCAA.

-41-

**INTERROGATORY NO. 9:**

Please IDENTIFY the market in which you contend competition was injured by the NCAA's activities challenged in your First Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 9:**

ASI incorporates by reference each and every General Objection set forth above as though fully set forth herein. ASI further objects to this interrogatory to the extent it calls for expert opinion and/or attorney work product. Moreover, discovery is ongoing and ASI's investigation into this matter is incomplete at this time. ASI reserves the right to supplement its response. Subject to and without waiving the foregoing objections and limitations, ASI responds as follows:

As previously disclosed during the early meeting of counsel process, ASI contends that ASI has no obligation to identify a relevant market pursuant to a full blown rule of reason analysis because horizontal price fixing by members of the NCAA is clearly governed by "quick look" rule of reason analysis. See Law v. National Collegiate Athletic Association, 134 F.3d 1010 (10th Cir. 1998); see also NCAA v. Regents of the University of Oklahoma, 468 U.S. 111 (1984). As the court in Law explained, "[u]nder quick look rule of reason analysis, anticompetitive effect is established, even without a determination of the relevant market, where the plaintiff shows that a horizontal agreement to fix prices exists,

-42-

that the agreement is effective, and that the price set by such an agreement is more favorable to the defendant than otherwise would have resulted from the operation of market forces." Law, 134 F.3d at 1020.

In the unlikely event that ASI is required by the court to identify a relevant market, it contends (subject to modification based upon discovery and expert analysis) that the NCAA and its member institutions restrained competition in the market for NCAA Postseason College Football Bowl Games in the United States, in general, and in Hawaii, in particular.

DATED: February 14, 2005

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER
DAVID W. KESSELMAN

ROHLFING & STONE
FREDERICK W. ROHLFING III

_____
DAVID W. KESSELMAN
Attorneys for Plaintiff Aloha Sports Inc.

26588.1

## PROOF OF SERVICE

STATE OF CALIFORNIA    )

COUNTY OF LOS ANGELES    )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 611 West Sixth Street, 20th Floor, Los Angeles, California 90017-3120. On **February 14, 2005**, I served the within PLAINTIFF ALOHA SPORTS INC.'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES on all interested parties in this action as follows:

**BY FACSIMILE:** by transmitting it from facsimile machine telephone number (213) 622-1656 to each of the persons named below at the facsimile numbers shown below:

William C. McCorriston, Esq.
McCorriston Miller Mukai MacKinnon LLP
Fax: (808) 524-8293

Robert Wierenga, Esq.
Atleen Kaur, Esq.
Miller, Canfield, Paddock and Stone, P.L.C.
Fax: (734) 663-8624

Upon completion of said facsimile machine transmission, the transmitting machine issued a transmission report showing the transmission was complete and without error.

☒ (Federal)    I declare under penalty of perjury that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **February 14, 2005**, at Los Angeles, California.

David W. Kesselman

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
TWENTIETH FLOOR
611 WEST SIXTH STREET
LOS ANGELES, CALIFORNIA 90017
(213) 622-4222

THIS DOCUMENT WAS PRINTED USING RECYCLED PAPER