# AGREEMENT BETWEEN

# THE ATLANTIC COAST CONFERENCE

# AND

# ALOHA SPORTS INC.

THIS AGREEMENT is made to be effective as of the 13th day of November 2002, between the ATLANTIC COAST CONFERENCE (hereinafter referred to as the "ACC"), and ALOHA SPORTS INC., a Hawaii corporation (hereinafter referred to as "ASI").

The ACC is a non profit unincorporated association of nine universities, with headquarters at Greensboro, North Carolina, consisting of Clemson University; Duke University; Florida State University; Georgia Technological Institute; University of Maryland; University of North Carolina; North Carolina State University; University of Virginia; and Wake Forest University.

ASI is a Hawaii corporation, located at 5251 Papai Street, Honolulu, Hawaii 96821.

## THE PARTIES AGREE AS FOLLOWS:

1. **Definition of Terms.**

The following terms used in this Agreement shall have the definition and meaning herewith described:

(a) "Agreement" shall mean this contract and agreement between the parties hereto.

(b) "Seattle Bowl" shall mean the post-season college football bowl game owned by ASI to be played annually in Seattle, Washington.

(f) "ACC representative" shall mean the Division I-A football team of an ACC member institution identified in accordance with the provisions herein to play in the Seattle or the Western Bowl. The team shall be composed of students-athletes of the institution that they represent, all of whom shall be eligible to represent their institution in varsity football competition under the rules and regulations of their institution, the NCAA, and the ACC.

(e) "Game" shall mean the Seattle Bowl a game between an ACC representative and an NCAA Division I-A opponent college varsity football team selected by ASI.

(g) "Opponent team" shall mean the Division I-A football team to be selected by ASI to play in the Seattle Bowl to oppose the ACC representative.

(h) "Broadcasters" shall mean such person, firm or corporation, whether one or more, as may be the holder or holders of radio or television, cable television, or other broadcasting rights, or any of them, to the Game.

(i) "NCAA" shall mean the National Collegiate Athletic Association, which is charged with oversight of college football bowl games and establishes policies and recommends rules for the conduct of such bowl games.

2. **ACC Participation in the Game**

Subsequent to each regular college football season for the term described, the ACC will provide a varsity football team representing one of its member institutions for participation in the Game on a date to be selected by ASI and the ACC. The parties agree that the representative of the ACC that participates in the Game shall be the ACC choice of teams which are eligible for post-season play. It shall be the ACC fifth choice following the selection of the ACC team(s) to participate in the College Football Bowl Championship Series. If the ACC does not have a team eligible to qualify for the Game in accordance with NCAA rules, then ASI has the right to go outside of the ACC to select a team to participate against the opponent team in the Game.

3. **Minimum Guaranteed Payment**

In consideration for its appearance in the Games, ASI shall pay to the ACC representative one million dollars ($1 million).

4. **Term**

The term of this Agreement shall be for four (4) years, covering the Games to be played subsequent to and immediately following the 2002, 2003, 2004 and 2005 college football seasons.

5. **Administration and Conduct of Games**

All aspects of the administration and conduct of the Game shall be in compliance with the rules and policies of the NCAA throughout the term of this Agreement. ASI and the ACC representative shall enter in to a contract that addresses game management and administrative details of the ACC representative's participation in the Game.

6.  **Game-related Elements; Team Choices; Hotels**

The ACC representative and the opponent team shall be treated equally in terms and conditions and selection of all Game-related elements, including, but not limited to, hotels, practice sites, practice times, dressing rooms, benches, uniforms, ticket locations and order of band performance. Any elements involving choices shall be made by representatives of the competing institutions and the Executive Director or designated officer of ASI in a timely fashion following the identification of the participating institutions.

**Team Hotel.** The ACC representative agrees to house its official team party, players, coaches and representatives for a minimum of 800 total room nights at one of the team hotels designated by ASI. The ACC representative shall arrive in the Game city no later than four days prior to the Game. The ACC representative shall not be required to pay more than $165.00, plus tax, per night, for a double standard room at the team hotel. The ACC representative shall depart on or the day after the Game.

**Band Hotel.** The ACC representative agrees to house its institution's pep band, consisting of a minimum of thirty (30) band members, at one of the hotels designated by ASI for a minimum of 120 total room nights. The ACC representative shall not be required to pay more than $130.00, plus tax, per night, for a room at the band hotel. The ACC representative shall depart on or the day after the Game.

8.  **Game Promotion**

(a)  The parties agree that it is the goal of each to seek optimum public awareness of their association in the Game. Each therefore pledges best efforts to publicize the annual participation in the Game by the ACC. Each ACC member will include information on the association in its normal media publications with the new Seattle logos and will otherwise publicize the Game when ever possible. ASI will publicize the association with the ACC to the maximum extent possible.

(b)  All media releases by either party hereto regarding this Agreement or the selection or invitation of a team under this Agreement require the prior approval of the other party.

9.  **Bowl Site Checklist**

Each year by October 30, ASI shall submit to each member of the ACC which is in competition to compete in the Game complete information on the forthcoming Game as set forth in the Bowl Site Checklist contained in the Postseason Football Handbook of the NCAA.

Immediately upon selection, the ACC representative shall provide ASI the information identified in the INSTITUTIONAL FORM as set forth in the Post-Season Football Handbook of the NCAA within two (2) days of said selection.

10. **Radio Policy**

ASI intends to select and designate an official radio broadcaster for the Game. A national or regional radio network awarded official network rights by ASI of the Game may air its broadcast live into any market without exclusivity restrictions, which includes markets that may receive a separate broadcast from the official outlet(s) of a participating ACC institution. In addition to the official radio broadcaster for the Game designated by ASI, it is agreed that only a station and/or network that has originated and/or aired live broadcasts of the ACC participant's home and away games throughout the regular season (the "flagship radio station") and the institutional station (if any) of the ACC representative may broadcast the Game. Any originating station representing a participating ACC institution shall pay ASI $250 or four times the station's highest published one-minute rate, whichever is higher, as published in the current year's Standard Rates and Data (November edition). Any station joining a participating institution's network shall be assessed $75, or three times its highest published one-minute rate, whichever is greater. The flagship radio station of the ACC representative shall receive the credentials necessary for it to originate its broadcast from the Stadium. If permitted, the on-field reporter must have been a part of the regular-season crew. An originating station and/or network shall submit to ASI a notarized affidavit of performance listing all stations on its network before it may originate a game broadcast. An originating station and/or network, shall sign a contract and present a certified check to ASI before it may originate a Game broadcast from the site of the Game.

A noncommercial radio station (if any) of the ACC representative also shall be permitted to originate a broadcast of the Game by paying an origination fee of $125 and shall receive the necessary credentials for such purpose. A noncommercial station, however, that feeds a commercial station shall be charged $250.

11. **Title sponsor**

ASI is soliciting a title sponsor for the Game. After the title sponsor is secured, all parties shall refer to the Game with the title sponsor name included. Wearing or embroidering of the official bowl logo on the participating team jersey is required.

12. **Game Rules**

The Game rules shall be the current football playing rules of the NCAA for the preceding football season.

13. **Game Officials**

The game officials for the Game shall be appointed through procedures administered by the NCAA. In no case may the officials be assigned by or from the assigning agency of either competing team or conference.

14. **Game Ball**

The official football used by each team shall be a football conforming with the NCAA rules.

15. **Attendance at Official Game Functions**

(a) On the day before the Game, institutional personnel and ASI officials, as required by the NCAA, shall attend a pregame meeting. The television format, game timing and other administrative and procedural details shall be reviewed at that time. The "Checklist for Pregame Meeting" of the NCAA shall be reviewed at that meeting.

(b) The ACC representative shall have appropriate representatives, including coaches and players where appropriate, participate in Classics events to include:

   (1) A press opportunity at the airport upon team arrival and a minimum of a daily morning press conference at the hotel;

   (2) The banquet is to include each participating team, its head coach and athletic director and conference representative;

   (3) An awards ceremony and press conference immediately following the Game;

   (4) All official Seattle bowl (Western Bowl) team events;

   (5) An annual early December planning meeting.

16. **Game Management**

The management of the Game shall be under the jurisdiction of ASI. However, ASI shall work closely with the Bowl Committee of the ACC to keep the ACC advised of the status, operation and conduct of the Game. The ACC agrees that each year it will share with ASI the Institutional Bowl Game Report its representative prepares for the NCAA.

17. **Ticket Availability, Requirements**

In accordance with the policies of the NCAA, ASI agrees to make available for purchase by the ACC representative a minimum of one-sixth (1/6) of the tickets available for the Game in the stadium selected by ASI for the site of the game. However, it is agreed the guarantee figure shall be 12,500 tickets. The number of tickets made available, the general location of such tickets and their price(s) shall be equal for both institutions participating in the Game.

The ACC agrees that its representative shall guarantee the purchase of a minimum of 12,500 tickets to the Game. The price of these tickets in 2002 shall be Fifty Dollars ($50.00), plus any applicable sales, admission, or stadium tax. The official Seating Chart of the Game Stadium, with the allocation of the 12,500 tickets for the ACC identified, shall be made available to the ACC by October 30 of each year of this agreement. Of these tickets, the ACC representative will have a minimum of 1000 prime tickets with 250 in a block between the 35-yard line and midfield, and 750 between the 35-yard line and the goal lines. Subsequent yearly ticket pricing shall be determined by May 25 prior to the upcoming Game each year of this Agreement. Ticket prices shall not be raised without the mutual written consent of both ASI and the ACC.

The parties agree that should the ACC representative have unused tickets available as of ten (10) days prior to the Game, it shall immediately so notify ASI so that ASI may attempt to sell first, or donate at last resort, the excess tickets in order to maximize attendance at the Game. The ACC representative shall remain financially responsible for any such tickets which are turned over to ASI and not sold. This guarantee may be assigned by ASI to the financial institution providing the letter of credit to the NCAA for the Game.

Should the Opponent institution have unused tickets available, such tickets first shall be offered to the ACC representative prior to offer to any other party. The ACC representative, however, shall not be obligated to purchase the excess tickets of the Opponent or take them on consignment.

### 18. Pep Band

The ACC representative shall bring its school pep band, consisting of a minimum of thirty (30) band members, to the Game three days prior to the game. The pep band shall remain in the Game city until after the Game is played. All costs, charges and expenses for travel, housing, supplies, equipment or other expenses of the pep band of the ACC representative shall be borne solely by the ACC representative.

### 19. Financial Settlement

Not later than April 1 of the year immediately following the Game, or such date as is then currently required by the NCAA, ASI shall complete a mutually agreed-upon settlement with the participating ACC institution and shall deliver to the ACC the payment due hereunder.

### 20. Team Gifts

ASI shall provide at no cost to the participating institutions 125 team gifts each valued at the NCAA's maximum allowable level for participation in the Game to the ACC representative and to the Opponent team respectively. Additional team gifts may be purchased by the competing institutions with an order form submitted within one week of the invitation to play in

the Game.

21. **Team and Institutional Expense**

All costs, charges and expenses for travel, housing, supplies, equipment of other expenses of the ACC representative team, players, coaches, trainers, officials or band, shall be borne solely by the ACC representative, and shall not be chargeable against any of the receipts or income of the Game. Such similar expenses of the Opponent shall be borne by it and shall not be chargeable against any of the receipts or income of the Game.

22. **Musical compositions, Presentations**

(a) The ACC agrees that its representative will submit a list of all musical compositions which any band affiliated with it may play in the stadium on the day of the Game to ASI's Executive Director at least fourteen (14) days prior to the Game so that clearances may be secured by the Broadcasters, and agrees that if the Broadcasters are unable to clear any of the compositions for performance, the band will not play any composition not cleared.

(b) The ACC representative shall submit the theme and script for its band and other presentations to ASI's Executive Director for approval at least fourteen (14) days prior to the Game.

(c) Neither the band from the ACC representative nor the band from the Opponent institution shall play after the team on offense breaks from the huddle.

23. **Time of Performance and Payments**

Time is of the essence in this Agreement with respect to all provisions hereof specifying a particular time or date for the performance of any act or the exercise of any right or privilege by any of the parties hereto. All payments to be made under the provisions of this Agreement shall be made when due or payable.

24. **Insurance**

(a) If required by the NCAA, ASI shall annually make available loss-of-income insurance for the participating ACC institution to purchase at its option and expense, which shall be deducted from the ACC institution's share of gross receipts.

(b) ASI shall maintain primary comprehensive general liability coverage listing the NCAA, ACC, and its participating representative institution as an additional insured on a general comprehensive liability insurance policy with combined single limits of at least $1

million per occurrence for bodily and property damage.

### 25. Non-Liability of Officers

The persons, the members of the board of directors, and the representatives of the respective parties executing this Agreement on behalf of the parties, respectively, shall incur no personal liability whatsoever by reason of their execution of this Agreement.

### 26. Indemnification

The ACC and ASI respectively agree to indemnify and hold harmless each other against, an in respect of any and all claims, losses, expenses, costs, obligations and liabilities, including reasonable attorneys' fees, either party may incur by reason of any act or omission solely of the other party or any of its respective agents, employees, successors or anyone acting by or on behalf of such party, that constitutes negligence, a breach or default under, or failure to perform, any obligation, duty or liability of that party under this Agreement.

### 27. Force Majeure

(a) If for any reason the Game is prevented from being played or shortened due to weather, war, act of God, national emergency, governmental restriction, preemption for an event of overwhelming public importance, or like cause, the occurrence of which is not within the control of ASI and is generally regarded as "force majeure," then the parties shall negotiate for a pro rata reduction in the Game fees set forth herein, and the ACC and the ACC representative shall be released from any further obligations under this Agreement that remain to be performed as of the occurrence of the force majeure event.

(b) If an ACC representative is unable to participate in the Game after accepting an invitation to represent the ACC in the Game, which inability is occasioned by an unforeseen national or local emergency affecting that team or institution, ASI agrees to first allow the ACC to provide a qualified substitute bowl-eligible ACC representative mutually agreed upon by the ACC and ASI prior to ASI inviting any other institution to take part in the Game, and the ACC shall use its best efforts to provide such a representative. Should ASI acquire a suitable replacement, the ACC shall not be liable to ASI for any damages resulting from the ACC's representative's inability to participate in the Game after accepting an invitation to the Game.

### 28. Entire Agreement

This Agreement contains the entire agreement of the parties hereto. No promise, representation, warranty or covenant not included in this Agreement has been or is being relied upon by either party hereto. Each party has relied or is relying upon by own examination of this Agreement and the documents and contracts referred to herein, the counsel of its own advisors

and the warranties, representations, duties and covenants contained in this Agreement.

### 29. Agreement Not Contrary to Law/Severability

To the best knowledge and belief of the parties hereto, this Agreement contains no provision that is contrary to any federal, state or local law, ruling or regulation. If any provision of this Agreement, or any part thereof, shall at any time be held to be invalid, in whole or in part, under any applicable federal, state or local law, ruling or regulation by a court of competent jurisdiction, or by an administrative agency of the federal, state or local government, or by an arbitrator with proper jurisdiction, then such provision or portion thereof of the provisions and/or agreements, as appropriate, shall remain in effect only to the extent permitted, and the remaining portions thereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

### 30. No Waiver

The failure of a party to seek redress for the violation of or to insist upon strict performance of any provision of this Agreement on any occasion, shall not prevent or dilute such party's right to insist later upon such performance of the same or similar provision or to have redress for the same or similar violation, regardless of such party's prior knowledge, or lack of knowledge, thereof.

### 31. Governing Law

This Agreement shall be governed by the laws of the State of Hawaii.

### 32. Notice

Any written notice required in this Agreement shall be deemed to have been given when personally delivered or deposited in the United States mail, certified or registered mail, postage prepaid, with return receipt requested, addressed to the other party to the Agreement at the address set forth on page 1.

### 33. Authorization

(a)   The ACC warrants that it has full right, power and authority to enter into this Agreement and grant the rights granted to ASI herein, and that the Commissioner of the ACC is authorized to sign this Agreement on the ACC's behalf.

(b)   ASI warrants that it has full right, power and authority to enter into this Agreement and to agree to the terms and conditions granted to the ACC as stated herein.

### 34. Bowl Logo/Merchandising/Marketing

Authorizations. The ACC and ASI authorize each other, on a non-exclusive basis, in games in which they participate, to include their respective names, slogans, logos, seals and/or other identifying marks in the Classics and institution's Classics-related merchandising efforts with the entity requesting said use paying any licensing or royalty fee due the entity owning said rights. It is understood that income derived by ASI in this manner shall become a portion of ASI's gross receipts and shall be distributed in accordance with the existing NCAA rules and regulations. It is the responsibility of the ACC, its member institutions, and ASI to contact one another regarding us of said conference, institutional or ASI marks, logos, seals, mascots, or other identifications, and to contact their respective designated licensor regarding use of said marks and logos. ASI acknowledged that any use of individual ACC member institution's marks, logos and slogans must be secured from that institution.

### 35. Contract with Representative

The ACC acknowledges that prior to the Game, ASI and the ACC representative shall execute a separate letter of agreement per NCAA requirements, however, that contract will incorporate and comply with the provisions of this Agreement.

### 36. Assignment

This Agreement may not be assigned by either party with the sole exception that ASI may assign its interest to the financial institution that issues ASI the letter of credit as required by the NCAA.

### 37. Default

The following shall constitute defaults under this Agreement:

(a) If ASI defaults in the payment of any part of the payment described in section 3 of this Agreement and that default continues more than thirty (30) days after a demand by the ACC to ASI; or

(b) Failure of ASI to provide for national domestic television coverage for the Game; or

(c) If ASI materially breaches any provision of this Agreement other than (a) or (b) above, or the ACC materially breaches any provision of this Agreement, and said breach by ASI or the ACC is not cured within thirty (30) days written notice to the address set forth herein.

### 38. Remedies Upon Default

(a) Upon any default by ASI as set forth in paragraphs (a) or (b) of paragraph 37 above, the ACC shall have the right to:

(1) Terminate and cancel this Agreement and all rights conferred to ASI under this Agreement;

(2) Declare all sums payable under this Agreement for the Game just completed, due and owing, less all amounts already paid for Game just completed.

(b) In addition to the ACC's and ASI's other rights at law and in equity, either party may terminate this Agreement if the other party has materially breached this Agreement or committed an event of default and fails to cure such material breach within thirty (30) days after notice of the breach is sent by the non-breaching party, and fails to demonstrate to the notifying party that such material breach as been cured and did not cause irreparable harm.

Each remedy provided is cumulative and shall be in addition to all other rights or remedies in this Agreement, or in law, equity or bankruptcy.

### 39. No Joint Venture

The relationship created by this Agreement shall not be construed as to create any joint venture or partnership between the ACC and ASI which would make one party liable for the debts, acts or omissions of the other party.

### 40. Modification

This Agreement may only be modified in writing, signed by both the ACC and ASI.

**IN WITNESS WHEREOF**, this Agreement has been duly executed, in duplicate, by the parties hereto, through their officers duly authorized, as of the date first mentioned in this instrument.

"ASI" "SEATTLE BOWL" "WESTERN BOWL"
ALOHA SPORTS INC.

By: *[signature]*

Terry Daw
Chief Executive Officer

"ACC"
ATLANTIC COAST CONFERENCE

By: *[signature]*

John D. Swofford
Commissioner